## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **MAXXIM MEDICAL GROUP, INC.,** | : | |
| <u>et al.</u>, | : | **Case No. 03-10438 (PJW)** |
| | : | |
| **Debtors.** | : | **Jointly Administered** |
| | : | |

: Procedures Hearing Date: September 25, 2003 at 11:00 a.m.

- - - - - - - - - - - - - - - - - - - - - - - - - - -x Procedures Objection Deadline: September 18, 2003 at 4:00 p.m.

### <u>NOTICE OF MOTION</u>

TO:    The United States Trustee, counsel to the agent for the Debtors' prepetition and postpetition secured lenders; counsel to the Committee; and those parties who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure

  The above-captioned debtors and debtors in possession (collectively, the "Debtors") have filed the attached **Motion for Order:  (I) Approving the Sale of the Purchased Assets to the Successful Bidder; (II) Approving Assumption and Assignment Procedures; (III) Approving the Sale Procedures, Including Without Limitation Expense Reimbursement and Breakup Fee; (IV) Approving Form and Manner of Notice; (V) Scheduling a Hearing to Consider the Sale of the Purchased Assets; and (VI) Granting Related Relief** (the "Motion")

  Responses, if any, to the relief requested with respect to the sales procedures contained in the Motion must be filed with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801 on or before <u>September 18, 2003 at 4:00 p.m.</u>

  At the same time, you must also serve a copy of the response on Debtors' undersigned counsel so as to be received no later than <u>September 18, 2003 at 4:00 p.m.</u>

  A HEARING ON THE SALE PROCEDURES PORTION OF THE MOTION WILL BE HELD ON SEPTEMBER 15, 2003 AT 11:00 A.M. (ET) BEFORE THE HONORABLE PETER J. WALSH, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE 6TH FLOOR, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE
COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT
FURTHER NOTICE OR HEARING

Dated: Wilmington, Delaware
September 12, 2003

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Brendan Linehan Shannon (No 3136)
Edward J Kosmowski (No 3849)
Matthew B Lunn (No 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

-and-

WILLKIE FARR & GALLAGHER LLP
Michael J Kelly
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

Co-Counsel for Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **MAXXIM MEDICAL GROUP, INC., et al.,** | : | **Case Nos. 03-10438 (PJW)** |
| | : | **Jointly Administered** |
| **Debtors.** | : | Procedures Hearing Date: September 25, 2003 at 11:00 a.m. |
| | : | Procedures Objection Deadline: September 18, 2003 at 4:00 p.m. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION FOR ORDER: (I) APPROVING THE SALE OF THE PURCHASED ASSETS TO THE SUCCESSFUL BIDDER; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES; (III) APPROVING THE SALE PROCEDURES, INCLUDING, WITHOUT LIMITATION, EXPENSE REIMBURSEMENT AND BREAKUP FEE; (IV) APPROVING FORM AND MANNER OF NOTICE; (V) SCHEDULING A HEARING TO CONSIDER THE SALE OF THE PURCHASED ASSETS; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys, Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP, respectfully represent:

**INTRODUCTION**

1        By this motion (the "Motion"), the Debtors seek the following relief, pursuant to sections 105(a), 363, 365 and 1146(c) of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

A        Initial Hearing

(i)        approval of procedures relating to assumption and assignment of unexpired leases and executory contracts, if any, to be assigned to the Successful Bidder[1] (the "Cure Objection Procedures"),

---

[1]        To the extent not otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Asset Purchase Agreement, the Sale Procedures Order or the proposed Sale Order, each annexed hereto

WP3:926423 2                                    61890 1001

(ii)   approval of the sale procedures (the "Sale Procedures") with respect to the sale of the Purchased Assets (the "Proposed Asset Sale"), including, without limitation, the Expense Reimbursement and Breakup Fee (each as defined herein);

(iii)  scheduling of a second hearing to consider approval of the Proposed Asset Sale (the "Sale Hearing") and setting an objection deadline with respect thereto; and

(iv)   approval of the form and manner of notice of, inter alia, the Sale Hearing, a public auction of the Purchased Assets (the "Auction"), the Sale Procedures and the Cure Objection Procedures

B.   Sale Hearing

(i)    approval of the Proposed Asset Sale to the Successful Bidder and an asset purchase agreement substantially similar to that certain Asset Purchase Agreement, dated as of September 8, 2003, by and among (a) MMI Acquisition Corp (the "Purchaser"), an acquisition entity created and owned by Lightyear Capital LLC; and (b) Maxxim Medical, Inc , a Delaware corporation, and certain of its subsidiaries, each of which is a Debtor herein (collectively, "Maxxim"), with the Ancillary Agreements,

(ii)   approval of the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)  approval of the payment of the Mandatory Repayment (as defined herein) to the Secured Parties (as defined herein) and deposit of the remaining proceeds of the sale (after making any required deposit of the Unsecured Creditors' Fund into an escrow account) in an escrow account for the benefit of the Secured Parties, as adequate protection with respect to the sale of collateral of the Secured Parties

## JURISDICTION

2.    This Court has jurisdiction to consider this Motion pursuant to 28 U S C §§ 157 and 1334  This is a core proceeding pursuant to, among others, 28 U S C § 157(b)(2)(A), (M), (N) and (O)  Venue is proper before this Court pursuant to 28 U S C §§ 1408 and 1409  The statutory bases for the relief requested include sections 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

2

## BACKGROUND

3   On February 11, 2003 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only.

4.   No trustee or examiner has been appointed in these cases. On February 24, 2003, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee") to serve in these cases.

5   Maxxim Medical, Inc, a Texas corporation and one of the Debtors, is a privately held corporation and the sole shareholder of Maxxim Medical Group, Inc ("MMG"), also a Debtor. MMG is the sole shareholder of Maxxim Medical, Inc, a Delaware corporation and a Debtor ("MMI Delaware"). MMI Delaware is the direct or indirect owner of a majority of shares of each of the remaining Debtor corporations and of other non-filing affiliates incorporated in foreign countries (the "Non-Filing Affiliates"). MMI Delaware is also the sole member of Maxxim Medical, LLC, one of the Debtors.

6   As of the Petition Date, the Debtors, together with the Non-Filing Affiliates, were leading developers, manufacturers and marketers of a broad range of single-use specialty medical products primarily used in the operating rooms of hospitals and surgery centers. In particular, the Debtors were leading suppliers of custom procedure trays and non-latex medical examination and surgical gloves to hospitals, surgery centers and other acute care facilities in the United States.

3

## MARKETING EFFORTS

7       Soon after the commencement of these cases, the Debtors began exploring the possibility of an asset sale or merger as a potential exit strategy from chapter 11  With the assistance of their financial advisors, Greenhill & Co. LLC ("Greenhill"), the Debtors approached numerous strategic and financial buyers in an effort to identify a suitable acquiror or merger partner  As a result of these marketing efforts, the Debtors received various offers to purchase substantially all of their assets.  The Debtors have evaluated those offers and have determined that under the circumstances the sale proposal received from the Purchaser is the highest or otherwise best offer received  The Debtors propose to utilize the Purchaser's bid, as memorialized in the Asset Purchase Agreement, dated as of September 8, 2003, among MMI Acquisition Corporation and Maxxim (the "Asset Purchase Agreement"), a copy of which is annexed hereto as Exhibit A, and the Ancillary Agreements, as a "stalking horse" bid (the "Initial Bid")

## PROPOSED ASSET SALE

8       Maxxim and the Purchaser have entered into the Asset Purchase Agreement under which, subject to the Auction, Court approval and other conditions set forth in the Asset Purchase Agreement, the Purchaser will buy the Purchased Assets from Maxxim for a total purchase price of $91,000,000 in cash (as the same may be adjusted, the "Purchase Price"), plus the amount of the Assumed Liabilities.

9       The salient terms of the Asset Purchase Agreement are as follows:[2]

---

[2]      To the extent this summary differs in any way from the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement will control.

4

- <u>Sellers</u>: Maxxim Medical, Inc., a Delaware corporation; Fabritek La Romana, Inc.; Maxxim Investment Management, Inc.; Maxxim Operations East, Inc.; Maxxim Operations West, Inc.; Maxxim Medical, LLC.

- <u>Purchased Assets to be Sold Free and Clear of Liens</u>: The Purchaser shall acquire all of Maxxim's right, title and interest in and to, whether owned directly or indirectly, or to which Maxxim is directly or indirectly entitled, their properties, assets, goodwill, rights and claims of whatever kind and nature, real or personal or mixed, tangible or intangible, known or unknown, actual or contingent and wherever situated, including Maxxim's rights under the Leases, as the same may exist on the Closing Date and to the extent related to the Business, including, among other things, real property, inventory, equipment, accounts receivable, intellectual property and Assigned Contracts (but excluding the Excluded Assets). The Purchased Assets are to be sold free and clear of Liens (as defined herein), to the extent effected by the Sale Order.

- <u>Working Capital Adjustment</u>: The Purchase Price is subject to a post-closing adjustment based on Closing Net Working Capital, up to a maximum of $2.5 million.

- <u>MMI Canada Option</u>: The Purchaser shall acquire an option to purchase all of the issued and outstanding shares of capital stock of Maxxim Medical Canada Limited, a Non-Filing Affiliate ("<u>MMI Canada</u>") for $100. The initial term of the option is six (6) months, with six (6) successive one (1)-month extensions available to the Purchaser.

- <u>Supply Agreement</u>: The Purchaser and MMI Canada shall enter into a supply and distribution agreement, which shall have an initial term of six (6) months commencing on the Closing Date, renewable for six (6) successive one (1)-month periods. The net cash flow of MMI Canada during the term of the Supply Agreement (the "<u>Term</u>") shall inure to the benefit of the Purchaser, provided that the Purchaser will provide funds to MMI Canada necessary so that, at all times during the Term, MMI Canada will not have negative cash flow.

- <u>Employees</u>: The Purchaser has agreed to make an offer to hire all active Business Employees, or to pay severance to those not hired. Although the Purchaser would offer to hire the Debtors' current management, their acceptance of employment is not a condition to closing the transaction.

- <u>Representations and Warranties</u>: Except for any inaccuracy that does not constitute a Material Adverse Change, Maxxim's representations and warranties must be true and correct in all respects on the Closing Date with the same effect as though such representations and warranties were made on or as of the Closing Date, subject to certain exceptions. "Material Adverse Change" means, generally, a condition or circumstance that is or is reasonably

5

likely to be materially adverse to the Business as a whole, subject to certain exceptions. Representations and warranties do not survive closing.

- Excluded Assets: Assets not being sold under the Asset Purchase Agreement include, among other things, any avoidance claims or causes of action available to Maxxim under Chapter 5 of the Bankruptcy Code, intercompany claims and certain identified claims against other parties. In addition, any assets of the Debtors that are not owned by the Sellers will be retained by the Debtors.

10. In addition to the foregoing, the Purchaser has agreed to assume under the Asset Purchase Agreement the following liabilities:

- all Liabilities shown or reflected in the Schedule of Assets and Liabilities, as increased or decreased in the ordinary course of the Business after the Liability Schedule Date, and all like Liabilities incurred after such date in the ordinary course of the Business, in each case, to the extent such Liabilities will be reflected on the Closing Net Working Capital Statement;

- all Liabilities and obligations under any and all Assigned Contracts that are required to be performed or paid on or after the Closing Date and that arise out of the operation of the Business on or after the Closing Date; and

- all Liabilities and obligations arising from and after the Closing Date in connection with the operation of the Business after the Closing Date by the Purchaser or its successors or assigns.

11. There is a need to consummate the sale of the Purchased Assets as rapidly as is practicable in order to preserve the viability of the Debtors' businesses as a going concern and to protect against the deterioration in the value of the Debtors' assets due to uncertainty about their future. Accordingly, the Debtors request that this Court waive the stay of the effectiveness of an order approving the sale and assignment of Maxxim's assets provided in Bankruptcy Rules 6004(g) and 6006(d), respectively.

12. The Debtors believe that the sale of the Purchased Assets will enable the Debtors to maximize the value of their estates. An additional benefit of the Proposed Asset Sale

6

is that it will preserve the jobs of many of the Debtors' employees, many of whom, it is expected, will be offered employment with the Purchaser after the sale is completed

## SALE PROCEDURES

13. While the Debtors believe the Asset Purchase Agreement and the Ancillary Agreements are fair and reasonable, the Debtors believe that the best interests of their estates would be served by conducting an Auction to identify the highest or otherwise best offer for the Purchased Assets. Accordingly, the Debtors seek entry of an order (the "Sale Procedures Order"), substantially in the form annexed hereto as Exhibit B, authorizing the Debtors to adopt the Sale Procedures.

14. The Debtors submit that the Sale Procedures, substantially in the form annexed hereto as Exhibit C, will enable the Debtors to run an efficient and value-maximizing bidding process and, if appropriate, an Auction. Among other things, the Sale Procedures provide that the Successful Bidder must comply with the Sale Procedures and commit to proceed to a closing upon the material terms and conditions set forth in the Asset Purchase Agreement. In addition, the Sale Procedures provide that, subject to the satisfaction of certain conditions, if the Purchaser is not the Successful Bidder, the Purchaser would be eligible to receive a Breakup Fee equal to $2.5 million and/or Expense Reimbursement in an amount not to exceed $750,000.

15. The Sale Procedures Order schedules the date, time and place for the Auction, the Bid Deadline, the Sale Hearing and an objection deadline with respect to the Proposed Asset Sale and the assumption and assignment of the Assigned Contracts. The Sale Procedures Order also approves the notices the Debtors intend to provide of the Proposed Asset Sale, the Sale Procedures and the Cure Objection Procedures.

7

## EXECUTORY CONTRACTS

16. The Debtors seek approval of certain procedures relating to the assumption and assignment of the Assigned Contracts. The leases and executory contracts to be assumed by Maxxim and assigned to the Successful Bidder have not yet been identified. If the Purchaser is the Successful Bidder, the Purchaser would have the right not to take one or more of the executory contracts currently designated to be an Assigned Contract. If another party is the Successful Bidder, said party may request that the Debtors assume and assign executory contracts and unexpired leases other than those designated as Assigned Contracts. Accordingly, the relief requested herein applies to all executory contracts and unexpired leases. The Debtors anticipate that the Assigned Contracts will be identified prior to the Sale Hearing.

17. To facilitate a prompt resolution of cure disputes relating to the Assigned Contracts, the Debtors propose that the Court authorize the Debtors to adopt the Cure Objection Procedures, substantially in the form annexed hereto as Exhibit D. The Debtors submit that the Cure Objection Procedures will help facilitate the resolution of any issues concerning cure amounts and/or the assumability of Assigned Contracts.

18. Generally, the Cure Objection Procedures set a deadline by which each counterparty to any executory contract or unexpired lease of a Debtor must assert any defaults, conditions or pecuniary losses under such agreements as of the Petition Date, which must be cured or otherwise satisfied in accordance with the Bankruptcy Code in order for such agreement to be assumed and assigned. Failure to assert a Cure Objection (as defined in the Cure Objection Procedures) may result in the Court entering an order authorizing the assumption and assignment of such agreement without regard to any objection such party may have, and would constitute a waiver of the right of such party to seek cure of such defaults under the applicable agreement.

8

## SUMMARY OF RELIEF REQUESTED AND BASES THEREFOR

19      By this Motion, the Debtors seek: (i) entry of an order, substantially in the form annexed hereto as Exhibit E, authorizing the Debtors to sell the Purchased Assets to the Successful Bidder pursuant to the Asset Purchase Agreement, as the same may be modified to reflect the terms and conditions of the highest or otherwise best offer; (ii) approval of the Sale Procedures, including, without limitation, the Expense Reimbursement and Breakup Fee, substantially in the form annexed hereto as Exhibit C; (iii) approval of the Cure Objection Procedures, substantially in the form annexed hereto as Exhibit D; (iv) authority to pay the Secured Lenders at Closing from the proceeds of the Proposed Asset Sale, as described herein, as adequate protection; (v) establishment of a hearing and objection deadline with respect to the Sale Procedures Order and the Proposed Asset Sale; (vi) approval of the form and manner of notice of the foregoing; and (vii) granting related relief

### Necessity of Section 363 Sale and
### Section 365 Assumption and Assignment

20      The necessity of the proposed sale and assumption and assignment pursuant to Bankruptcy Code sections 105, 363 and 365 stems from the current state of the Debtors' financial condition and the prospects for continued operation of the Debtors' businesses  The Debtors believe that a sale of substantially all of their assets represents their best option for maximizing the value of the Debtors' estates  At this critical juncture, the Debtors believe that Maxxim's sale of the Purchased Assets to the Purchaser (or a bidder who submits an otherwise higher or otherwise better offer at the Auction), on terms materially consistent with those set forth in the Asset Purchase Agreement and the Ancillary Agreements, is in the best interests of the Debtors, their estates and their creditors

9

61890 1001

### The Proposed Sale of the Debtors' Assets
### Satisfies the Applicable Standards of Section 363(b)

21    The Debtors respectfully submit that the Proposed Asset Sale satisfies the governing standard for asset sales in the Third Circuit  Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate "  11 U S C  § 363(b)(1)  Courts within this Circuit interpreting section 363(b)(1) have held that transactions should be approved under section 363(b)(1) when they are supported by the sound business judgment of management  See In re Montgomery Ward, 242 B R  147, 153 (D  Del  1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"),  see also In re Delaware Hudson Ry.  Co., 124 B R  169, 176 (D  Del  1991) (outlining requirements for sale of assets pursuant to section 363);  In re Phoenix Steel Corp., 82 B R  334, 335-36 (Bankr  D  Del  1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith); see also In re Titusville Country Club, 128 B R  396, 399 (Bankr  W D  Pa 1991); In re Industrial Valley Refrig. & Air Cond.  Supp , 77 B R  15, 20 (Bankr  E D  Pa  1987)

22    The "sound business purpose" test requires a debtor to establish four elements to sell or use property of the estate outside the ordinary course of business:

> (a)    that a "sound business reason" justifies the sale of assets outside the ordinary course of business;
>
> (b)    that adequate and reasonable notice has been provided to interested persons;
>
> (c)    that the debtor has obtained a fair and reasonable price; and
>
> (d)    good faith

See Titusville Country Club, 128 B R at 399; In re Sovereign Estates, Ltd., 104 B R 702, 704 (Bankr E D Pa 1989); Phoenix Steel Corp., 82 B R at 335-36; Industrial Valley, 77 B R at 21 The Proposed Asset Sale is justified under section 363(b) because it unquestionably satisfies all of the factors under the "sound business purpose" test

> (a)     The Proposed Asset Sale is Supported by
>          Sound Business Judgment

23      Based upon an analysis of their ongoing and future business prospects absent a substantial capital infusion, the Debtors have concluded that Maxxim's sale of the Purchased Assets represents the best manner in which to maximize value to creditors of the Debtors' chapter 11 estates   Preservation of enterprise value for the benefit of all constituencies is a compelling circumstance, and maximization of asset value for the benefit of all creditors is a sound business purpose, warranting authorization of the proposed sale of the Purchased Assets Accordingly, the Debtors submit that the Proposed Asset Sale is supported by sound business judgment

> (b)     The Proposed Asset Sale is for a Fair and Reasonable Price

24      The Debtors are confident that their marketing efforts will yield the maximum value for the Purchased Assets   As further assurance that Maxxim has received the highest or otherwise best offer for the Purchased Assets, the Asset Purchase Agreement will be tested through an Auction, consistent with the requirements of the Bankruptcy Code, to the extent other acceptable bids are received in accordance with the proposed Sale Procedures Upon the conclusion of the bidding process and/or the Auction, the Debtors, the Court and all parties in interest can be assured that the Purchased Assets will be sold for their fair market value   Consequently, the fairness and reasonableness of the consideration to be received by the

11

Debtors ultimately will be demonstrated by adequate "market exposure" – the best means for establishing whether a fair and reasonable price is being paid

25    In addition to a fair and reasonable value offered by the Purchaser, the Proposed Asset Sale also is the product of arms-length, good faith negotiations, in which Maxxim bargained for the maximum possible purchase price for the Purchased Assets  The negotiations involved substantial time and energy by the parties and their professionals, and the Asset Purchase Agreement reflects give-and-take and compromises by both sides

> (c)    The Debtors Will Provide Reasonable Notice
> of the Proposed Asset Sale to Interested Parties

26    The Debtors believe that the notice to be provided as discussed herein is sufficient to provide reasonable notice of the Motion, the Auction and the Proposed Asset Sale

> (d)    The Proposed Asset Sale is in Good Faith

27    Any agreement reached as a result of the bidding process, including that of the Purchaser, would be the product of a good faith, arm's length process between Maxxim and such Successful Bidder  In seeking approval of the Proposed Asset Sale, the Debtors must demonstrate to the Court that the Sale Procedures are fair and equitable  Moreover, the Debtors do not intend to solicit bids from entities affiliated with the Debtors or their respective officers and directors  Thus, the Proposed Asset Sale satisfies the good faith element of the "sound business purpose" test  Compare In re After Six, Inc., 154 B R , 876, 883 (Bankr  E D  Pa 1993) (good faith found where officers, directors and employees of debtor had no apparent connection to purchasers) with In re Abbotts Dairies of Pennsylvania, Inc., 788 F 2d 143, 147-48 (3rd Cir  1986) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders "), see also In re Sovereign Estates,

12

Ltd., 104 B.R. at 704 (good faith lacking where proposed settlement agreement benefited non-debtor insiders); Industrial Valley, 77 B.R. at 22 (evidence of inside dealing fatal to good faith requirement)

## Request for Approval of Assumption and
## Assignment of Assigned Contracts to Successful Bidder

28. The Debtors respectfully submit that the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder will satisfy the standards in the Third Circuit governing such actions. As stated above, section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or expired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease in the Third Circuit is whether the debtor's reasonable business judgment supports assumption or rejection. Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.

29. Maxxim submits that any decision to assume and assign an executory contract or unexpired lease following the proposed bidding process and Auction, each of which is intended to generate the greatest value for such assets, will be grounded in sound business judgment. Maxxim intends to satisfy any obligations which remain outstanding under the relevant Assigned Contracts by curing, or providing adequate assurance of prompt cure of such defaults, including any actual pecuniary losses, in accordance with the Cure Objection Procedures. Therefore, Maxxim believes it will satisfy the standards regarding assumption of the Assigned Contracts.

13

30      Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract   See In re Rickel Home Centers, Inc , 209 F 3d 291, 299 (3rd Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate")   Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract     only if the trustee assumes such contract     and adequate assurance of future performance is provided "  11 U S C  § 365(f)(2)   The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B R  524, 538 (Bankr  D N J  1989)

31      In connection with meeting the standard for approval of the Proposed Asset Sale, the Successful Bidder will have to provide adequate assurance of future performance before any of the Assigned Contracts may be assigned   Under the Asset Purchase Agreement, the Purchaser covenants to provide adequate assurance of future performance with respect to the Assigned Contracts   Accordingly, Maxxim fully expects that the Successful Bidder, whether the Purchaser or another entity, will be able to satisfy this standard.

### Request For Approval of Proposed Asset Sale Free and Clear Of Liens, Claims, Encumbrances and Interests is Proper

32      Other than the Assumed Liabilities and Permitted Transferred Liens, the Successful Bidder should not be liable as a successor or otherwise, for any debts or other liabilities of the Debtors or any of their predecessors or affiliates or for any debts, liabilities or other obligations in any way whatsoever relating to or arising from Maxxim's ownership of the Purchased Assets, or Maxxim's  operations or use or ownership of the Purchased Assets arising prior to consummation of the transactions contemplated by the Asset Purchase Agreement  The Debtors seek authority to sell the Purchased Assets free and clear of any and all Liens, Claims or

14

other interests of entities in property of Maxxim's estate other than Permitted Transferred Liens and the Assumed Liabilities (collectively, the "Interests"), provided, however, that the release of Interests by the Secured Parties shall be subject to the conditions described more fully in paragraph 38 herein

33.     Extensive case law exists providing that claims against Maxxim are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer  Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests " The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code  See Folger Adam Security v. DeMatteis/MacGregor, JV, 209 F 3d 252, 259 (3d Cir 2000) In Folger Adam, the Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property " Id at 258

34.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any Interests in such property if:

      (1)     such a sale is permitted under applicable non-bankruptcy law;

      (2)     the party asserting such a lien, claim or interest consents to such sale;

      (3)     the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

      (4)     the interest is the subject of a bona fide dispute; or

      (5)     the party asserting the interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest

11 U S C  363(f) (emphasis added)

15

35      Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant Maxxim's sale of the Purchased Assets free and clear of all Interests  See In re Elliot, 94 B R  at 345 (section 363(f) written in disjunctive, court may approve sale "free and clear" provided at least one of the subsections is met)  The Debtors submit that each Interest satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto  Maxxim accordingly requests that the Purchased Assets be transferred to the Successful Bidder free and clear of all Interests, as described in paragraph 32

36      For obvious reasons, the very purpose of an order purporting to authorize the sale of the Purchased Assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct  Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled to know that the Purchased Assets are not infected with latent claims that will be asserted against the Successful Bidder after the proposed transaction is completed  Existing case law authorizes the issuance of injunctions under these circumstances:

> Courts have long recognized that inherent within the authority to sell property free and clear of liens is the power to enjoin such creditors from pursuing the purchaser of such property  [] Nevertheless, more explicit protection is often needed to effectuate this important aspect of a § 363 sale  In other words, an actual injunction barring creditors from suing a purchaser of estate assets is sometimes necessary and appropriate to give the 'free and clear' aspect of § 363(f) meaning  When this is the case, a court has the power to 'issue an [] order   necessary or appropriate to carry out [§ 363(f), one of] the provisions of the [Bankruptcy Code] '

In re Dow Corning Corp., 198 B R  214, 245 (Bankr  E D  Mich  1996) (citations omitted)  Also, the bankruptcy courts generally recognize that:

16

61890 1001

[Although] § 105(a) neither creates substantive rights nor permits the courts to contravene the Bankruptcy Code,' it is equally clear that under certain circumstances 'a permanent injunction is necessary to 'carry out' the effect of the 'free-and-clear' language [contained in a § 363 sale order] '

W.B.Q. Partnership, 189 B R at 110 See also In re P.K.R. Convalescent Centers, 189 B R 90 (Bankr E D Va 1995) (the bankruptcy court enjoined a creditor from suing the asset purchaser prior to the approval of the sale)

37     In this matter, the Purchaser is understandably unwilling to purchase the Purchased Assets from the Debtors, supposedly free and clear of Interests, only to be forced to repeatedly re-litigate the issue with any individual claimants after the sale is completed Accordingly, any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of these chapter 11 cases

## Request for Authority to Pay Adequate Protection

38     The Debtors request authority to pay the Mandatory Repayment to the Secured Lenders as adequate protection to protect against diminution in the value of the collateral securing their interests  As a condition to the release, discharge and termination of their Interests on the Purchased Assets, the Secured Lenders require, contemporaneously with the closing of the Proposed Asset Sale, the payment of the Mandatory Repayment to the agent (the "Agent") on behalf of the DIP Secured Parties and the Pre-Petition Secured Parties (each as defined in the DIP Order and collectively, the "Secured Parties") (except that if the Debtors do not give written notice of the amount of the Mandatory Repayment to the Purchaser at least two (2) Business Days prior to the Closing, the Interests of the Secured Parties shall be released,

17

terminated and discharged upon the Closing) [3]  The Mandatory Repayment shall be applied in

accordance with the Documents or the Existing Agreements, as applicable (each as defined in the

DIP Order) [4]  The Debtors submit that the payment of the Mandatory Repayment is appropriate

in this case

**The Successful Bidder is a Good Faith Purchaser**
**Under Section 363(m) of the Bankruptcy Code**

39      The Debtors additionally request that the Court find that any Successful

Bidder is entitled to the protections provided by section 363(m) of the Bankruptcy Code in

---

[3]      "DIP Order" means the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U S C §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and (B) to Utilize Cash Collateral Pursuant to 11 U S C §363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U S C §§ 361, 362, 363 and 364

"Mandatory Repayment" shall mean the payment to the Agent, on behalf of the Secured Parties, of $50 million or, if less, the following amount:  the aggregate amount of gross proceeds received by the Debtors from the Sale, after deducting therefrom a reasonable estimate of (i) all cash expenditures by the Debtors from the closing date of the Sale through the effective date of the Debtors' plan of reorganization (the "Plan"), including any purchase price adjustment and closing and transaction costs associated with the Sale, (ii) all priority and administrative expense claims (including reserves therefor) to be payable pursuant to the Plan, (iii) all costs and expenses to be incurred after the effective date of the Plan that relate directly to the liquidation of those remaining assets of the Debtors that are not sold pursuant to the Sale, (iv) all costs and expenses that relate directly to winding-down the Debtors' estates and closing their chapter 11 cases, including the costs and expenses of claims' reconciliation, but excluding the costs and expenses associated with the Liquidating Trust established in accordance with the stipulation and consent order described in footnote 4 below ((i), (ii), (iii) and (iv), collectively the "Emergence Costs"); and (v) if the Bankruptcy Court shall have approved the stipulation and consent order described in footnote 4 below among the Debtors, the Official Committee of Unsecured Creditors and the Secured Parties providing for the creation of an escrow account containing the greater of $2 million and the Percentage Payment (as defined below) (the "Unsecured Creditors' Fund") for the benefit of the unsecured creditors of the Debtors, the amount of the Unsecured Creditors' Fund

[4]      The Debtors, the Creditors' Committee and the Agent are negotiating the terms of a settlement which would provide, among other things, for the (i) creation of an escrow account containing the greater of $2 million and the Percentage Payment (as defined below), and (ii) assignment to a litigation trust of certain avoidance actions and third party claims, in each case for the benefit of unsecured creditors of the Debtors  The settlement is subject to final documentation, execution and court approval  For purposes of this Motion, "Percentage Payment" shall mean a payment equal to 7.5% of the Net Proceeds of the Sale  For this purpose, Net Proceeds means the aggregate amount of gross proceeds received by the Debtors from the Sale (including for this purpose the principal amount of any claims of the lenders assumed by the Purchaser, but excluding any other liabilities assumed by the Purchaser as well as closing and transaction costs associated with the Sale) less the sum of (i) $50 million and (ii) Emergence Costs

18

connection with the Proposed Asset Sale  Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)  of this section of a sale  of property does not affect the validity of a sale  under such authorization to an entity that purchased  such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale  were stayed pending appeal

11 U S C  § 363(m)

      40      Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the transaction is reversed on appeal  By its terms, section 363(m) applies to sales of interests in tangible assets, and a recent opinion by the United States Court of Appeals for the Third Circuit indicates that section 363(m) also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365  See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F 3d 490 (3rd Cir  1998)  In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder with respect to the assignment of the Assigned Contracts pursuant to the Asset Purchase Agreement

      41      As required by section 363(m) of the Bankruptcy Code, the Debtors have acted in good faith in negotiating the Proposed Asset Sale  Although the Bankruptcy Code does not define "good faith purchaser," the Court of Appeals for the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith, and for value' " In re Abbotts Dairies of Pennsylvania, Inc., 788 F 2d at 147  To constitute a lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders " Id. (citations omitted)  Due to the absence of a bright

19

line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings " In re Pisces Leasing Corp., 66 B R  671, 673 (E D N Y  1986)

42     Here, the Asset Purchase Agreement and the Ancillary Agreements were intensely negotiated at arm's-length, in which the Purchaser has, at all times, acted in good faith under the Abbotts Dairy standards  Further, there is no evidence of fraud or collusion in the terms of the Proposed Asset Sale or the Sale Procedures  To the contrary, the Sale Procedures must be approved by the Court  The Debtors will not solicit bids from related companies and do not share corporate officers or directors with those companies they intend to solicit bids from  Other than with respect to the continued employment of the Debtors' employees, the terms of the Asset Purchase Agreement and the Ancillary Agreements do not benefit any insiders of the Debtors  Moreover, the bidding/auction process will allow Maxxim to attain the highest or otherwise best offer for the Purchased Assets  For these reasons, the Debtors respectfully submit that the Debtors and the Successful Bidder have acted in good faith within the meaning ascribed to the term by the Court of Appeals for the Third Circuit

### Relief From Transfer
### Taxes Under Section 1146(c)

43     Section 1146(c) of the Bankruptcy Code provides that the making or delivery of an instrument of transfer under a confirmed chapter 11 plan of reorganization may not be taxed under any law imposing a stamp or similar tax  See 11 U S C  1146(c)  The Debtors are aware of the recent decision by the United States Court of Appeals for the Third Circuit in In re Hechinger Investment Co. of Delaware, Inc., 335 F 3d 243 (3d Cir  2003) (hereinafter "Hechinger") limiting the availability of the waiver of tax liability under Bankruptcy Code section 1146(c)  However, as set forth more fully below, the Debtors respectfully submit

20

that the facts of these chapter 11 cases are materially distinguishable from those presented in Hechinger such that this Court may grant and approve relief under Bankruptcy Code section 1146(c) in this context

       44     In this case, the Proposed Asset Sale is the necessary first step of a two step process The Secured Lenders' willingness to consent to the proposed sale of the Purchased Assets has been conditioned upon the Debtors' agreement to promptly propose a chapter 11 plan Unlike in Hechinger the Proposed Asset Sale here represents the essential precondition to the chapter 11 plan, and the Debtors expect plan confirmation to follow closely upon the heels of approval and closing of the Proposed Asset Sale The short time span that the Debtors anticipate between consummation of the Proposed Asset Sale and the proposal of a chapter 11 plan create a circumstance in which relief under section 1146(c) is warranted. Further, the Debtors propose to escrow any potential taxes that may be subject to Bankruptcy Code section 1146(c) resulting from the Proposed Asset Sale Accordingly, the Debtors reserve the right to request a ruling of this Court that section 1146(c) of the Bankruptcy Code applies to the Proposed Asset Sale

## Cause Exists to Approve the Sale Procedures

       45     The Sale Procedures, providing for, among other things, a Breakup Fee and Expense Reimbursement, are reasonable and appropriate Sellers of assets often employ bidding protections in order to encourage the making of bids A breakup fee is a fee paid by a seller to a potential acquirer of assets in the event the transaction is not consummated or certain conditions in the purchase agreement are not met Bidding protections may also include paying the out-of-pocket expenses incurred by a bidder in arranging the deal, including due diligence expenses, or compensating a bidder for its lost opportunity costs See In re Hupp Industries, Inc., 140 B R 191, 194 (Bankr N D Ohio 1992)

21

46     In this Circuit, a court may approve a breakup fee as an administrative

expense under section 503(b) of the Bankruptcy Code where the fee is "necessary to preserve the

value of the estate " In re O'Brien Envtl. Energy, Inc., 181 F 3d 527, 535 (3d Cir 1999) A

breakup fee may be necessary to preserve the value of the estate if assurance of the fee

"promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited " Id at 537 Moreover:

> if the availability of break-up fees and expenses were to induce a bidder to
> research the value of the debtor and convert that value to a dollar figure on
> which other bidders can rely, the bidder may have provided a benefit to
> the estate by increasing the likelihood that the price at which the debtor is
> sold will reflect its true worth

Id

47     That is the case here  The Debtors have determined in their sound and

reasonable business judgment that the naming of the Purchaser as the "stalking horse" fosters the

auction process and enhances and preserves the value of the Purchased Assets  The Debtors'

current financial condition dictates an expedited sale of the Purchased Assets  The Purchaser has

made it clear that it would not have tendered its initial bid without the assurance of a breakup

fee  The terms of the bid, as contained in the Asset Purchase Agreement, were the product of

rigorous negotiations between the parties  The Breakup Fee is an essential term to the Purchaser,

protecting its considerable investment in negotiating and performing due diligence in support of

the proposed transaction  Accordingly, the Breakup Fee undoubtedly "induced [the Purchaser]

to research the value of the debtor [i e , Maxxim] and to convert that value into a dollar figure on

which other bidders can rely " Id  The Breakup Fee, therefore, may encourage further bidding,

by providing other potential bidders with a benchmark as to Maxxim's value by demonstrating

what the "stalking horse" has proposed as an initial value of the Purchased Assets

22

48    Moreover, the Breakup Fee will not discourage further bidding  O'Brien
181 F 3d at 535 (break-up fees may be impermissible where they would serve to discourage
further bidding by favoring one purchaser over other bidders)  There is no reason to believe that
the existence of a breakup fee will discourage further bidding by other potential purchasers  On
the contrary, the presence of a breakup fee may encourage further bidding by possibly inducing
third party interest where none existed previously  In addition, the Breakup Fee is beneficial to
the Debtors' estates  The Initial Bid will serve as a "stalking horse" which will establish a floor
for further bidding on the Purchased Assets  If the Initial Bid is not the successful bid because
Maxxim has received a higher or otherwise better offer, the Debtors will have benefited from the
floor established by their proposal

49    In addition, the Breakup Fee proposed herein is "reasonably related to the
bidder's efforts and the transaction's magnitude "  Integrated Resources, 147 B R  650, 662-63
(S D N Y  1992), appeal dismissed, 3 F 3d 49 (2d Cir  1993)  The "bidding incentive" here is
not unreasonable in relation to the funding amount  The amount of the Breakup Fee is
approximately 2 7% of the total Purchase Price (i e , the cash purchase price to be paid by the
Purchaser, and not including the Assumed Liabilities)  Furthermore, because the expenses to be
reimbursed consist exclusively of actual, fully documented, reasonable out-of-pocket costs
incurred by the Purchaser and the maximum amount of the Expense Reimbursement is $750,000,
the amount payable from the estate will be directly "related to the bidder's efforts "  Integrated
Resources, 147 B R  at 662-63

50    In comparison to bidding incentives approved in other cases, this request
for a Breakup Fee and Expense Reimbursement is relatively modest  See Integrated Resources,
147 B R  at 662 (break-up fee representing  3 to 3 1% of transaction amount plus reimbursement

23

of expenses upheld; expert testified that outside of bankruptcy break-up fees average 3 3%); In re MobileMedia Communications, Inc., 97-174 (PJW) (Bankr D Del ) (fees of 2 9% and 3 2% upheld)

51. Moreover, should the Debtors determine that another bid submitted by a party other than the Purchaser is the highest or otherwise best offer for the Debtors' assets and enter into an agreement with such Successful Bidder, it would result in a significant gain to the Debtors' estates

52. In these circumstances, the decision of the Debtors, with the input of their professionals, to agree to the Breakup Fee and Expense Reimbursement should be supported See O'Brien, 181 F 3d at 535 (although the business judgment rule is not the governing standard for break-up fee approval, "the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination") As demonstrated above, the Sale Procedures are a necessary tool to encourage bidding for the Purchased Assets and to maximize the value of Maxxim's estate In addition, the proposed Breakup Fee and Expense Reimbursement are reasonable in relation to the efforts expended and to be expended by the Purchaser and the magnitude and significance of the proposed transaction The Debtors believe that the Breakup Fee adequately and reasonably compensates the Purchaser in connection with the Debtors' efforts to sell the Assets and for any lost opportunity costs related to their preparation of the Asset Purchase Agreement in anticipation of a sale of all or substantially all of the assets Accordingly, the Debtors respectfully submit that the Expense Reimbursement and Breakup Fee are reasonable and should be approved by this Court

## FORM, MANNER AND EXTENT OF NOTICE

The Debtors propose the following notice procedures:

24

(i)     Auction and Sale Notice:  Not later than five (5) business days after the entry of the Sale Procedures Order, the Debtors will cause the Auction and Sale Notice, substantially in the form attached hereto as Exhibit F, to be (a) sent by first-class mail postage prepaid to all of the Debtors' creditors and equity interest holders of record, all entities known by the Debtors to have expressed a bona fide interest in acquiring the Purchased Assets, all taxing authorities or recording offices which have a reasonably known interest in the relief requested, the Securities and Exchange Commission, the Office of the United States Trustee, counsel for the Committee, counsel for the Agent, all federal, state and local regulatory authorities with jurisdiction over the Debtors, the United States Attorney for the District of Delaware, all insurers, all non-debtor parties to contracts or leases (executory or otherwise), and otherwise known parties-in-interest in these bankruptcy cases; and (b) published in the national edition of The Wall Street Journal pursuant to Bankruptcy Rule 2002(l)  Such notice is good and proper notice to such interested parties, including those whose identities are unknown to the Debtors.

(ii)    Cure Amount Notice:  Not later than five (5) business days after the entry of the Sale Procedures Order, the Debtors shall cause the Cure Amount Notice, substantially in the form attached to the Motion as Exhibit G, to be served on the non-debtor parties to all unexpired leases, license agreements and executory contracts

54      The content and manner of service proposed herein and the related notices satisfies all sufficiency of notice and adequacy of service requirements set forth in section 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, as well as the general principles of procedural due process  The Debtors submit that the notice they intend to provide of the Sale Procedures, the Cure Objection Procedures, the Auction, the Sale Hearing, the objection deadline relating to the Sale Hearing, and the Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice

25

## CONCLUSION

55     For all the foregoing reasons, the Debtors respectfully request the Court

enter orders, substantially in the forms annexed hereto as <u>Exhibits B and E</u>, and grant such other

and further relief as is just and proper

Dated:   September 12, 2003
         Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Brendan Linehan Shannon (No  3136)
Edward J  Kosmowski (No  3849)
Matthew B  Lunn (No  4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

and

WILLKIE FARR & GALLAGHER LLP
Michael J  Kelly
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

Co-Counsel to the Debtors and Debtors in Possession

26

# EXHIBIT A

ASSET PURCHASE AGREEMENT

AMONG

MAXXIM MEDICAL, INC.,

THE SUBSIDIARIES OF MAXXIM MEDICAL, INC. NAMED HEREIN

AND

MMI ACQUISITION CORP.

Dated as of September 8, 2003

# ARTICLE I.

## DEFINITIONS

Section 1.1. Definitions .................................................................................................................2

# ARTICLE II.

## SALE AND PURCHASE OF PURCHASED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

Section 2.1. Purchase and Sale of Purchased Assets ...............................................................13
Section 2.2. Assumption of Liabilities ......................................................................................13
Section 2.3. Purchase Price .......................................................................................................15
Section 2.4. Adjustment to Purchase Price ...............................................................................15
Section 2.5. Deposit ...................................................................................................................17
Section 2.6. Allocation of Purchase Price .................................................................................17
Section 2.7. Sale at Closing Date ..............................................................................................17
Section 2.8. Discharge of Liens .................................................................................................18
Section 2.9. Casualty and Condemnation .................................................................................18
Section 2.10. Additional Contracts; Assignable Contracts, Licenses, Permits; Rejected Contracts 18

# ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 3.1. Authority of Sellers ...............................................................................................19
Section 3.2. MMI Subsidiary Sellers ........................................................................................20
Section 3.3. No Conflict or Violation ........................................................................................20
Section 3.4. Consents and Approvals ........................................................................................20
Section 3.5. Compliance with Law ............................................................................................20
Section 3.6. Health Care Matters ..............................................................................................21
Section 3.7. Schedule of Assets and Liabilities ........................................................................21
Section 3.8. Material Adverse Change ......................................................................................21
Section 3.9. Assigned Contracts ................................................................................................22
Section 3.10. Intellectual Property ..............................................................................................22
Section 3.11. Labor Relations .....................................................................................................22
Section 3.12. Employee Benefits .................................................................................................23
Section 3.13. Insurance ................................................................................................................24
Section 3.14. Litigation ................................................................................................................24
Section 3.15. Tax Matters ............................................................................................................24
Section 3.16. Interim Operations .................................................................................................25
Section 3.17. Brokers ...................................................................................................................25

i

**Section 3.18.** Environmental Matters.............................................................................25
**Section 3.19.** Accounts Receivable...............................................................................26
**Section 3.20.** Inventories...............................................................................................26
**Section 3.21.** Permits .....................................................................................................26
**Section 3.22.** Customers and Suppliers........................................................................26
**Section 3.23.** Purchased Assets.....................................................................................26
**Section 3.24.** Disclaimer of Additional Representations and Warranties...................27
**Section 3.25.** No Survival .............................................................................................27

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

**Section 4.1.** Authority of the Purchaser .....................................................................27
**Section 4.2.** No Conflict or Violation .........................................................................28
**Section 4.3.** Consents and Approvals .........................................................................28
**Section 4.4.** Financing...................................................................................................28
**Section 4.5.** Litigation...................................................................................................28
**Section 4.6.** Brokers......................................................................................................28
**Section 4.7.** Adequate Assurances Regarding Executory Contracts..........................28
**Section 4.8.** No Survival ..............................................................................................28

## ARTICLE V.

## CERTAIN COVENANTS OF THE SELLERS

**Section 5.1.** Conduct of Business Before the Closing Date.......................................29
**Section 5.2.** Consents and Approvals .........................................................................31
**Section 5.3.** Information and Access ...........................................................................31
**Section 5.4.** Further Assurances...................................................................................31
**Section 5.5.** Reasonable Best Efforts ..........................................................................31
**Section 5.6.** Assignment of Contracts.........................................................................31
**Section 5.7.** Cure of Defaults.......................................................................................31
**Section 5.8.** Accounts Receivable................................................................................32
**Section 5.9.** Maintenance of Accounts ........................................................................32
**Section 5.10.** Rejected Contracts...................................................................................32
**Section 5.11.** Removal of Excluded Assets ..................................................................32
**Section 5.12.** Name Change...........................................................................................32
**Section 5.13.** Maxxim Canada .......................................................................................32
**Section 5.14.** Maxxim Canada Option ..........................................................................32
**Section 5.15.** Consents...................................................................................................32

## ARTICLE VI.

## CERTAIN COVENANTS OF THE PURCHASER

**Section 6.1.** Hart-Scott-Rodino...................................................................................33
**Section 6.2.** Reasonable Best Efforts ..........................................................................33

**Section 6.3.** Consents and Approvals ....................................................................33
**Section 6.4.** Adequate Assurances Regarding Executory Contracts........................33
**Section 6.5.** Performance Under Assigned Contracts ..............................................33
**Section 6.6.** Further Assurances..............................................................................34
**Section 6.7.** Revolving Credit Facility....................................................................34
**Section 6.8.** Maxxim Canada..................................................................................34
**Section 6.9.** Maxxim Canada Option ......................................................................34
**Section 6.10.** Transition Arrangements ....................................................................34

## ARTICLE VII.

## CONDITIONS TO THE SELLERS' OBLIGATIONS

**Section 7.1.** Representations and Warranties..........................................................34
**Section 7.2.** Compliance with Agreement ..............................................................34
**Section 7.3.** Corporate Documents ........................................................................34
**Section 7.4.** Entry of the Approval Order...............................................................35
**Section 7.5.** Entry of the Sale Procedures Order ....................................................35
**Section 7.6.** Hart-Scott-Rodino.............................................................................35
**Section 7.7.** No Order .............................................................................................35
**Section 7.8.** Ancillary Agreements ........................................................................35
**Section 7.9.** Revolving Credit Facility....................................................................35
**Section 7.10.** The Supply Agreement ......................................................................35

## ARTICLE VIII.

## CONDITIONS TO THE PURCHASER'S OBLIGATIONS

**Section 8.1.** Representations and Warranties..........................................................35
**Section 8.2.** Compliance with Agreement ..............................................................36
**Section 8.3.** Consents.............................................................................................36
**Section 8.4.** Corporate Documents ........................................................................36
**Section 8.5.** Non-Foreign Status Certificate ..........................................................36
**Section 8.6.** Entry of the Order ..............................................................................36
**Section 8.7.** Entry of the Sale Procedures Order ....................................................36
**Section 8.8.** Hart-Scott-Rodino.............................................................................36
**Section 8.9.** No Order .............................................................................................36
**Section 8.10.** Ancillary Agreements ........................................................................37
**Section 8.11.** Revolving Credit Facility....................................................................37
**Section 8.12.** The Supply Agreement ......................................................................37

## ARTICLE IX.

## THE CLOSING; BIDDING PROTECTIONS; TERMINATION

**Section 9.1.** The Closing........................................................................................37
**Section 9.2.** Bidding Protections............................................................................37
**Section 9.3.** Bankruptcy Court Orders ...................................................................40

**Section 9.4.** Termination ................................................................................................. 40
**Section 9.5.** Effects of Termination .................................................................................. 41

## ARTICLE X.

### TAXES; INFORMATION

**Section 10.1.** Taxes Related to Purchase of Assets .......................................................... 41
**Section 10.2.** Real Estate Apportionments and Proration of Real and Personal Property Taxes 42
**Section 10.3.** Information and Cooperation ....................................................................... 42
**Section 10.4.** Payment of Excluded Taxes ........................................................................ 42

## ARTICLE XI.

### EMPLOYEES AND EMPLOYEE BENEFIT PLANS

**Section 11.1.** Employment ................................................................................................ 43
**Section 11.2.** Employee Welfare Benefit Plans ................................................................. 43
**Section 11.3.** COBRA ...................................................................................................... 44
**Section 11.4.** 401(k) Plan ................................................................................................. 44
**Section 11.5.** Vacation and Sick Leave ............................................................................ 45
**Section 11.6.** Severance Benefits following the Closing Date .......................................... 46
**Section 11.7.** Sellers' Stock Option Plan .......................................................................... 46
**Section 11.8.** No Third Party Beneficiaries ...................................................................... 46

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

**Section 12.1.** Representations and Warranties .................................................................. 46
**Section 12.2.** Notices ....................................................................................................... 46
**Section 12.3.** Amendments; Waiver ................................................................................. 47
**Section 12.4.** Assignment ................................................................................................ 47
**Section 12.5.** Announcements .......................................................................................... 48
**Section 12.6.** Expenses .................................................................................................... 48
**Section 12.7.** Entire Agreement. ...................................................................................... 48
**Section 12.8.** Descriptive Headings ................................................................................. 48
**Section 12.9.** Counterparts ............................................................................................... 48
**Section 12.10.** Governing Law; Jurisdiction ..................................................................... 48
**Section 12.11.** Construction .............................................................................................. 49
**Section 12.12.** Substantive Consolidation ........................................................................ 49
**Section 12.13.** Severability ............................................................................................... 49

| SCHEDULE NUMBER | SCHEDULE NAME |
|---|---|
| 1.1 | MMI Subsidiary Sellers |
| 1.2 | Excluded Assets |
| 1.3 | Revised 2004-2005 Projections |
| 1.4 | Leases |
| 1.5 | Owned Real Property |
| 1.6 | Schedule of Assets and Liabilities |
| 2.2 | Excluded Liabilities |
| 3.1 | Jurisdictions of Qualification |
| 3.4 | Consents and Approvals |
| 3.5 | Compliance with Law |
| 3.9 | Material Other Contracts |
| 3.10 | Company Intellectual Property |
| 3.11(a) | Labor Relations |
| 3.11(b) | Collective Bargaining Contracts |
| 3.12 | Employee Benefit Plans |
| 3.13 | Insurance |
| 3.14 | Litigation |
| 3.15 | Tax Audits |
| 3.16 | Interim Operations |
| 3.18 | Environmental Matters |
| 3.19 | Accounts Receivable |
| 3.21 | Permits |
| 3.22 | Customers and Suppliers |
| 8.3 | Required Consents |

| EXHIBIT | EXHIBIT NAME |
|---|---|
| A | Assignment and Assumption Agreement |
| A-1 | Assignment and Assumption of Lease Agreement |
| B | Bill of Sale and Assumption Agreement |
| C | Option Agreement |
| D | Term Sheet relating to Revolving Credit Facility |
| E | Adjustment Escrow Agreement |
| F | Deposit Escrow Agreement |
| G | Term Sheet relating to Supply Agreement between Purchaser and Maxxim Canada |
| H | Term Sheet relating to Transition Services |
| I | Approval Order |
| J | Sale Procedures Order |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the **"Agreement"**) is made and entered into as of September 8, 2003 among **Maxxim Medical, Inc.**, a Delaware corporation (**"MMI"**) and a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code, each of the subsidiaries of MMI specified on **Schedule 1.1** (each an **"MMI Subsidiary Seller"** and collectively the **"MMI Subsidiary Sellers"**), each of which is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (MMI, together with the MMI Subsidiary Sellers, each a **"Seller"** and collectively the **"Sellers"**), and MMI Acquisition Corp., a Delaware corporation (the **"Purchaser"**).

## PRELIMINARY STATEMENT

**WHEREAS**, the Sellers, indirectly and directly through the MMI Subsidiary Sellers, are engaged primarily in the business of developing, manufacturing and marketing specialty medical products, including custom procedure trays, surgical and examination gloves, infection control apparel, vascular access and pressure monitoring products, interventional radiology and critical care products, drapes and gowns and providing clinical services (the **"Existing Business"**);

**WHEREAS**, MMI owns all of the issued and outstanding shares of capital stock of each MMI Subsidiary Seller;

**WHEREAS**, on February 11, 2003, the Sellers filed voluntary petitions with the Bankruptcy Court initiating cases under chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell convey, assign, transfer and deliver to the Purchaser, substantially all of the assets of the Business, and the Purchaser will assume, and the Sellers will assign to the Purchaser, certain liabilities of the Business, all on the terms and subject to the conditions set forth herein; and

**WHEREAS**, upon the terms and subject to the conditions set forth herein, and as authorized under sections 105, 363, 365 and 1146 of the Bankruptcy Code, the Purchaser will purchase from the Sellers substantially all of the assets of the Business and the Purchaser will assume from the Sellers certain liabilities of the Business;

**NOW, THEREFORE**, in consideration of the premises and of the mutual representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I.

## DEFINITIONS

**Section 1.1.    Definitions.**  Unless otherwise defined herein, the terms defined in the preamble and the recitals to this Agreement shall have the respective meanings specified therein, and the following terms shall have the meanings specified below:

"**Accounts Receivable**" means any and all accounts receivable, notes and other amounts receivable from third parties, including, without limitation, customers and employees, arising from the conduct of the Business, together with any unpaid financing charges accrued thereon.

"**Additional Contract**" has the meaning set forth in **Section 2.10(a)**.

"**Adjustment Escrow Agreement**" has the meaning set forth in **Section 2.3**.

"**Adjustment Escrow Fund**" has the meaning set forth in **Section 2.10(a)**.

"**Affiliate**" means "affiliate" as defined in Rule 405 promulgated under the Securities Act of 1933, as amended.

"**Agreement**" has the meaning set forth in the preamble and shall include all Schedules and Exhibits attached hereto.

"**Allocation**" has the meaning set forth in **Section 2.6(a)**.

"**Ancillary Agreements**" means, collectively, the Adjustment Escrow Agreement, Assignment and Assumption Agreement, the Bill of Sale and Assumption Agreement, the Deposit Escrow Agreement and the Option Agreement.

"**Approval Order**" has the meaning set forth in **Section 7.4**.

"**Assignable Contract, License or Permit**" has the meaning set forth in **Section 2.10**.

"**Assigned Contracts**" means the Leases and the Other Contracts (other than Rejected Contracts).

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement to be executed at Closing by the Purchaser and the Sellers in substantially the form attached hereto as **Exhibit A**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.2**.

"**Bankruptcy Code**" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101, *et seq.*

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

**"Bill of Sale and Assumption Agreement"** means the Bill of Sale and Assumption Agreement to be executed at Closing by the Purchaser and the Sellers in substantially the form attached hereto as **Exhibit B**.

**"Break-Up Fee"** has the meaning set forth in **Section 9.2(c)**.

**"Business"** means that portion of the Existing Business constituting or conducted with the Purchased Assets. For the avoidance of doubt, the term **"Business"** shall not include the portion of the Existing Business conducted by Maxxim Canada.

**"Business Day"** means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in the city of New York.

**"Business Employees"** means employees of the Sellers who, on the applicable date, perform services primarily for the Business.

**"Cases"** means the chapter 11 cases of each of the Sellers pending in the Bankruptcy Court and being jointly administered for procedural purposes as In re Maxxim Medical Group, Inc., et al., Case No. 03-10438 (PJW).

**"Closing"** has the meaning set forth in **Section 9.1**.

**"Closing Date"** has the meaning set forth in **Section 9.1**.

**"Closing Net Working Capital"** has the meaning set forth in **Section 2.4**.

**"Closing Net Working Capital Statement"** has the meaning set forth in **Section 2.4**.

**"COBRA"** has the meaning set forth in **Section 3.12(f)**.

**"Code"** means the Internal Revenue Code of 1986, as heretofore or hereafter amended.

**"Company Intellectual Property"** has the meaning set forth in **Section 3.10.**

**"Confidentiality Agreement"** means the confidentiality agreement dated March 20, 2003 between Maxxim Medical, Inc., a Texas corporation and Lightyear Capital LLC.

**"Deposit"** means the deposit delivered by the Purchaser to MMI on the date hereof, to be held and applied as provided in **Section 2.5**, together with any interest thereon earned as provided in such Section.

**"Deposit Escrow Agreement"** has the meaning set forth in Section 2.5(a).

**"DIP Lenders"** means JPMorgan Chase Bank and the other financial institutions from time to time party to the Revolving Credit and Guaranty Agreement.

**"Environmental Claim"** means any and all actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, notices of liability or potential liability, investigations, proceedings, consent orders or consent agreements, by, from or with any Person, relating in any way to an Environmental Law, and Environmental Permit or any Hazardous Material.

**"Environmental Laws"** means all United States federal, state and local and non-United States Laws, and consent decrees and consent agreements, in effect and as amended prior to or as of the Closing, concerning the pollution or protection of the environment, health and safety as such relate to exposure to Hazardous Materials and natural resource damages.

**"Environmental Permits"** has the meaning set forth in **Section 3.18(b)**.

**"Equipment and Fixtures"** means, to the extent used in the Business, (a) building operating systems and equipment, other systems and equipment, furniture, furnishings, fixtures, trade fixtures and improvements, selling and other supplies and any other tangible personal property, including items leased by the Sellers, and (b) to the extent assignable, any rights of the Sellers to the warranties, licenses and other similar rights with respect thereto.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Escrow Agent"** has the meaning set forth in **Section 2.3**.

**"Excluded Assets"** means (a) any cash in the bank accounts of the Sellers or cash equivalents (including for this purpose all collected funds (including checks), as of 12:01 a.m., New York City time, on the Closing Date received in lockboxes of the Sellers), (b) any capital stock, securities or other interests held by any Seller in any subsidiary thereof or any other Person, (c) corporate seals, minute books, charter documents, corporate stock record books, original Tax and financial records and such other books and records as pertain to the organization, existence or share capitalization of any of the Sellers, (d) any rights of the Sellers or any of their Affiliates to any refunds of Taxes due to (or to be claimed by) the Sellers or any of their Affiliates in respect of Excluded Taxes except to the extent Liabilities with respect to such Excluded Taxes constitute Assumed Liabilities, (e) any assets of any Plan maintained by any Seller or any of its Affiliates, unless such Plan is required to be assumed pursuant to Article XI or to the extent that any assets relating to any Plan are transferred to any plan maintained by the Purchaser pursuant to Article XI, (f) except as otherwise provided on Schedule 1.6, any property, casualty, workers' compensation or other insurance policy or related insurance services contract relating to any Seller or any of its Affiliates or any of such Seller's property and any rights (including prepaid premiums and deposits) of any Seller or any of its Affiliates under such insurance policy or contract, in each case to the extent relating to periods prior

to the Closing Date, (g) any rights of the Sellers under this Agreement, the Ancillary Agreements or any other agreement between any Seller and the Purchaser, (h) any assets, or other rights of any Seller which do not relate to the Business, (i) intercompany claims of the Sellers, including claims involving non-debtor Affiliates, (j) any asset of any Seller that would constitute Purchased Assets (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (1) in the ordinary course of the Business and not in violation of the terms of this Agreement or (2) as otherwise permitted by the terms of this Agreement, (k) except as otherwise provided in **Section 2.10**, the Premium Finance Agreement listed in section (d) on **Schedule 3.4** and any agreement, license or permit listed in section (a) or (c) on **Schedule 3.4**, to the extent any such agreement, license or permit is non-assignable, (l) any books, records and information related primarily to any of the Excluded Assets or Excluded Liabilities, provided that the Sellers shall deliver to the Purchaser and the Purchaser shall be entitled to retain copies of such books, records and information to the extent they relate to the Purchased Assets or Assumed Liabilities or are otherwise required in the operation or administration of the Business, (m) without limiting the generality of the other provisions of this definition, any assets, properties, claims or rights of the Sellers listed on **Schedule 1.2**, (n) any avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code, including actions to avoid transfers pursuant to section 502, 510, 541, 542, 544, 545, 547, 548, 549 or 550-553 of the Bankruptcy Code or to recover property transferred pursuant to section 550 of the Bankruptcy Code, and (o) without limiting any of the foregoing, any of the following, to the extent that they relate solely to any Excluded Assets or Excluded Liabilities: contracts, licenses, permits, approvals, claims, deposits, prepayments, prepaid assets, refunds, causes of action, rights of recovery, rights of setoff and rights of recoupment of the Sellers as of the Closing Date.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.2.**

"**Excluded Taxes**" shall mean (a) all Income Taxes owed by the Sellers or any of their Affiliates for any period, (b) all Taxes relating to the Excluded Assets or Excluded Liabilities for any period, (c) all Taxes relating to the Purchased Assets, the Business or the Assumed Liabilities for any Pre-Closing Period and (d) all Taxes of the Sellers or any other Person by reason of being a member of a consolidated, combined, unitary or affiliated group that includes any Seller or other Person prior to the Closing, by reason of a tax sharing, tax indemnity or similar agreement entered into by any Seller or any of its present or past Affiliates prior to the Closing (other than this Agreement) or by reason of transferee or successor liability arising in respect of a transaction undertaken by any Seller or any of its present or past Affiliates prior to the Closing.

"**Executory Contracts**" means all Assigned Contracts entered into by or assigned to a Seller before the Petition Date and which are executory or unexpired as of the Closing Date.

"**Existing Business**" has the meaning set forth in the recitals hereto.

"**Expense Reimbursement**" has the meaning set forth in **Section 9.2(c)**.

**"Federal Funds Rate"** means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York.

**"GAAP"** means United States generally accepted accounting principles, as in effect from time to time.

**"Governmental Agency"** means (a) any international, foreign, federal, state, county, local or municipal governmental or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

**"Governmental Order"** means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

**"Hazardous Material"** means (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Law, and (c) any other chemical, material or substance which is regulated by any Environmental Law.

**"HSR Act"** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

**"Income Taxes"** shall mean Taxes imposed on or measured by reference to gross or net income or receipts, and franchise, net worth, capital or other doing business Taxes.

**"Independent Accounting Firm"** has the meaning set forth in **Section 2.4(a)**.

**"Intellectual Property"** means trademarks, service marks, domain names, brand names, logos, trade names, trade dress, label designs, copyrights, customer lists, art work, patents, patent applications, developments, research data, test procedures, marketing plans, processes, confidential information, inventions (whether or not patentable), discoveries, business methods, trade secrets, registrations and applications for registrations thereof, goodwill and rights in computer software, technology and know-how; and all rights granted or retained in licenses under any of the foregoing; and all other intellectual and intangible property rights (including applications for, and extensions and reissuances of, any of the foregoing and the rights therein) and all claims for past infringements.

**"Inventory"** means all stock in trade, merchandise, goods, supplies and other products, raw materials, work-in-process and finished products related primarily to the Business, together with all rights against suppliers of such inventories (including claims receivable for rejected inventory), and all prepayments and amounts paid on deposit with respect to the same (including any of the foregoing owned by the Sellers but at metered customer locations or in the possession of manufacturers, suppliers or dealers or in transit or returned goods).

**"IRS"** means the Internal Revenue Service of the United States Department of the Treasury.

**"Knowledge"** as applied to any Seller means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of MMI and as applied to the Purchaser means the actual knowledge of the corresponding officers of the Purchaser, in each case after (i) reasonable inquiry of the officers of MMI and the Purchaser, as applicable, having responsibility over the matter in question and (ii) reasonable review of the files of MMI and the Purchaser, as applicable, relating to the matter in question.

**"Law"** means any federal, state, local or foreign statute, law (including Environmental Laws), ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Agency, or other requirement or rule of law.

**"Leased Property"** means all of the Sellers' right, title and interest, as tenant or sub-tenant, under the real property Leases described on **Schedule 1.4**.

**"Leases"** means those real property leases and equipment leases more particularly described on **Schedule 1.4**.

**"Liability"** means any indebtedness, obligation or other liability (whether known or unknown, asserted or unasserted, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

**"Liability Schedule Date"** means July 27, 2003.

**"Licenses"** means all approvals, agreements, authorizations, permits (including Environmental Permits), licenses, easements, orders, certificates, registrations, franchises, qualifications, leases, rulings, waivers, variances or other form of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Agency.

**"Lien"** means any lien (including environmental and Tax liens), claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, encumbrance, reversion, reverter, preferential arrangement, deemed or statutory trusts, right of first refusal, option to purchase, restrictive covenant, condition or restriction of any kind, including any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership and any agreement or commitment to create or suffer any of the foregoing.

7

**"Material Adverse Change"** means any condition, circumstance or change in, or effect on, the Business or the Sellers, that, individually or in the aggregate, is or is reasonably likely to be materially adverse to the business, operations, assets or liabilities, results of operations, or condition (financial or otherwise) of the Business, taken as a whole, other than any condition, circumstance, change or effect arising or resulting from (a) general economic or political conditions, events, circumstances, changes or effects which do not have a materially disproportionate effect on the Sellers, taken as a whole, (b) acts of war, terrorism or other like acts of hostility, (c) conditions affecting the medical supply industry generally which do not have a materially disproportionate effect on the Sellers, taken as a whole, and (d) matters reflected in the pro forma projected financial results contained in the Revised 2004-2005 Projections.

**"Material Other Contracts"** means Other Contracts (other than those terminable by a Seller within 90 days without penalty) (a) from which the Sellers received revenues from the other party or parties thereto, or made payments to such other party or parties, that exceeded $250,000 for the year ended December 31, 2002 or that could reasonably be expected to result in revenues or payments, as the case may be, in excess of such amount for the year ending December 31, 2003 or (b) in the case of Other Contracts not involving the purchase or sale of goods or services, that are deemed by management of the Sellers to be material to the Business.

**"Maxxim Canada"** shall mean Maxxim Medical Canada Limited, a corporation organized and existing under the laws of Canada.

**"Maxxim Canada Option"** shall mean an option to purchase all of the issued and outstanding shares of the capital stock of Maxxim Canada, which option shall be substantially in the form of the agreement attached hereto as **Exhibit C**.

**"MMI"** has the meaning set forth in the preamble.

**"MMI Subsidiary Sellers"** has the meaning set forth in the preamble.

**"MMI Superior Proposal"** has the meaning set forth in **Section 9.2(b)**.

**"Net Working Capital"** means the working capital assets included in the Purchased Assets minus the working capital liabilities included in the Assumed Liabilities (including Taxes), determined in accordance with GAAP consistently applied and the Schedule of Assets and Liabilities, the amount and calculation of Net Working Capital as of the Liability Schedule Date being set forth in the Schedule of Assets and Liabilities. In determining the working capital assets and the working capital liabilities hereunder, (a) only the accounts reflected on the Schedule of Assets and Liabilities shall be taken into account regardless of their amount and all known errors and omissions shall be corrected, (b) all known proper adjustments to such accounts shall be made and (c) all levels of reserves for any known and quantifiable liabilities and obligations shall be maintained unless a change in underlying circumstances necessitates a change in the levels of reserves.

**"Other Contracts"** means, collectively, all contracts, agreements, commitments, arrangements, instruments, guaranties, bids and proposals to which any Seller is a party and relating to the Business as of the Closing Date, all unfilled orders outstanding as of the Closing Date for the purchase of goods or services by any Seller relating to the Business and all unfilled orders outstanding as of the Closing Date for the sale of goods or services by any Seller in connection with the Business; provided, however, that Other Contracts shall not include (a) Leases, Excluded Assets or Excluded Liabilities, (b) agreements relating to the provision of professional or other services to the Sellers in connection with the Cases, and (c) such contracts, the assignment of which requires consent of the other party thereto pursuant to Section 365(c)(1) of the Bankruptcy Code, which consent has not been obtained as of the Closing Date, subject to Sections 2.10, 5.5 and 5.15 hereof.

**"Owned Real Property"** means all of each Seller's right, title and interest in and to the real property described on **Schedule 1.5**.

**"Parent"** means Maxxim Medical, Inc., a Texas corporation.

**"Permit"** means any permit, approval, authorization, license, variance or permission required by a Governmental Agency under any applicable Law.

**"Permitted Liens"** means, with respect to (a) any Purchased Asset, liens for Taxes that are not yet delinquent or that the Sellers are contesting in good faith, (b) insurance policies and premiums, liens incurred in connection with the Premium Finance Agreement listed in section (d) on **Schedule 3.4**, and, (c) the Owned Real Property, the Leased Property and personal property: (i) any covenants, conditions, restrictions, easements, encroachments, encumbrances, rights-of-way, reversions, rights of first refusal, options to purchase or other imperfections of title with respect to any such asset which, individually or in the aggregate, does not materially detract from the value of, or materially interfere with the present operation or use of, such asset or which, in the case of Leased Property, are set forth in the respective Leases, (ii) mechanics', carriers', workers', repairers', materialmen's and similar liens with respect to amounts that are not yet due and payable or that the Sellers are contesting in good faith and (iii) zoning, entitlement, building and other land use regulations imposed by a Governmental Agency.

**"Person"** means any individual, partnership, firm, corporation, trust, association, limited liability company, joint venture, estate, unincorporated organization, group, Governmental Agency or other entity.

**"Petition Date"** means February 11, 2003.

**"Plan"** has the meaning set forth in **Section 3.12(a)**.

**"Post-Closing Period"** shall mean any taxable period (or portion thereof) beginning on or after the Closing Date.

**"Pre-Closing Period"** shall mean any taxable period (or portion thereof) ending prior to the Closing Date.

**"Property Taxes"** shall mean real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the level of any item.

**"Proposed Adjustments"** has the meaning set forth in **Section 2.4(a)**.

**"Purchase Price"** has the meaning set forth in **Section 2.3**.

**"Purchased Assets"** means all of the Sellers' right, title and interest in and to, whether owned directly or indirectly, or to which the Sellers are directly or indirectly entitled, their properties, assets, goodwill, rights and claims of whatever kind and nature, real or personal or mixed, tangible or intangible, known or unknown, actual or contingent and wherever situated, including the Sellers' rights under the Leases, as the same may exist on the Closing Date and to the extent related to the Business, including the following:

(a)      all Leases, Leased Property and improvements and other appurtenances thereto and rights in respect thereof;

(b)      all Owned Real Property (together with the buildings, structures, fixtures and all other improvements thereto);

(c)      all Inventories of the Business (including Inventory in transit) and other tangible personal property used in the Business;

(d)      all Equipment and Fixtures;

(e)      all rights to products sold or leased and to any products or services under research or development for the Business prior to or on the Closing Date;

(f)      **[Intentionally Omitted]**

(g)      all Accounts Receivable of the Business, including construction allowances from landlords under Leases, vendor credits pursuant to Assigned Contracts and, in each case, all proceeds thereof (other than the proceeds of Accounts Receivable described in clause (a) of the definition of **"Excluded Assets"**);

(h)      all Company Intellectual Property and copies and tangible embodiments thereof in whatever form or medium, including the items listed on **Schedule 3.10**, including all rights to the corporate name "Maxxim Medical" as well as all goodwill associated with the Business and all rights to sue and recover damages for past, present and future infringement, misappropriation, dilution, or other violation of the Company Intellectual Property listed on **Schedule 3.10**;

(i)      all right, title and interest in, to and under the Assigned Contracts;

(j)      all books and records relating to the Business (including such books and records as are contained in computerized storage media), including books and records related to Inventory, purchasing, accounting, sales, manufacturing, pricing, research and

development, quality control, engineering, maintenance, repairs, marketing, banking, Company Intellectual Property, shipping records, personnel files for Transferred Employees and all files, customer and supplier lists, records, literature and correspondence related to the Business; provided, however, that the Sellers shall be entitled to make and retain copies of such books and records to the extent they relate to Excluded Assets or Excluded Liabilities or are otherwise required in the administration of the estates of the Sellers and their Affiliates and the Cases;

      (k)     to the extent legally assignable, all Permits;

      (l)     the Maxxim Canada Option;

      (m)     to the extent that any of the following relate to any Assumed Liability or any of the Purchased Assets: contracts, licenses, approvals, claims, deposits, prepayments, prepaid assets, refunds (excluding Tax refunds in respect of Excluded Taxes), causes of action, rights of recovery, rights of setoff and rights of recoupment of the Sellers as of the Closing Date;

      (n)     all lock boxes of the Sellers (excluding the cash described in clause (a) of the definition of "Excluded Assets") and all cash received by the Sellers from collection of Accounts Receivables on or after the Closing Date other than cash from checks received by the Sellers prior to the Closing Date;

      (o)     all computer systems, programs, networks, hardware, software, software engines, databases, operating systems, Internet Web sites, Web site content and links and equipment used to process, store, maintain and operate data, information and functions (**"IT Systems"**) owned by a Seller and primarily used in the Business, including systems to operate payroll, accounting, billing/receivable, payables, inventory, asset tracking, customer service and human resources functions (the **"Transferred IT Systems"**);

      (p)     all confidentiality, noncompetition or nondisclosure agreements executed by vendors, suppliers or employees of Sellers or other third parties (including other bidders), or otherwise executed in favor of any of the Sellers, in each case relating to the Business, the Purchased Assets or the Assumed Liabilities;

      (q)     all rights of any Seller associated with the Assumed Liabilities; and

      (r)     all other assets reflected in the Schedule of Assets and Liabilities, except to the extent disposed of since the Liability Schedule Date in the ordinary course of business and in compliance with the terms of this Agreement;

in each case, as the same may exist on the Closing Date; provided, however, that notwithstanding any of the foregoing provisions of this definition, the Purchased Assets shall not include any Excluded Assets.

      **"Purchaser"** has the meaning set forth in the preamble.

      **"Purchaser Objection Notice"** has the meaning set forth in **Section 2.4(a)**.

"**Purchaser Savings Plan**" has the meaning set forth in **Section 11.4**.

"**Rejected Contract**" has the meaning set forth in **Section 2.10(b)**.

"**Revised 2004-2005 Projections**" means the projections attached hereto as **Schedule 1.3**.

"**Revolving Credit and Guaranty Agreement**" means the Revolving Credit and Guaranty Agreement, dated as of February 14, 2003, as the same has been and may be amended or modified, among Maxxim Medical Group, Inc., a Delaware corporation, as borrower, Parent, the subsidiaries of Maxxim Medical Group, Inc., the DIP Lenders and JPMorgan Chase Bank, for itself and as fronting bank, administrative agent and collateral agent for the other financial institutions named therein.

"**Revolving Credit Facility**" means one or more agreements providing for a $15,000,000 revolving credit facility, including letters of credit, to be entered into prior to the Closing Date between the Purchaser and certain of the existing lenders of the Sellers substantially on the terms set forth in the term sheet attached hereto as **Exhibit D**.

"**Sale Hearing**" has the meaning set forth in the Sale Procedures Order.

"**Sale Procedures Order**" has the meaning set forth in **Section 9.3(a)**.

"**Schedule of Assets and Liabilities**" means the Schedule of Assets and Liabilities of the Sellers as of July 27, 2003, determined in accordance with GAAP and consistent with past practices attached hereto as **Schedule 1.6**.

"**Schedules**" means the various Schedules referred to in this Agreement delivered separately to the Purchaser on or before the date of this Agreement.

"**Seller**" or "**Sellers**" has the meaning set forth in the preamble.

"**Seller Savings Plan**" has the meaning set forth in **Section 11.4**.

"**Straddle Period**" shall mean any taxable period beginning prior to and ending after the Closing Date.

"**Successful Bidder**" has the meaning set forth in the Sale Procedures Order.

"**Supply Agreement**" has the meaning set forth in **Section 5.12**.

"**Tax Return**" means any report, return, declaration, election, claim for refund, information return or other information, statement or form supplied required to be supplied to a taxing authority in connection with Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" means all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional

amounts imposed with respect thereto) imposed by any government or taxing authority, including, without limitation, income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, social security, unemployment, disability, real property, personal property, registration and alternative or add-on minimum, estimated or other tax.

**"Transaction Taxes"** has the meaning set forth in **Section 10.1**.

**"Transferred Employees"** has the meaning set forth in **Section 11.1(b)**.

**"Transferred IT Systems"** has the meaning set forth in the definition of Purchased Assets.

**"WARN"** has the meaning set forth in **Section 11.1(a)**.

## ARTICLE II.

## SALE AND PURCHASE OF PURCHASED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

**Section 2.1.    Purchase and Sale of Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall purchase from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver to the Purchaser, all of the Sellers' right, title and interest in and to the Purchased Assets free and clear of all Liens to the extent effected by the Approval Order.

**Section 2.2.    Assumption of Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, from and after the Closing, the Purchaser will assume and pay, perform, discharge, hold the Sellers harmless against and be responsible solely for the following Liabilities of the Sellers (the **"Assumed Liabilities"**) and no other Liabilities:

(a)    all Liabilities shown or reflected in the Schedule of Assets and Liabilities, as increased or decreased in the ordinary course of the Business after the Liability Schedule Date, and all like Liabilities incurred after such date in the ordinary course of the Business, in each case, to the extent such Liabilities will be reflected on the Closing Net Working Capital Statement;

(b)    all Liabilities and obligations under any and all Assigned Contracts that are required to be performed or paid on or after the Closing Date and that arise out of the operation of the Business on or after the Closing Date; and

(c)    all Liabilities and obligations arising from and after the Closing Date in connection with the operation of the Business after the Closing Date by the Purchaser or its successors or assigns.

Notwithstanding the preceding clauses (a) through (c), Assumed Liabilities shall not include, to the extent not shown or reflected in the Schedule of Assets and Liabilities, (i) Liabilities with respect to Excluded Taxes (except to the extent specifically identified and

reserved for in the Schedule of Assets and Liabilities), (ii) Liabilities of the Sellers relating to any pending or threatened litigation or legal proceeding arising out of the operation of the Business or relating to any state of facts existing or occurring prior to the Closing Date, including those items listed on **Schedule 3.14**, (iii) cure obligations pursuant to **Section 5.7** and all other obligations of the Sellers under the Assigned Contracts arising prior to the Closing Date and required to be performed thereunder prior to the Closing Date, other than those specifically assumed by the Purchaser, (iv) Liabilities set forth on **Schedule 2.2**, (v) any Liabilities arising out of or relating to the use, condition or ownership of the Purchased Assets or the operation of the Business by Sellers or any other Person (other than the Purchaser), including, without limitation, Liability for personal injury of customers or employees at any time prior to the Closing Date, (vi) any Liabilities for infringement, misappropriation, dilution or other violation of Intellectual Property rights arising out of or relating to any event or state of facts occurring or existing prior to the Closing Date, (vii) any Liabilities relating to (A) any Hazardous Material at, on, under, migrating to or from, or transported to or from the Owned Real Property or the Leased Property, prior to the Closing Date, (B) any Environmental Claim arising at any time that relates to the Business, the Owned Real Property or the Leased Property, prior to the Closing Date or (C) any noncompliance with or violation of any applicable Environmental Law or Environmental Permit relating in any way to the Business prior to the Closing Date, (viii) any Liabilities of any Seller arising out of or relating to the organizational documents of such Seller, including any obligation to indemnify any Person, (ix) any Liabilities arising out of or relating to any Rejected Contract; (x) any Liabilities arising out of or relating to any Plan or any Transferred Employee, except as provided in **Article XI,** and (xi) any Liabilities arising out of or relating to any Excluded Asset. For the avoidance of doubt, Assumed Liabilities shall include all unfilled orders as of the Closing Date for the purchase by any Seller of goods or services or both goods and services relating to the Business.

The Excluded Liabilities shall include all Liabilities, whether asserted before, on or after the Closing, for any breach of a representation, warranty, covenant or agreement, or for any claim of indemnification, contained in any lease, contract, license, commitment, agreement or arrangement that the Purchaser has agreed to succeed to or assume, to the extent that such breach or claim arises out of or by virtue of any Seller's performance or nonperformance thereunder on or prior to the Closing, it being understood that, as between the parties hereto, the foregoing shall apply notwithstanding any provision which may be contained in, or any form of consent to the assignment of, any such lease, contract, license, commitment, agreement, or arrangement which by its terms imposes such Liabilities upon the Purchaser and to which succession or assignment is accepted by the Purchaser notwithstanding the presence of such a provision; and all such Liabilities shall constitute Excluded Liabilities as defined below.

All Liabilities and obligations of any kind whatsoever of the Sellers not expressly assumed by the Purchaser pursuant to **Section 2.2**, including the Liabilities set forth in the preceding paragraphs, whether or not incurred or accrued, whether asserted before, on or after the Closing Date, shall be retained by the Sellers, who shall be responsible for paying, performing and discharging such liabilities and obligations when due, and the Purchaser shall not assume or have any responsibility for, such Liabilities and obligations, and such Liabilities and obligations are hereinafter referred to as the **"Excluded Liabilities."** The Purchaser shall not assume or pay, perform or discharge, or hold the Sellers harmless against, or be responsible for, any of the Excluded Liabilities.

**Section 2.3. Purchase Price.** Subject to the provisions of **Section 2.4**, the total purchase price for the Purchased Assets is $91,000,000, payable in cash (as the same may be adjusted, the **"Purchase Price"**), plus the amount of the Assumed Liabilities. The Purchase Price shall be paid to the Sellers, subject to the conditions set forth in this Agreement, at the Closing, as follows: (a) $2,500,000 (the **"Adjustment Escrow Fund"**) shall be paid by the Purchaser in cash to The Bank of New York, as escrow agent (the **"Escrow Agent"**), on the Closing Date as security for any Liability of Sellers pursuant to the purchase price adjustment in **Section 2.4** below, (b) the balance of the Purchase Price less the Deposit shall be paid to the Sellers in immediately available funds, by wire transfer to an account or accounts designated by the Sellers in accordance with the Approval Order and (c) the Escrow Agent shall deliver the Deposit to the Sellers in immediately available funds, by wire transfer to an account or accounts designated by the Sellers. The Adjustment Escrow Fund shall be held by the Escrow Agent pursuant to the terms and conditions of the Adjustment Escrow Agreement substantially in the form attached hereto as **Exhibit E**. The Purchaser shall deduct from the Purchase Price (including any amounts payable under **Section 2.4** hereof) any amounts required to be withheld or deducted under the Code or other applicable Tax law. Any amounts so deducted shall be remitted by the Purchaser to the appropriate Tax authority on a timely basis.

**Section 2.4. Adjustment to Purchase Price.** The Purchase Price shall be subject to adjustment as follows:

(a) **Post-Closing Determination.** Within thirty (30) days after the Closing Date, the Purchaser shall prepare and deliver to the Sellers a statement (the **"Closing Net Working Capital Statement"**) setting forth the Net Working Capital as of 12:01 a.m., New York City time, on the Closing Date (the **"Closing Net Working Capital"**). From and after the Closing Date, the Purchaser shall provide the Sellers full access during normal business hours to the books, records, facilities and employees of the Business and shall cooperate with the Sellers to the extent reasonably requested by the Sellers to determine Closing Net Working Capital or to investigate the basis of any dispute in connection therewith. Not later than thirty (30) calendar days after receipt of the Closing Net Working Capital Statement, the Sellers shall provide the Purchaser with a list in writing of those items, if any, specifying the estimated amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, to which the Sellers take exception and the Sellers' proposed adjustments (the **"Proposed Adjustments"**); provided that the Sellers may dispute an item only on the basis that the amounts reflected on the Closing Net Working Capital Statement were not arrived at in accordance with GAAP in a manner consistent with the preparation of the Schedule of Assets and Liabilities or were arrived at based on mathematical or clerical error. If the Sellers fail to deliver to the Purchaser the Proposed Adjustments within thirty (30) calendar days following receipt of the Closing Net Working Capital Statement, the Sellers shall be deemed to have accepted the Closing Net Working Capital Statement for purposes of any Purchase Price adjustment under subsection (b) below. If the Purchaser does not deliver to the Sellers written notice of objections (**"Purchaser Objection Notice"**) within fifteen (15) calendar days following receipt of the Proposed Adjustments, the Purchaser shall be deemed to have accepted the Proposed Adjustments for purposes of any such Purchase Price adjustment. If the Purchaser delivers the Purchaser Objection Notice, and if the Purchaser and the Sellers are unable, within fifteen (15) calendar days after receipt by the Sellers of the Purchaser Objection Notice, to resolve the disputed exceptions set forth in the Purchaser Objection Notice, the Purchaser and the Sellers shall each, within thirty (30) days after the end of

such fifteen (15) day period, submit its or their determination of the Closing Net Working Capital, the calculation thereof and a written summary of the items so in dispute to a firm of independent certified public accountants mutually acceptable to the Purchaser and the Sellers (the **"Independent Accounting Firm"**). The Independent Accounting Firm shall, within sixty (60) days following its selection, deliver to the Purchaser and the Sellers a written report resolving the items so in dispute and determining based on such resolution, the resulting Closing Net Working Capital, and its determinations will be conclusive and binding upon the parties hereto for purposes of any such Purchase Price adjustment. To the extent appropriate, the determinations of the Independent Accounting Firm will be made and articulated in accordance with GAAP consistently applied and the provisions of the Schedule of Assets and Liabilities. The fees and expenses of the Independent Accounting Firm shall be borne proportionately by the Purchaser, on the one hand, and the Sellers, on the other hand, based on the extent to which the Purchaser's and the Seller's respective determinations of Closing Net Working Capital differ from the Closing Net Working Capital as determined by the Independent Account Firm.

(b)     **Purchase Price Adjustment**. Within three (3) calendar days following the final determination, pursuant to subsection (a) above, of the Closing Net Working Capital, and based upon such final determination:

(i)     if the Closing Net Working Capital is less than the Net Working Capital as set forth on the Schedule of Assets and Liabilities, then the Sellers shall pay to the Purchaser an amount equal to such deficiency up to $2,500,000 by wire transfer of immediately available funds to an account designated by the Purchaser, which amount shall be satisfied out of the Adjustment Escrow Fund, and the Purchaser shall instruct the Escrow Agent to deliver any amounts remaining in the Adjustment Escrow Fund to Sellers after such payment to the Purchaser; or

(ii)     if the Closing Net Working Capital exceeds the Net Working Capital as set forth on the Schedule of Assets and Liabilities, then the Purchaser shall pay to Sellers by wire transfer of immediately available funds to an account designated by Sellers an amount equal to such excess up to $2,500,000 and the Purchaser shall instruct the Escrow Agent to deliver the entire amount of the Adjustment Escrow Fund to Sellers.

(c)     **Instructions**. The Purchaser and the Sellers agree to prepare, execute and deliver joint written instructions to the Escrow Agent (pursuant to the terms of the Adjustment Escrow Agreement) with respect to the distribution of the entire Adjustment Escrow Fund promptly following the date the Closing Net Working Capital Statement is determined to be final pursuant to **Section 2.4(a)** in accordance with **Section 2.4(b)**.

(d)     **Interest**. Any payment by the Sellers or the Purchaser required by **Section 2.4(b)** shall bear interest at a rate per annum equal to the Federal Funds Rate as in effect on the Closing Date for the period from the Closing Date through the day prior to the date of payment. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed, without compounding. Any payment pursuant to this **Section 2.4** (excluding payments attributable to interest) shall be treated by the parties as an increase or decrease in the Purchase Price.

**Section 2.5. Deposit.** (a) Not later than noon, New York City time, on the Business Day immediately following the date of the execution and delivery of this Agreement, the Purchaser shall deliver to the Escrow Agent a deposit in the amount of $2,000,000 to be held by the Escrow Agent pursuant to the terms and conditions of the Deposit Escrow Agreement substantially in the form attached hereto as **Exhibit F** and applied or disposed of as provided in subsections (b) and (c) below.

(b)     If the Closing occurs, the Deposit shall be applied as provided in **Section 2.3**. If the Closing does not occur as a result of a material breach by the Purchaser of any of its obligations under this Agreement, or of a failure of any of the conditions set forth in **Section 7.1, 7.2 or 7.6** to be satisfied or waived, the Escrow Agent will remit the Deposit, as promptly as practicable, but in no event later than five (5) Business Days following the termination of this Agreement, to the Sellers in full and final satisfaction of any and all liabilities and obligations of the Purchaser arising out of this Agreement or such failure of the Closing to occur, and the Purchaser and the Sellers agree that such amount shall constitute reasonable liquidated damages on account thereof and the Sellers' sole and exclusive remedy arising in connection with the breach by the Purchaser of any of its obligations under this Agreement. If the Closing does not occur or this Agreement is terminated for any other reason, the Escrow Agent will remit the Deposit, as promptly as practicable, but in no event later than five (5) Business Days following the termination of this Agreement, to the Purchaser.

(c)     Pending its application or disposition pursuant to subsection (b) above, the Deposit shall be held by the Escrow Agent in an interest-bearing bank account in which no other funds are held.

(d)     The Purchaser and the Sellers agree to prepare, execute and deliver joint written instructions to the Escrow Agent (pursuant to the terms of the Deposit Escrow Agreement) with respect to the distribution of the Deposit in accordance with **Section 2.5(b)**.

**Section 2.6. Allocation of Purchase Price.** (a) Prior to the Closing, the Sellers and the Purchaser shall agree on the initial allocation of the sum of the Purchase Price and the Assumed Liabilities among the Purchased Assets in accordance with Section 1060 of the Code and the regulations thereunder (the **"Allocation"**). Within ten (10) Business Days after completion of the adjustments contained in **Section 2.4**, the Sellers and the Purchaser shall agree on the final Allocation. For all Tax purposes, the Purchaser and the Sellers agree that the transactions contemplated in this Agreement shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that none of them will take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise.

(b)     The Purchaser and the Sellers shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the regulations thereunder and shall file such statements or forms with their respective federal income Tax Returns. The parties shall prepare such statements or forms consistently with the Allocation. Each party shall provide the other party with a copy of such statements or forms as filed.

**Section 2.7. Sale at Closing Date.** The sale, transfer, assignment and delivery by the Sellers of the Purchased Assets to the Purchaser, and the assumption by the Purchaser of

the Assumed Liabilities, as herein provided shall be effected on the Closing Date by (a) the execution and delivery by the Sellers and the Purchaser of an assignment and assumption of the Assigned Contracts (including a separate assignment and assumption of the Leases) substantially in the form attached hereto as **Exhibit A**, free and clear of all Liens, to the extent effected by, the Approval Order, (b) the execution and delivery by the Sellers and the Purchaser, if applicable, of quitclaim deeds or similar instruments of conveyance with respect to the Owned Real Property free and clear of all Liens, to the extent effected by, the Approval Order, and (c) with respect to the other Purchased Assets and Assumed Liabilities, by the execution and delivery by the Sellers and the Purchaser of the Bill of Sale and Assumption Agreement.

        **Section 2.8.   Discharge of Liens.** Notwithstanding anything to the contrary in this Agreement, if as of the Closing Date there are any Liens that the Sellers are obligated to pay and discharge under this Agreement, subject to the Approval Order, the Sellers may use any portion of the Purchase Price to discharge the same, either by way of payment, escrow or by bonding.

        **Section 2.9.   Casualty and Condemnation.** In the event of any damage or destruction by reason of any casualty to any of the Purchased Assets after the date hereof, or if there shall be any taking by condemnation or eminent domain of any of the Purchased Assets, the Sellers shall (a) in the case of damage or destruction, pay over to the Purchaser at the Closing any insurance proceeds received by the Sellers prior to the Closing Date (including the amount of any applicable deductible or self-insurance retention) and assign to the Purchaser all of the Sellers' right, title and interest in and to any additional proceeds related to such damage or destruction and (b) in the case of condemnation or eminent domain, pay over to the Purchaser at the Closing all awards received by the Sellers on account of such condemnation or eminent domain prior to the Closing Date and assign to the Purchaser all of the Sellers' right to receive any additional awards related to such condemnation or eminent domain; provided that if the costs for restoration of such Purchased Assets after such damage or destruction by reason of any casualty or taking by condemnation or eminent domain exceed the actual proceeds or awards received by at least $500,000, the Purchasers shall be entitled to terminate this Agreement pursuant to **Section 9.4(g)**.

        **Section 2.10.   Additional Contracts; Assignable Contracts, Licenses, Permits; Rejected Contracts.** (a) If at any time after the date hereof through the date that is sixty (60) days after the Closing Date (i) the Purchaser determines that any Seller is a party to any contract, agreement, lease, license, commitment, sale or purchase order or other instrument primarily related to the Business that has not been previously included as a Purchased Asset hereunder or, if after the Closing Date, transferred to the Purchaser or its designee and is not an Excluded Asset (each, an **"Additional Contract"**), or (ii) the Purchaser, or its designee, shall qualify for, or otherwise satisfy all conditions precedent to, an assignment of any agreement, license or permit listed in section (a) or (c) on **Schedule 3.4** that has not been previously included as a Purchased Asset hereunder or, if after the Closing Date, transferred to the Purchaser (each, an "Assignable Contract, License or Permit"), the Purchaser shall have the right, in its sole discretion, to demand that any such Additional Contract or Assignable Contract, License or Permit, as the case may be, be assumed and assigned to the Purchaser, or its designee, and thereby transferred to the Purchaser or its designee as a Purchased Asset without any additional consideration (but subject to the last sentence of this **Section 2.10(a)**), by written notice to the

applicable Seller and the applicable Seller shall use its reasonable best efforts to assign such Additional Contract or Assignable Contract, License or Permit, as the case may be, to the Purchaser, or its designee, and to obtain any required third-party consents associated therewith; provided that the Purchaser may not demand the assumption or assignment of any Additional Contract or Assignable Contract, License or Permit, as the case may be, that previously has expired or has been rejected by any Seller in the Cases pursuant to an order of the Bankruptcy Court. In connection with the foregoing, the Sellers shall be obligated to cure any and all defaults (or provide adequate assurance that they will cure any and all defaults) as required by the Bankruptcy Code in connection with the assumption and assignment of any Additional Contract or Assignable Contract, License or Permit, as the case may be, as to which the Sellers are given written notice during the period from the date hereof to and including the date that is thirty (30) days after the Closing Date (the "**30-day Period**") and the Purchaser shall be obligated to cure any and all defaults (or provide adequate assurance that they will cure any and all defaults) as required by the Bankruptcy Code in connection with the assumption and assignment of any Additional Contract or Assignable Contract, License or Permit, as the case may be, following expiration of the 30-day Period.

(b)    Notwithstanding the foregoing, the Purchaser may, during the 30 days following the date hereof, specifically reject any Lease or Other Contract (the "**Rejected Contracts**") by providing written notice to the Sellers of its intention to do so. Upon delivery of such written notice the parties hereto agree that **Schedule 1.4** and **Schedule 3.9** shall without further action be deemed amended to remove any reference to such Rejected Contracts, that each such Rejected Contract shall be deemed to be an Excluded Asset and that all determinations with respect to the satisfaction of the conditions set forth in Article VIII and all determinations with respect to representations and warranties and related materiality qualifications shall be made without regard to the Rejected Contracts.

## ARTICLE III.

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers represent and warrant to the Purchaser as follows:

**Section 3.1.    Authority of Sellers.** Each Seller is a corporation or limited liability company duly organized, validly existing and in good standing under the Laws of its state of organization. Each Seller is duly qualified to do business and is in good standing in each of the jurisdictions set forth on **Schedule 3.1** below such Seller's name, which are all of the jurisdictions in which the ownership of the Purchased Assets or the conduct of the Business requires such qualification, except where the failure to be so qualified or in good standing does not constitute a Material Adverse Change. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full corporate or limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements, and the execution and delivery by each Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate or limited liability company action on the part of each Seller. This Agreement constitutes, and each of the Ancillary Agreements upon its execution will constitute, the legal, valid and binding obligation of each Seller enforceable in accordance

with its terms, subject to issuance of the Approval Order and the receipt of the consents, waivers and approvals specified on **Schedule 3.4**, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or similar Laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full corporate or limited liability company power and authority to own its properties and to carry on the Business presently being conducted by it.

        **Section 3.2.**   **MMI Subsidiary Sellers.** All of the outstanding shares of capital stock of, or other ownership interests in, each MMI Subsidiary Seller are owned by MMI, directly or indirectly. All of the issued and outstanding shares and interests (as applicable) of the MMI Subsidiary Sellers have been duly authorized, are validly issued, fully paid and non-assessable, were issued free of pre-emptive or similar rights and are held of record and beneficially by MMI, directly or indirectly. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require any of the MMI Subsidiary Sellers to issue, sell or otherwise cause to become outstanding any of its capital stock or other ownership interests or rights in respect thereof. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the MMI Subsidiary Sellers.

        **Section 3.3.**   **No Conflict or Violation.** After giving effect and subject to the Approval Order, the execution, delivery and performance by each of the Sellers of this Agreement and the Ancillary Agreements to which it is, or will be on the Closing Date, a party do not and will not violate any provision of the certificate or articles of incorporation or by-laws (or equivalent documents) of such Seller and, assuming that the consents, waivers, authorizations, approvals, declarations, filings and registrations referred to in **Section 3.4** are obtained, do not and will not (a) violate any provision of Law, or any order, judgment or decree of any court or other Governmental Agency applicable to the Business, such Seller or the Purchased Assets, (b) violate or result in a breach of or constitute (with due notice or lapse of time or both) a material default under any Assigned Contract, loan agreement, mortgage, security agreement, indenture or other instrument to which such Seller is a party or by which it is bound or to which any of the Purchased Assets is subject and, in each case, became so on or after the Petition Date or (c) result in the imposition or creation of any Lien upon or with respect to any of the Purchased Assets.

        **Section 3.4.**   **Consents and Approvals.** Assuming the entry of the Approval Order, **Schedule 3.4** sets forth a true and complete list of each consent, waiver, authorization or approval of (a) any Governmental Agency and each declaration to or filing or registration with any such Governmental Agency or (b) any other Person in connection with any Assigned Contract involving the payment by any Seller of more than $250,000 in any calendar year, that is required for the execution and delivery of this Agreement by the Sellers or the performance by the Sellers of their obligations hereunder.

        **Section 3.5.**   **Compliance with Law.** To the Knowledge of the Sellers, except as set forth on **Schedule 3.5**, the Sellers (a) are in compliance in all material respects with all Laws and Governmental Orders applicable to the Sellers, the Business or the Purchased Assets, (b) have not received written notice of any violation of any such Law or Governmental Order

that remains unresolved and (c) are not in default in any material respect under any order, writ, judgment, award, injunction or decree of any Governmental Agency applicable to the Sellers, the Business or the Purchased Assets.

**Section 3.6.** **Health Care Matters.** (a) Since October 2, 2002, no Seller has received any (i) Notices of Adverse Findings or (ii) warning letters or other adverse correspondence from the United States Food and Drug Administration ("**FDA**") or any other Governmental Agency in which the FDA or such other Governmental Agency asserted that the operations of such Seller may not be in substantial compliance with applicable law, in each case received by such Seller from the FDA or any other Governmental Agency.

(b)     To the Knowledge of the Sellers, the operations of the Sellers are in compliance with all applicable laws and regulations of the FDA and all Governmental Agencies which have jurisdiction over their products except for such non-compliance which (i) does not constitute a Material Adverse Change or (ii) would not subject the Sellers, the Purchaser or their respective officers or directors to any risk of criminal liability.

(c)     There are no actual or, to the Knowledge of the Sellers, threatened enforcement actions, fines, injunctions, civil or criminal penalties, recalls, seizures, detentions, investigations or suspensions by the FDA or other Governmental Agencies which have jurisdiction over its medical products concerning its products, including, without limitation, any fines, injunctions, civil or criminal penalties, recalls, seizures, detentions, investigations or suspensions except for any such actions, fines, injunctions, civil or criminal penalties, recalls, seizures, detentions, investigations or suspensions which (i) do not constitute a Material Adverse Change or (ii) would not subject the Sellers, the Purchaser or their respective officers or directors to any risk of criminal liability.

(d)     All products of the Sellers are in substantial compliance with all premarketing, facility registration and product listing requirements, as well as manufacturing laws and regulations of the FDA and Governmental Agencies applicable to the Business and the Purchased Assets.

(e)     Since October 2, 2002, to the Knowledge of the Sellers, neither the Seller nor its officers, directors or managing employees have engaged in any activities which are prohibited under federal or state criminal or civil laws (including without limitation the federal Anti-Kickback statute, Stark law and federal False Claims Act and any state laws prohibiting kickbacks or certain referrals), or the regulations promulgated pursuant to such laws, or are cause for civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other state or federal health care program.

**Section 3.7.** **Schedule of Assets and Liabilities.** The Schedule of Assets and Liabilities was prepared in accordance with GAAP consistently applied and presents fairly the matters set forth therein as of the Liability Schedule Date.

**Section 3.8.** **Material Adverse Change.** Since the Liability Schedule Date, there has not occurred any Material Adverse Change.

Section 3.9.  Assigned Contracts.  **Schedule 3.9** sets forth a true and complete list of the Material Other Contracts.  True and complete copies of the Assigned Contracts or summaries thereof have been made available by the Sellers to the Purchaser.  Other than as set forth on **Schedule 3.9**, neither the Sellers nor any other party under any of the Assigned Contracts has commenced any action against the other or given or received any written notice of default or violation under any Assigned Contract which was not withdrawn or dismissed, except for those defaults which will be cured prior to the Closing or as to which the Sellers shall have provided adequate assurance that they will cure in accordance with the Order (or which need not be cured under the Bankruptcy Code to permit the assumption and assignment of Assigned Contracts).  Except as set forth on **Schedule 3.4**, after giving effect and subject to entry of the Approval Order and payment of any amounts required to cure defaults as required by the Bankruptcy Code under an Assigned Contract, all of the Assigned Contracts will be freely assignable by a Seller to the Purchaser in accordance with this Agreement without the consent of the other party thereto, and, except as set forth on **Schedule 3.9**, shall continue in full force and effect.  To the Knowledge of the Sellers, except as set forth on **Schedule 3.9**, the Sellers have not received written notice of the non-renewal or termination of any Material Other Contract.

Section 3.10.  Intellectual Property.  (a)  **Schedule 3.10** sets forth a true and complete list of all patents and patent applications, trademark, copyright and domain name applications and registrations, and material unregistered copyrights and trademarks that the Sellers own and use in the Business and all licenses, sublicenses and other agreements concerning Intellectual Property used in the Business (the "**Company Intellectual Property**").  The Company Intellectual Property includes all Intellectual Property necessary to the continued operation of the Business consistent with past practice.  Except as set forth on **Schedule 3.10**, the Sellers either own or have the right to use by license, sublicense, agreement or other permission all of the Company Intellectual Property and no Seller has granted any license or other right to any third party with respect to the Company Intellectual Property other than the licenses listed on **Schedule 3.10**.  Except as set forth on **Schedule 3.10**, none of the Sellers has been charged with, nor to the Knowledge of the Sellers, is threatened to be charged with, with respect to the trademarks, service marks and trade names listed on **Schedule 3.10**, and the conduct of the Business does not result in, the infringement or other violation of the Intellectual Property of any other Person that constitutes a Material Adverse Change.

(b)  The Transferred IT Systems include all IT Systems material to the continued operation of the Business consistent with past practice.  Subject to the Approval Order or obtaining the requisite approval for licenses requiring consent, waiver, authorization or approval to assign, such licenses being set forth on **Schedule 3.4** or **Schedule 3.10**, the consummation of the transactions contemplated in this Agreement will not impair or interrupt (i) access and use of the Transferred IT Systems in connection with the Business and (ii) to the extent applicable, access and use of the Transferred IT Systems by customers and suppliers of the Business.

Section 3.11.  Labor Relations.  (a)  Except as set forth on **Schedule 3.11(a)**, the Sellers are currently in compliance with all applicable Laws relating to the employment of labor, including those related to wages, hours, the payment and withholding of taxes, collective bargaining, occupational safety or health, human rights or anti-discrimination or any other Laws or regulations affecting Business Employees and, to the Knowledge of the Sellers, there is no

material investigation being conducted or threatened by any Governmental Agency relating thereto.

(b)     Except as set forth on **Schedule 3.11(b)**, the Seller is not a party to any collective bargaining or other labor union contract applicable to Business Employees and no collective bargaining agreement is being negotiated by the Seller with respect to Business Employees. There is no labor dispute, strike or work stoppage against the Seller pending or, to the Knowledge of the Sellers, threatened in writing which may interfere with the Business. To the Knowledge of the Seller, neither the Seller nor any representative or employee of the Seller has committed any unfair labor practices in connection with the operation of the Business.

**Section 3.12.  Employee Benefits**. (a) **Schedule 3.12** lists all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other material employee benefit arrangements relating to the Business, including any such arrangements providing severance pay, sick leave, vacation pay, salary continuation for disability, retirement benefits, deferred compensation, bonus pay, incentive pay, stock options, hospitalization insurance, medical insurance, life insurance or scholarships or tuition reimbursements, maintained by a Seller or to which a Seller is obligated to contribute thereunder for current or former Business Employees (each a **"Plan"** and collectively, the **"Plans"**). True, correct and complete copies of the following documents, with respect to each of the Plans, to the extent applicable, have been made available to the Purchaser: (i) the Plan and its related trust document, including any amendments thereto, (ii) the most recent IRS Form 5500 filed with the Internal Revenue Service and (iii) the most recent summary plan description.

(b)     None of the Plans in effect on the date hereof could require, separately or in the aggregate (including without limitation, as a result of this Agreement or the transactions contemplated hereby) the payment of any "excess parachute payment" within the meaning of section 280G of the Code.

(c)     None of the Plans is a multiemployer plan, as defined in Section 3(37) of ERISA, or a single-employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA, and, to the Knowledge of the Sellers, the Sellers have not incurred any material liability under, arising out of or by operation of Title IV of ERISA.

(d)     Each Plan that is intended to qualify under Section 401(a) of the Code and the trust maintained pursuant thereto has received, has an application pending or remains within the remedial amendment period for obtaining a favorable determination letter from the IRS that it is so qualified and that its trust is exempt from tax under Section 501(a) of the Code, and, to the Knowledge of the Sellers, nothing has occurred with respect to the operation of any such Plan that could reasonably be expected to cause such Plan and related trust not to qualify or be so exempt from tax.

(e)     To the Knowledge of the Sellers, the Plans have been maintained in accordance with their terms and with the provisions of ERISA and the Code and other applicable federal and state laws and regulations. There are no unpaid contributions due prior to the date hereof with respect to any Plan that are required to have been made under the terms of the Plan or any applicable law.

(f) The Sellers have no obligation to provide any deferred compensation, pension or non-pension benefits to retired or other former employees, except for health benefits as specifically required by Part 6 of Title I of ERISA (**"COBRA"**) or other applicable law or pension benefits payable from a Plan intended to be "qualified" within the meaning of Section 401(a) of the Code.

(g) All group health plans covering employees of the Sellers have been operated in material compliance with the requirements of Section 4980B of the Code (and any predecessor provisions) and COBRA.

(h) Neither the Sellers nor, to the Knowledge of the Sellers, any other "disqualified person" or "party in interest", as defined in Section 4975 of the Code and Section 3(14) of ERISA, respectively, has engaged in any "prohibited transaction", as defined in Section 4975 of the Code or Section 406 of ERISA, with respect to any Plan nor, to the Knowledge of the Sellers, have there been any fiduciary violations under ERISA which could subject any Seller (or any officer, director or employee thereof) to any penalty or tax under Section 502(i) of ERISA or Sections 4971 and 4975 of the Code.

(i) With respect to any Plan: (i) no filing, application or other matter is pending with the IRS, the Pension Benefit Guaranty Corporation, the United States Department of Labor or any other Governmental Agency; (ii) there is no action, suit or claim pending (nor, to the Knowledge of the Sellers, any basis for such a claim), other than routine claims for benefits; and (iii) there are no outstanding liabilities for taxes or penalties under ERISA or the Code.

**Section 3.13. Insurance.** **Schedule 3.13** sets forth a list of all insurance policies providing coverage for the properties or operations of the Business, the type and amount of coverage and the expiration dates of the policies. The Sellers have not received notice from any insurance carrier threatening a suspension, revocation, modification or cancellation of any such insurance policy or a material increase in any premium in connection therewith.

**Section 3.14. Litigation.** Other than in connection with the Cases and except as set forth on **Schedule 3.14**, there are no actions, causes of action, suits or proceedings pending or, to the Knowledge of the Sellers, threatened against any of the Sellers with respect to the Business or the Purchased Assets, at law or in equity, or before or by any Governmental Agency, which (a) seek damages in excess of $100,000, (b) seek to restrain or enjoin the consummation of the transactions contemplated hereby, (c) seek equitable or injunctive relief that would adversely effect the Business following the Closing, or (d) constitute a Material Adverse Change or affect the legality, validity or enforceability of this Agreement or any Ancillary Agreement.

**Section 3.15. Tax Matters.** To the extent effected by the Approval Order and other than Liens for Taxes that are not yet delinquient, no Tax Liens (i) will attach to the Purchased Assets after the Closing or (ii) are currently attached to the Purchased Assets and will be attached to the Purchased Assets after the Closing. No Seller has received any written notice or inquiry from any jurisdiction where the Seller does not currently file income or franchise Tax Returns to the effect that such filings are required with respect to the Business or that the Business may otherwise be subject to taxation by such jurisdiction. The Sellers have properly and timely withheld, collected or deposited all amounts required to be withheld, collected or

deposited in respect of Taxes. There are no material Tax investigations, inquiries or audits by any Tax authority in progress relating to the Purchased Assets or the Business, nor has any Seller received any written notice from any Tax authority that it intends to conduct such an audit or investigation, except as set forth on **Schedule 3.15**.

**Section 3.16. Interim Operations**. Other than with respect to matters reflected in the docket for the Cases, since the Petition Date, (a) the Business has been operated in the ordinary course, consistent with past practice and (b) none of the Sellers has taken any action that, if taken after the date hereof, would constitute a violation of **Section 5.1(a) – (n)**, except as set forth on **Schedule 3.16**. Other than in the ordinary course of business (including the execution and delivery of post-petition leases and/or lease renewals) or except as approved by the Bankruptcy Court, since the Petition Date, none of the Sellers has, with respect to the Business, mortgaged or pledged any of the Purchased Assets, except pursuant to the Revolving Credit and Guaranty Agreement or sold or transferred or agreed to sell or transfer any of the Purchased Assets (other than pursuant to this Agreement).

**Section 3.17. Brokers**. Except Greenhill & Co., LLC in connection with the transactions contemplated by this Agreement, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of the Sellers. The Sellers are solely responsible for the fees and expenses of Greenhill & Co.

**Section 3.18. Environmental Matters**. (a) Except as set forth on **Schedule 3.18**, each Seller is in compliance in all material respects with all applicable Environmental Laws, except to the extent any such noncompliance has been fully and finally resolved. To the Sellers' Knowledge, there is no requirement proposed for adoption or implementation under any Environmental Law or Environmental Permit that constitutes a Material Adverse Change.

(b)     Each Seller is in compliance in all material respects with all permits, licenses and other authorizations that may be required pursuant to Environmental Laws (**"Environmental Permits"**) for the occupation of the facilities and the operation of the Business, except to the extent any such noncompliance has been fully and finally resolved.

(c)     Except as set forth on **Schedule 3.18**, no Seller has received any written notice of any Environmental Claim arising under Environmental Laws and relating to the Business, except to the extent any such notice has been fully and finally resolved.

(d)     No Seller has assumed or undertaken any material liability or corrective or remedial obligation of any other Person relating to Environmental Laws.

(e)     To the Knowledge of the Sellers, there is no asbestos or asbestos-containing material at any of the Owned Real Property or Leased Property, that requires removal or encapsulation under any Environmental Law.

(f)     Except as set forth on **Schedule 3.18**, neither the execution of this Agreement nor the consummation of the transactions contemplated herein will require any notice to or consent of any Governmental Agency, pursuant to any applicable Environmental Law or

Environmental Permit, including pursuant to the Connecticut Property Transfer Act ("**PTA**") or the New Jersey Industrial Site Recovery Act ("**ISRA**").

(g)     This **Section 3.18** contains the sole and exclusive representations and warranties of the Sellers with respect to any environmental, health or safety matters, including without limitation, any arising under Environmental Laws.

**Section 3.19.  Accounts Receivable.  Schedule 3.19** is an aged list of the Accounts Receivable as of the date of Liability Schedule Date showing separately those Accounts Receivable that as of such date had been outstanding for (a) 29 days or less, (b) 30 to 59 days, (c) 60 to 89 days, and (d) more than 89 days.  All Accounts Receivable (a) are valid and genuine, (b) arise out of bona fide sales and deliveries of goods, performance of services or other transactions in the ordinary course of business and consistent with past practices and (c) are not subject to the defenses, setoffs or counterclaims in any material amount except as described on **Schedule 3.19** or as reserved on the Schedule of Assets and Liabilities.  The allowance for doubtful accounts, rebates and customer returns with respect to the Accounts Receivable of the Sellers has been calculated in accordance with GAAP consistently applied and, to the Sellers' Knowledge, is adequate.

**Section 3.20.  Inventories.**  All Inventory used in the Business (a) was acquired and has been maintained in accordance with the regular business practices of the Sellers, (b) consists of items of a quality and quantity useable or saleable in the ordinary course of business consistent with past practice, (c) as of the Closing Date, will be owned by the Purchaser, free and clear of all Liens, to the extent effected by the Approval Order, other than Permitted Liens and (d) is valued at the lower of cost or market value taking into account the Sellers' allowance for excess and obsolete inventory.  The Inventories are in good and merchantable condition in all material respects, are suitable and useable for the purposes for which they are intended and are in a condition such that they can be sold in the ordinary course of business consistent with past practice.

**Section 3.21.  Permits.**  Except as set forth on **Schedule 3.21**, the Sellers have all material permits, Licenses, certificates of authority, consents, authorizations, orders and approvals of, and have made all filings, applications and registrations with Governmental Agencies necessary for each Seller to own, lease and operate the Purchased Assets, and to conduct the Business as presently conducted (collectively, the **"Permits"**).  The Sellers are in compliance in all material respects with all Permits and no suspension or cancellation of any of the Permits is pending or, to the Knowledge of the Sellers, threatened.

**Section 3.22.  Customers and Suppliers.  Schedule 3.22** sets forth a complete and correct list of (a) the ten (10) largest customers by dollar volume of the Sellers and (b) the ten (10) largest suppliers by dollar volume of the Sellers, in each case for the period from January 1, 2003 through the Liability Schedule Date.

**Section 3.23.  Purchased Assets.**  Subject to and after giving effect to the Approval Order, the applicable Seller will have at Closing good and marketable title to, or a valid leasehold interest in, the Purchased Assets, except for assets disposed of in the ordinary course of business and consistent with this Agreement prior to the Closing Date.  Except for any

Rejected Contracts and any contract that is referred to in clause (c) of the definition of the term **"Other Contracts"** and except as set forth in section (a) or (c) on **Schedule 3.4**, the Purchased Assets include all assets and properties that are necessary or required for the conduct of the Business immediately following the Closing in the same manner as conducted by Sellers prior thereto.

    **Section 3.24. Disclaimer of Additional Representations and Warranties.** (a) Except as expressly set forth in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, and any certificate or instrument delivered pursuant to the terms hereof or thereof, the Sellers make no representations or warranties with respect to the Business, or their operations, assets (including the Purchased Assets), liabilities (including the Assumed Liabilities) or conditions, including, with respect to the Purchased Assets. Except as provided in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements and any other certificate or instrument delivered pursuant to the terms hereof or thereof, the Purchased Assets are to be conveyed hereunder "AS IS" on the date hereof and in their present condition, subject to reasonable use, wear and tear between the date hereof and the Closing Date, and the Purchaser shall rely upon its own examination thereof.

    (b)    Disclosure of an item in any Schedule shall not be deemed to be an admission that such item is material or otherwise required to be disclosed on such Schedule. Any matter disclosed on any one Schedule shall be deemed to modify each representation and warranty of the Sellers to the extent it reasonably apprises the Purchaser that such matters are excepted from such representation and warranty.

    **Section 3.25. No Survival.** All of the representations and warranties of the Sellers contained in this Agreement, the Schedules and Exhibits hereto or in any certificate or other instrument delivered by any Seller pursuant to the terms hereof or thereof shall terminate immediately after, and none of such representations or warranties shall survive, the Closing.

**ARTICLE IV.**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

    The Purchaser represents and warrants to the Sellers as follows:

    **Section 4.1. Authority of the Purchaser.** The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Purchaser has full corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements, and the execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Purchaser. This Agreement constitutes, and each of the Ancillary Agreements upon its execution will constitute, the legal, valid and binding obligation of the Purchaser enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or similar laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies. The Purchaser

27

has full corporate power and authority to own its properties and to carry on the business presently being conducted by it.

Section 4.2.  **No Conflict or Violation**.  The execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements do not and will not violate any provision of the certificate of incorporation or by-laws of the Purchaser and do not and will not violate any provision of law, or any Governmental Order applicable to the Purchaser, or violate or result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any loan agreement, mortgage, security agreement, indenture or other instrument to which the Purchaser is a party or by which it is bound.

Section 4.3.  **Consents and Approvals**.  The execution, delivery and performance by the Purchaser of this Agreement do not require the consent or approval of, or filing with, any Governmental Agency or other Person except (a) as may be required to effect the transfer of any Permits and (b) as required pursuant to the HSR Act.

Section 4.4.  **Financing**.  At the time of the Closing, the Purchaser will have sufficient funds to enable the Purchaser to pay the Purchase Price and the Purchaser will have obtained all consents and approvals necessary to be obtained on the part of the Purchaser for the execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements and the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby.

Section 4.5.  **Litigation**.  There are no actions, causes of action, suits, proceedings, orders, writs, injunctions, or decrees pending or, to the Knowledge of the Purchaser, threatened against the Purchaser at law or in equity or before or by any Governmental Agency, which seeks to restrain or enjoin the consummation of the transactions contemplated hereby or affect the legality, validity or enforceability of this Agreement or the Ancillary Agreements.  The Purchaser is not subject to any Governmental Order, and, to the Purchaser's Knowledge, there are no Governmental Orders threatened to be imposed on the Purchaser by any Governmental Authority, in either case, that could materially adversely affect the Purchaser.

Section 4.6.  **Brokers**.  Except for Stonington Partners, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Purchaser.  The Purchaser shall be solely responsible for payment of the fees and expenses of Stonington Partners, Inc.

Section 4.7.  **Adequate Assurances Regarding Executory Contracts**.  The Purchaser is and will be capable of satisfying the conditions contained in section 365(b) of the Bankruptcy Code with respect to the Executory Contracts.

Section 4.8.  **No Survival**.  All of the representations and warranties of the Purchaser contained in this Agreement, the Schedules and Exhibits hereto or in any certificate or other instrument delivered by the Purchaser pursuant to the terms hereof or thereof shall terminate immediately after, and none of such representations or warranties shall survive, the Closing.

## ARTICLE V.

## CERTAIN COVENANTS OF THE SELLERS

Each Seller covenants with the Purchaser that from and after the date hereof through the Closing Date (or after the Closing Date to the extent expressly so provided herein):

**Section 5.1. Conduct of Business Before the Closing Date**. Without the prior written consent of the Purchaser, which consent will not be unreasonably withheld or delayed, or unless otherwise ordered by the Bankruptcy Court sua sponte or on motion by a third party, notice of which order or motion shall be promptly delivered by the Sellers to the Purchaser, or except as set forth on **Schedule 3.16**, between the date hereof and the Closing Date, the Sellers shall use their reasonable best efforts to (i) preserve the Purchased Assets, (ii) keep available to the Purchaser the services of the employees of the Sellers, (iii) preserve their current relationships with the Sellers' customers and suppliers and (iv) continue to operate the Business as it relates to the Purchased Assets in the ordinary course of the Business, and shall not, except as required or permitted pursuant to the terms hereof, (A) make any material change in the Purchased Assets or the Business, as it relates to the Purchased Assets, or (B) enter into any transaction respecting the Business, other than, in any such case, in the ordinary course of the Business consistent with the Sellers' past practices. Subject to any obligations as a debtor or debtor-in-possession under the Bankruptcy Code or order of the Bankruptcy Court, without limiting the generality of, but subject to, the foregoing, unless otherwise consented to in writing by the Purchaser, the Sellers shall, consistent with their past practices:

(a) Subject to clause (c) below, perform all of their material post-petition obligations under the Leases and Other Contracts in accordance with their terms;

(b) Comply in all material respects with all statutes, laws, ordinances, rules, regulations and Governmental Orders applicable to the Purchased Assets and Assumed Liabilities except where compliance is being disputed by the Sellers in good faith;

(c) Not amend or modify or terminate any of the Leases or Other Contracts or agree or consent to any amendments or modifications or terminations thereof, other than in the ordinary course of business;

(d) Not change, in any material respect, any of their methods or procedures relating to accounting, other than such changes required by GAAP;

(e) Not make, revoke or change any Tax election or method of Tax accounting, or settle or compromise any Liability with respect to Taxes, in each case, in respect of the Purchased Assets and the Business;

(f) Promptly notify the Purchaser if the Sellers receive any notices from any lessor, Governmental Agency, insurance company or any other Person indicating (i) any default that could reasonably be expected to materially and adversely affect the Purchased Assets, (ii) that any of the Owned Real Property or Leased Properties are or may be in material violation of any law, and cause compliance at the Sellers' cost, except where compliance is being disputed by the Sellers in good faith or will be cured prior to or at the Closing, (iii) any notice or other

communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or (iv) that any Material Other Contract will not be renewed or is being terminated prior to its scheduled expiration date;

(g)     Not enter into any material agreements that would be binding on the Purchaser or affect any of the Purchased Assets after the Closing Date, other than in the ordinary course of business;

(h)     Promptly notify the Purchaser of (i) any order of the Bankruptcy Court entered in the Cases that affects or will affect the operation of the Business or the Purchased Assets and promptly deliver a copy of any such order to the Purchaser and (ii) any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order;

(i)     Maintain in full force and effect insurance comparable in amount and scope to coverage maintained by it (or on its behalf) with respect to the Business on the date hereof;

(j)     Not mortgage, pledge, sell, transfer, lease, sublease, license or otherwise dispose of or encumber any Purchased Asset or any right to any Purchased Asset other than in the ordinary course of business, in connection with the Revolving Credit and Guarantee Agreement or in connection with that certain final order, dated March 19, 2003, (i) authorizing the Debtors to (A) obtain post-petition financing pursuant to 11 U.S.C. Sections 105, 361, 362, 364(c)(1), 364(c)(3) and 364(d)(1) and (ii) granting adequate protection for pre-petition secured parties pursuant 11 U.S.C. Sections 361, 362, 363 and 364;

(k)     Other than pursuant to plans, agreements or other arrangements existing on the date hereof, not increase the compensation payable to any of the officers or employees of the Business, except for increases in base salary or wages in the ordinary course of business, or grant any bonus, severance or termination pay to, or enter into any employment or severance agreement with, any director, officer or other employee of the Business, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, officer or employee;

(l)     Not bring, settle, compromise or waive any claim or legal right that could reasonably be expected to materially and adversely affect the validity or value of the Business or the Purchased Assets, except in the ordinary course of business consistent with past practices and where not material;

(m)     Not make or commit to make capital expenditures in excess of $500,000 in the aggregate; and

(n)     Not agree to take any of the actions specified in this Section 5.1, except as contemplated by this Agreement or the Ancillary Agreements or pursuant to an order of the Bankruptcy Court.

**Section 5.2.   Consents and Approvals.** Subject to **Article IX**, the Sellers shall use reasonable best efforts to obtain (a) entry of the Approval Order by the Bankruptcy Court and (b) any other consent, authorization, order and approval of all Governmental Agencies that may be or become necessary for the Sellers' execution and delivery of, and the performance of their obligations pursuant to this Agreement and the Ancillary Agreements and will cooperate fully with other parties in promptly seeking to obtain such consents, authorizations, orders and approvals.

**Section 5.3.   Information and Access.** The Sellers will permit representatives of the Purchaser to have reasonable access during normal business hours after reasonable notice from the Purchaser to the Sellers, and in a manner so as not to interfere with normal operations, to all premises, properties, personnel, accountants, books, records, contracts and documents of or pertaining to the Business, subject to any requirements of applicable law. The Purchaser and each of its representatives will treat and hold as confidential such information in accordance with the terms and provisions of the Confidentiality Agreement, which Confidentiality Agreement remains in full force and effect. If the Purchaser discovers any breach of any representation or warranty contained in this Agreement, or any circumstance or condition that upon the Closing would constitute such a breach, the Purchaser covenants that it will promptly so inform the Sellers.

**Section 5.4.   Further Assurances.** Upon the request of the Purchaser at any time after the Closing Date, the Sellers shall forthwith execute and deliver such documents and take such actions as the Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 5.5.   Reasonable Best Efforts.** Upon the terms and subject to the conditions of this Agreement, the Sellers will use reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby and by the Ancillary Agreements. Without limiting the foregoing, the Sellers will use reasonable best efforts to take or cause to be taken by others all reasonable actions required to obtain or satisfy all consents (including without limitation, those listed on **Schedules 3.4 and 3.10(a))** , including the payment of reasonable consent fees where required with respect to the agreements and contracts listed on **Schedule 3.4,** and to continue such efforts as may be required after the Closing Date to facilitate the full and expeditious transfer of legal title, or the sublease or sublicense as the case may be, of the Purchased Assets.

**Section 5.6.   Assignment of Contracts.** At the Closing and effective as of the Closing Date, the Sellers shall sell, assign and transfer to the Purchaser all their rights under the Assigned Contracts, free from all prior defaults by the Sellers and all claims by third parties against the Purchaser or the Purchased Assets relating to any prior defaults by the Sellers thereunder, in each case as provided in and required by Section 365 of the Bankruptcy Code and as required by the Bankruptcy Court.

**Section 5.7.   Cure of Defaults.** The Sellers shall, on or prior to the Closing, cure any and all defaults or provide adequate assurance that they will cure any and all defaults with respect to Assigned Contracts as provided in and required by Section 365 of the Bankruptcy

Code and as required by the Bankruptcy Court, so that there shall be no such defaults under any of the Assigned Contracts, so that such Assigned Contracts may be assumed by the Sellers and assigned to the Purchaser as applicable in accordance with the provisions of section 365 of the Bankruptcy Code and so that the Purchaser shall have no obligations for defaults existing prior to the assignment.

        **Section 5.8.   Accounts Receivable.** Each Seller shall promptly remit in kind to the Purchaser any payments received by such Seller after the Closing in respect of Accounts Receivable constituting a part of the Purchased Assets.

        **Section 5.9.   Maintenance of Accounts.** From and after the Closing Date, the Sellers shall maintain all checking accounts (with sufficient funds therein) until all checks drawn on such accounts prior to the Closing Date have cleared.

        **Section 5.10.  Rejected Contracts.** The Sellers shall not reject any Assigned Contract in any bankruptcy proceeding following the date hereof (other than such Leases and Other Contracts as shall have been rejected by the Purchaser pursuant to **Section 2.10**) unless this Agreement is terminated in accordance with its terms.

        **Section 5.11.  Removal of Excluded Assets.** Within 90 days following the Closing, or such longer period as the Sellers' may reasonably request, but in any event, not to exceed the term of the transition services agreement to be entered into between the Purchaser and MMI substantially on the terms set forth on Exhibit I, the Sellers shall remove all Excluded Assets from the locations used in the operation of the Business and the Purchaser agrees to grant the Sellers reasonable access to the Excluded Assets for the purpose of effecting such removal.

        **Section 5.12.  Name Change.** The Sellers agree that at the Closing, or as soon as practicable thereafter (but in no event later than sixty (60) days after the Closing Date), they will and will use their reasonable best efforts to cause their U.S. Affiliates to (i) not use the corporate names "Maxxim Medical", or any names similar thereto in any business activity except as necessary for the administration of the Chapter 11 Cases, and (ii) file amendments to their respective organizational documents to change their respective names to names other than those described above or derivations thereof; provided, however, that Maxxim Canada shall be entitled to use the corporate names "Maxxim Medical", and any names similar thereto during the term of the Supply Agreement and for an additional 30 days thereafter.

        **Section 5.13.  Maxxim Canada.** The Sellers shall use their reasonable best efforts to cause Maxxim Canada to enter into a supply and distribution agreement substantially on the terms set forth in the term sheet attached hereto as **Exhibit G** (the **"Supply Agreement"**) with the Purchaser at or prior to the Closing.

        **Section 5.14.  Maxxim Canada Option.** The Parent will enter into the Maxxim Canada Option.

        **Section 5.15.  Consents.** If a consent of a third party which is required in order to assign any Purchased Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date notwithstanding the Sellers having complied with the provisions of **Section 5.5**, or if an attempted assignment would be ineffective or would

adversely affect the ability of any Seller to convey its interest in question to the Purchaser, the Sellers will cooperate with the Purchaser following the Closing Date and use reasonable best efforts in any lawful arrangement that would not subject Sellers to any liability to provide that the Purchaser shall receive the interests of any Seller in the benefits of such Purchased Asset.

## ARTICLE VI.

## CERTAIN COVENANTS OF THE PURCHASER

**Section 6.1.** **Hart-Scott-Rodino**. The Purchaser will file, within ten (10) Business Days after the date hereof, a notification under the HSR Act in connection with the transactions contemplated by this Agreement and will respond as promptly as practicable to any inquiries received from the Federal Trade Commission or the Antitrust Division of the Department of Justice for additional information or documentation and to any inquiries or requests received from any state attorney general or other Governmental Agency in connection with antitrust matters. The Purchaser will, in cooperation with the Sellers, use reasonable best efforts so that the waiting period provided for in the HSR Act expires or terminates prior to the Closing Date.

**Section 6.2.** **Reasonable Best Efforts**. Upon the terms and subject to the conditions of this Agreement, the Purchaser will use reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby. The Purchaser shall cooperate as reasonably necessary or desirable to secure any consents, including the provision of financial information regarding the Purchaser and its intended use of the Purchased Assets.

**Section 6.3.** **Consents and Approvals**. The Purchaser will use reasonable best efforts to provide, at the Sellers' request, assistance in obtaining the Sales Procedures Order and the Approval Order in order to effect the transactions contemplated by this Agreement. Without limiting the foregoing, the Purchaser agrees that it will promptly take all actions that are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sales Procedures Order and the Approval Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the Purchaser's employees and representatives available to testify before the Bankruptcy Court. Other than as expressly permitted in this Agreement, the Purchaser shall not take any action that could reasonably be expected to materially hinder or impair the Sellers ability to obtain the Sales Procedures Order or the Approval Order.

**Section 6.4.** **Adequate Assurances Regarding Executory Contracts**. With respect to each Executory Contract and without limiting **Section 6.3,** the Purchaser shall provide adequate assurance as required under the Bankruptcy Code of the future performance of such Executory Contract by the Purchaser.

**Section 6.5.** **Performance Under Assigned Contracts**. The Purchaser agrees that from and after the Closing Date it shall take all actions necessary to satisfy its obligations under the terms and conditions of each of the Assigned Contracts.

**Section 6.6.    Further Assurances**. Upon the request of the Sellers at any time after the Closing Date, the Purchaser shall forthwith execute and deliver such documents as the Sellers or their counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 6.7.    Revolving Credit Facility**. The Purchaser shall use its reasonable best efforts to enter into the Revolving Credit Facility on or prior to the Closing Date or obtain alternative financing on substantially similar terms or as otherwise acceptable to the Purchaser.

**Section 6.8.    Maxxim Canada.** The Purchaser shall enter into the Supply Agreement.

**Section 6.9.    Maxxim Canada Option.** The Purchaser shall enter into the Maxxim Canada Option.

**Section 6.10.    Transition Arrangements**. From and after the Closing Date, the Purchaser, with its then available personnel, shall cooperate with the Sellers in the establishment of such reasonable transition arrangements substantially on the terms set forth on **Exhibit H** attached hereto.

### ARTICLE VII.

### CONDITIONS TO THE SELLERS' OBLIGATIONS

The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by the Sellers) of each of the following conditions on or prior to the Closing Date:

**Section 7.1.    Representations and Warranties**. The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date except for changes expressly permitted by this Agreement and except that any such representation and warranty which is itself qualified as to materiality, or similar qualifier shall not be deemed so qualified for purposes of this condition and any representation and warranty that addresses matters only as of a certain date shall be so true and correct as of that certain date. The Purchaser shall have delivered to the Sellers a certificate signed by an executive officer of the Purchaser, dated the Closing Date, to the foregoing effect.

**Section 7.2.    Compliance with Agreement**. The Purchaser shall have performed and complied in all material respects (and in all respects in the case of **Article II**) with all covenants and conditions to be performed or complied with by it on or prior to the Closing Date. The Purchaser shall have delivered to the Sellers a certificate signed by an executive officer of the Purchaser, dated the Closing Date, to the foregoing effect.

**Section 7.3.    Corporate Documents**. The Sellers shall have received from the Purchaser certified copies of the resolutions duly adopted by the board of directors of the Purchaser approving the execution and delivery of this Agreement and the consummation of the

transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

      **Section 7.4.**   **Entry of the Approval Order.** (a) The Bankruptcy Court shall have entered the Approval Order, (b) the Approval Order shall not have been vacated, reversed, modified, amended or stayed, and the time to appeal or seek review or rehearing of the Approval Order shall have expired and (c) the Approval Order shall not modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material respect that adversely affects the Sellers. The **"Approval Order"** shall be an order or orders, substantially in the form attached as **Exhibit I** hereto, pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to Sellers and Purchaser approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

      **Section 7.5.**   **Entry of the Sale Procedures Order.** The Sale Procedures Order shall have been entered by the Bankruptcy Court.

      **Section 7.6.**   **Hart-Scott-Rodino.** All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise terminated.

      **Section 7.7.**   **No Order.** No Governmental Agency shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated by this Agreement or the Ancillary Agreements illegal or otherwise restraining or prohibiting the consummation of such transactions.

      **Section 7.8.**   **Ancillary Agreements.** The Purchaser shall have executed and delivered to the Sellers each of the Ancillary Agreements.

      **Section 7.9.**   **Revolving Credit Facility.** The Purchaser shall have entered into the Revolving Credit Facility or obtained alternative financing on substantially similar terms or as otherwise acceptable to the Purchaser.

      **Section 7.10. The Supply Agreement.** The Purchaser shall have executed and delivered the Supply Agreement to Maxxim Canada.

## ARTICLE VIII.

## CONDITIONS TO THE PURCHASER'S OBLIGATIONS

      The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by the Purchaser) of each of the following conditions on or prior to the Closing Date:

      **Section 8.1.**   **Representations and Warranties.** Except for any inaccuracy that does not constitute a Material Adverse Change, the representations and warranties of the Sellers set forth in this Agreement, shall be true and correct in all respects on the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing