Date (other than any representation and warranty that addresses matters as of a certain date which shall be so true and correct as of that certain date), except for changes permitted by this Agreement and except that any such representation and warranty which is itself qualified as to Material Adverse Change or materiality or similar qualifier shall not be deemed so qualified for purposes of this condition. The Sellers shall have delivered to the Purchaser a certificate signed by an executive officer of the Sellers, dated the Closing Date, to the foregoing effect.

**Section 8.2.    Compliance with Agreement**. The Sellers shall have performed and complied in all material respects (and in all respects in the case of **Article II**) with all covenants and conditions to be performed or complied with by them on or prior to the Closing Date. The Sellers shall have delivered to the Purchaser a certificate signed by an executive officer of each of the Sellers, dated the Closing Date, to the foregoing effect.

**Section 8.3.    Consents**. Other than the entry of the Approval Order, all consents, waivers, authorizations and approvals of any Governmental Agency or any other Person set forth on **Schedule 8.3** shall have been duly obtained and shall be in full force and effect on the Closing Date.

**Section 8.4.    Corporate Documents**. The Purchaser shall have received from Sellers certified copies of the resolutions duly adopted by the boards of directors or managers of Sellers approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

**Section 8.5.    Non-Foreign Status Certificate**. The Purchaser shall have received from each Seller a certificate of non-foreign status (in a form reasonably acceptable to the Purchaser) pursuant to section 1.1445-2(b)(2) of the Treasury regulations promulgated under the Code.

**Section 8.6.    Entry of the Order**. (a) The Bankruptcy Court shall have entered the Approval Order, (b) the Approval Order shall not have been vacated, reversed, modified, amended or stayed, and the time to appeal or seek review or rehearing of the Approval Order shall have expired and (c) the Approval Order shall not modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material respect that adversely affects the Purchaser.

**Section 8.7.    Entry of the Sale Procedures Order**. The Sale Procedures Order shall have been entered by the Bankruptcy Court.

**Section 8.8.    Hart-Scott-Rodino**. All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise terminated.

**Section 8.9.    No Order**. No Governmental Agency shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated by this Agreement or the Ancillary Agreements illegal or otherwise restraining or prohibiting the consummation of such transactions.

**Section 8.10. Ancillary Agreements**. The Sellers shall have delivered to the Purchaser each of the Ancillary Agreements.

**Section 8.11. Revolving Credit Facility**. The Purchaser shall have entered into the Revolving Credit Facility or obtained alternative financing on substantially similar terms or as otherwise acceptable to the Purchaser.

**Section 8.12. The Supply Agreement.** Maxxim Canada shall have executed and delivered the Supply Agreement to the Purchaser.

## ARTICLE IX.

## THE CLOSING; BIDDING PROTECTIONS; TERMINATION

**Section 9.1. The Closing**. The closing of the purchase and sale of the Purchased Assets (the **"Closing"**) shall be held within five (5) Business Days after each of the conditions precedent set forth in **Articles VII** and **VIII** have been satisfied or waived (the **"Closing Date"**). The Closing shall be held at the offices of Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019. At the Closing, all of the transactions provided for in **Article II** (other than **Section 2.4**) shall be consummated on a substantially concurrent basis and shall, upon the occurrence of the Closing, be deemed effective as of 12:01 a.m., New York City time, on the Closing Date.

**Section 9.2. Bidding Protections**. (a) **Competing Transaction**. From the date hereof and until the entry by the Bankruptcy Court of the Sales Procedures Order, (i) the Sellers shall not and shall cause their representatives and Affiliates not to (A) initiate, solicit or encourage submission of any inquiries, proposals or offers by, or contact any Person (other than Purchaser and its Affiliates, agents and representatives) in connection with any sale or disposition of the Purchased Assets (a **"Competing Transaction"**) or, (B) participate in any negotiations regarding, or furnish to any Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any Person to do so or seek any Competing Transaction and (ii) the Sellers shall immediately cease and cause to be terminated all existing discussions or negotiations with any Persons (other than the Purchaser or its Affiliates and representatives) conducted hereafter with respect to the foregoing; provided, however, that, notwithstanding the foregoing, from the date of filing of the Approval Motion to the date of the entry by the Bankruptcy Court of the Sales Procedures Order, the Sellers shall be permitted to respond to inquiries from, and provide information to, any Persons; and provided, further, that after the date hereof, the Sellers shall promptly notify the Purchaser of the existence and material terms of any proposal received by any Seller with respect to any Competing Transaction. From the date of the entry by the Bankruptcy Court of the Sales Procedures Order and until the entry by the Bankruptcy Court of the Approval Order, the Sellers are permitted to cause their representatives and Affiliates to, among other things, respond to any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) and participate in any negotiations in connection with any Competing Transaction in the manner contemplated by the Sales Procedures Order. Following the date of the entry by the Bankruptcy Court of the Approval Order and through the earlier of the consummation of the transactions contemplated by this Agreement or

the termination thereof, the Sellers shall not, and shall cause their representatives and Affiliates not to, engage in the conduct set forth in clauses (i) and (ii) of this **Section 9.2(a)**. Notwithstanding the foregoing, the parties acknowledge that the Sellers may have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and Purchased Assets to prospective buyers. The Sellers shall promptly notify the Purchaser of the existence of any proposal received by any Seller after the date of this Agreement with respect to any Competing Transaction, and the Sellers shall, with respect to such Competing Transaction, communicate to the Purchaser the material terms of any proposal which it may receive, including the identity of the entity making such proposal.

(b) **Other Proposals**. The Sellers shall not accept any offer from any other Person for the acquisition of all or substantially all of the assets of the Business (other than the Excluded Assets) or more than 50% of the voting power of the equity securities of MMI, other than an MMI Superior Proposal. **"MMI Superior Proposal"** means any bona fide proposal made by any Person or Persons to acquire, directly or indirectly, all or substantially all of the assets of the Business (other than Excluded Assets), or more than 50% of the voting power of the equity securities of MMI, on terms which the Board of Directors of MMI determines in its good faith judgment to be more favorable to the Sellers than the transaction provided for in this Agreement (taking into account all factors relating to such proposed transaction deemed relevant by such Board of Directors, including the financing thereof, any governmental or regulatory conditions or requirements, the proposed timing thereof and all other conditions thereto), including a recapitalization transaction approved by the Board of Directors of MMI; provided that no such proposal may be deemed an MMI Superior Proposal unless such proposal represents a valuation which is equal to or in excess of the sum of (i) the Purchase Price, (ii) the Break-Up Fee, which for purposes of this **Section 9.2(b)** shall be deemed to equal $2,500,000, (iii) the Expense Reimbursement, which for purposes of this **Section 9.2(b)** shall be deemed to equal $750,000 and (iv) an amount equal to 2% of the Purchase Price.

(c) **Break-Up Fee and Expense Reimbursement**. The Sellers shall use their reasonable best efforts to obtain prompt Bankruptcy Court authority to pay the Expense Reimbursement and Break-Up Fee (each as defined below), which in each case, upon entry of the Sales Procedures Order will be payable to the Purchaser in accordance with this **Section 9.2(c)** in cash by wire transfer of immediately available funds to an account designated by the Purchaser. Upon the occurrence of the following events, and as compensation for entering into this Agreement, taking action to consummate the transactions hereunder, incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, and providing a benefit to the Sellers' estate by being a "stalking horse" bidder, the Sellers agree to be, jointly and severally, obligated to pay to the Purchaser (A) $2,500,000 or such other amount as is approved by the Bankruptcy Court (the **"Break-Up Fee"**) and/or (B) the reimbursement of reasonable actual and documented expenses of the Purchaser (including, without limitation, professional fees) in connection with and arising out of all efforts to prepare, evaluate, negotiate, bid, implement and consummate the transactions contemplated by this Agreement, including, without limitation due diligence investigation, fees and expenses relating to obtaining financing, negotiation with the Sellers and other parties-in-interest, preparation and review of this Agreement and other documents necessary or appropriate to consummate the

transactions contemplated by this Agreement, efforts relating to any other agreements between the Sellers and the Purchaser, costs of enforcing this Agreement or any order of the Bankruptcy Court contemplated hereby, and/or any litigation expenses incurred in connection with any matter brought before the Bankruptcy Court or any other court of competent jurisdiction with standing to hear matters pertaining hereto and involving the Purchaser, and including, without limitation, legal, investment banking, appraisal, professional advisory, consulting, accounting and other similar fees, expenses, and disbursements, in each case incurred or paid prior to the date on which this Agreement is terminated (collectively, the **"Expense Reimbursement"**); provided, however, that the Expense Reimbursement shall not exceed $750,000 or such other amount as is approved by the Bankruptcy Court, in each case payable as soon as practicable, but no later than three (3) Business Days following the termination of this Agreement as specified below (or, in the case of the Break-Up Fee payable pursuant to clause (i) below, upon consummation of the transaction or stand-alone plan of reorganization) as follows:

(i)     Unless this Agreement has been terminated pursuant to Section 9.4(a) or 9.4(e), by the Purchaser pursuant to Section 9.4(c), (f)(ii), (g) or (h), or by the Sellers pursuant to Section 9.4(d), the Break-Up Fee and the Expense Reimbursement shall be payable in the event of a consummation of (A) an agreement providing for the sale of substantially all of the Sellers' assets or more than 50% of the voting power of the outstanding equity securities of MMI or (B) a stand-alone plan calling for the reorganization of the Sellers;

(ii)     The Break-Up Fee and the Expense Reimbursement shall be payable if prior to termination of this Agreement pursuant to Section 9.4, the Sellers seek, support or fail to oppose, any of the following actions that could reasonably cause the Assets not to be sold to the Purchaser pursuant to this Agreement:  (A) dismissal of any of the Cases; (B) filing of a plan of reorganization or liquidation, dissolution, merger or substantially similar transaction that is inconsistent with the sale of the Purchased Assets to the Purchaser pursuant to this Agreement, except as permitted by the Sales Procedures Order or Approval Order; (C) the appointment of a trustee, receiver, liquidator or similar Person for the purpose of liquidating the Purchased Assets; (D) piecemeal liquidation of the Purchased Assets pursuant to a proceeding under chapter 11 of the Bankruptcy Code or conversion of the Cases to a proceeding under chapter 7 of the Bankruptcy Code; or (E) the filing of any pleading authorizing any course of action materially inconsistent with the Sale to Purchaser in accordance with this Agreement, except as permitted by the Sales Procedures Order and Approval Order;

(iii)     The Expense Reimbursement only (and not the Break-Up Fee) shall be payable in the event of a material breach by any Seller of its obligations under this Agreement such that the Purchaser terminates this Agreement pursuant to **Section 9.4(d)**; provided, however, if either matter set forth in clauses (i)(A) and (B) of this **Section 9.2(c)** shall be consummated after such termination, the Break-Up Fee shall also be payable or

(iv)     The Expense Reimbursement only (and not the Break-Up Fee) shall be payable in the event the Purchaser terminates this Agreement under the circumstances described in **Sections 9.4(b) and 9.4(h)**; provided, however, that in the case of a

termination under **Section 9.4(b)**, if either matter set forth in clause (i)(A) or (B) of this **Section 9.2(c)** shall be consummated after such termination, the Break-Up Fee shall also be payable.

Notwithstanding anything herein to the contrary, in no event will the Sellers be required to pay the Break-Up Fee or the Expense Reimbursement on more than one occasion.

**Section 9.3. Bankruptcy Court Orders.** (a) Within ten (10) Business Days of the date hereof, Sellers shall file a motion or motions in the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, seeking to obtain (i) an order substantially in the form annexed as **Exhibit J** hereto (the **"Sale Procedures Order"**) approving the provisions of this **Section 9.3** and providing that the Break-Up Fee and the Expense Reimbursement shall be payable by Sellers as set forth herein and (ii) the Approval Order.

(b) The Sellers shall use reasonable best efforts to obtain the Sales Procedures Order and the Approval Order and the Purchaser shall cooperate with and take such actions as reasonably requested by the Sellers in obtaining such orders.

**Section 9.4. Termination.** Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time before the Closing and in no other manner:

(a) By mutual written consent of the Purchaser and the Sellers;

(b) Subject to the Approval Order, by either the Purchaser or the Sellers if the Sellers determine that the Purchaser is not the Successful Bidder; provided, however, that, if the Sellers determine that this Agreement is the second highest or otherwise best bid, the Purchaser may not terminate this Agreement pursuant to this provision , and shall remain obligated to close the transactions contemplated hereby at all times, prior to the eleventh Business Day after the later of (i) the bid deadline provided for in the Sales Procedure Order and (ii) the conclusion of any initially scheduled auction conducted pursuant to the Sale Procedures Order;

(c) By the Purchaser or the Sellers (if such terminating party is not then in breach or default of any of its obligation hereunder), if the Closing has not occurred on or before November 21, 2003;

(d) By the Sellers or the Purchaser (if such terminating party is not then in breach or default of any of its obligations hereunder), if the other party is in breach of its representations made in this Agreement, or is in breach or default of any of its obligations hereunder, in each case such that the corresponding condition to Closing set forth in **Sections 7.1, 7.2, 8.1** and **8.2**, as applicable, would not be satisfied and such breach or default, if curable, is not cured within five (5) Business Days following delivery of notice thereof by the non-breaching party;

(e) By the Purchaser or the Sellers, within two (2) Business Days following October 10, 2003, if the Sale Procedures Order is not entered by October 10, 2003;

(f)     By the Purchaser upon the occurrence of any of the events enumerated in (i) **Section 9.2(c)(i)(B)** or (ii) **Section 9.2(c)(ii)**; provided in each case that Purchaser shall not be in material breach of its obligations under this Agreement;

(g)     By the Purchaser under the circumstances described in Section 2.9; or

(h)     By the Purchaser (if the Purchaser is not then in breach or default of its obligations hereunder) in the event the Closing shall not have occurred 20 Business Days after the Approval Order is entered.

**Section 9.5.     Effects of Termination.** (a)  In the event that this Agreement is terminated pursuant to **Section 9.4**, written notice thereof shall forthwith be given to the other party specifying the provision hereof pursuant to which such termination is made, this Agreement shall forthwith become wholly void and of no further force and effect, and there shall be no liability on the part of the Purchaser or the Sellers, except (i) that the obligations of the Sellers and the Purchaser under **Section 12.6** shall remain in full force and effect, (ii) that if this Agreement shall be terminated pursuant to **Section 9.4(d)** hereof, the Sellers' sole and exclusive remedy shall be limited to the Deposit and the Purchaser's sole and exclusive remedy shall be limited to the Break-Up Fee and the Expense Reimbursement and  (iii) for Purchaser's right to payment of the Break-Up Fee and/or Expense Reimbursement pursuant to **Section 9.2(c)**.

(b)     The foregoing provisions of this **Section 9.5** shall not limit the rights of the parties hereto to seek specific performance of any obligation hereunder of any other party.

## ARTICLE X.

## TAXES; INFORMATION

The parties hereto hereby covenant and agree as follows:

**Section 10.1.     Taxes Related to Purchase of Assets.** Unless otherwise exempt under Section 1146(c) of the Bankruptcy Code, 50%, but in no event more than $25,000, of all state and local sales, transfer, transfer gains, excise, value-added, use or other similar Taxes (collectively, **"Transaction Taxes"**) that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets shall be paid by the Purchaser, and the balance of the Transaction Taxes shall be paid by the Sellers.  The Purchaser and the Sellers agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement.  The Purchaser and the Sellers agree to cooperate in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities and to take all reasonable steps necessary to establish any and all available exemptions from such Transaction Taxes.  Without limiting the foregoing, to the extent applicable, the Purchaser shall complete and execute a resale or other exemption certificate with respect to the inventory items sold hereunder, and shall provide the Sellers with an executed copy thereof.  Any refund of Transaction Taxes received by one party hereto that is attributable to a payment made under this **Section 10.1** by another party shall, to such extent, be promptly paid over to that other party.

**Section 10.2.  Real Estate Apportionments and Proration of Real and Personal Property Taxes.**  Property Taxes on the Purchased Assets or of the Business for a Straddle Period and all expenses relating to the Owned Real Property and Leased Property of every type and nature as is customary with a closing of this type shall be prorated on a per diem basis between the Purchaser and the Sellers as of the Closing Date.  All such prorations shall be allocated so that items relating to Pre-Closing Periods shall be allocated to the Sellers and items relating to Post-Closing Periods shall be allocated to the Purchaser, provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code.  The amount of all such prorations shall be settled and paid on the Closing Date, provided that final payments with respect to prorations that are not able to be calculated as of the Closing Date shall be calculated and paid as soon as practicable thereafter.  If any of the Property Tax rates for the current taxable period are not established by the Closing Date, the prorations shall be made on the basis of the rate in effect for the preceding taxable period, and such proration shall be adjusted upon presentation of written evidence by the Purchaser that the actual Property Taxes paid differ from the amount assumed on the Closing Date.

**Section 10.3.  Information and Cooperation.**  The Purchaser and the Sellers agree to furnish or cause to be furnished to each other, as promptly as practicable, such information, access to information and assistance relating to the Business or the assets and liabilities of the Business as is reasonably necessary (a) for preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters or (b) in the case of the Purchaser, in connection with the negotiation, settlement, payment or other disposition by or on behalf of the Sellers of any claim or proceeding in the Cases or any other matter relating to the administration or winding up of the Cases.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents in their possession relating to ruling or other determinations by Tax authorities.  The Sellers and the Purchaser shall make themselves (and their respective employees) available on a mutually convenient basis to provide explanations of any documents or information provided under this **Section 10.3.**

The Purchaser agrees to retain possession of all files and records delivered to the Purchaser by the Sellers for a period of at least six years from the Closing Date.  In addition, from and after the Closing Date, the Purchaser agrees that it will provide access to the Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours) to such files and records as the Sellers may reasonably deem necessary in connection with any matter referred to in the preceding paragraph.  Before the Sellers shall dispose of any files and records relating to any Taxes, other than Excluded Taxes unless such files or records relating to such Excluded Taxes are material to the Purchaser's liability for Taxes, of the Purchased Assets or the Business, the Purchaser shall be given the opportunity, after 90 days' prior written notice, to remove and retain all or any part of such documents as the Purchaser may select (at the Purchaser's expense).

**Section 10.4.  Payment of Excluded Taxes.**  The Sellers shall pay and discharge when due, and be solely liable for, all Excluded Taxes except (i) to the extent Liabilities with

respect to such Excluded Taxes constitute Assumed Liabilities and (ii) Transaction Taxes to be paid by the Purchaser pursuant to **Section 10.1.**

## ARTICLE XI.

## EMPLOYEES AND EMPLOYEE BENEFIT PLANS

**Section 11.1. Employment.** (a) **Offer to Hire.** Effective as of the Closing Date, the Purchaser shall (i) offer to hire, in a comparable position and at the same rate of pay, each active Business Employee, including the Chief Executive Officer, the Chief Financial Officer and the Chief Operating Officer of MMI, who is primarily involved in the conduct of the Business on the day immediately prior to the Closing Date and all those inactive Business Employees who are on approved leave on the Closing Date because of jury duty, family or medical leave, sick leave, vacation or military duty or (ii) pay severance benefits to the Business Employees set forth in the preceding sentence to which the Purchaser does not offer employment in an amount equal to one week of "Base Salary" for each "Year of Service" (as such terms are defined in the Maxxim Medical, Inc. Amended and Restated Severance Plan, effective February 10, 2003) with the Seller, with a minimum of one week of Base Salary and a maximum of eight weeks of Base Salary. The Purchaser shall be responsible for any obligations or Liabilities to the Business Employees, under the federal Worker Adjustment and Retraining Notification Act (Pub. L. 100-379) and any similar state or local "plant closing" law (**"WARN"**), to the extent that WARN thresholds are exceeded as a result of actions taken by the Purchaser after the Closing Date with respect to the Business Employees. The Sellers shall be responsible for any obligations or Liabilities to the Business Employees under WARN as a result of actions taken by the Sellers prior to the Closing Date.

(b) **Transferred Employees.** The Business Employees who accept and commence employment with the Purchaser shall be referred to herein as **"Transferred Employees"**. The Purchaser's obligation with respect to Transferred Employees shall commence as of the Closing Date.

(c) **Terms of Employment.** For the period ending one year after the Closing Date, the Purchaser will provide Transferred Employees with benefits (other than benefits pursuant to an equity-based program or loan program) under the Purchaser's employee benefit plans which are substantially equivalent in the aggregate to those provided to such employees pursuant to the Plans specified on **Schedule 3.12.** Except as provided otherwise in this **Article XI**, the Transferred Employees' employment with the Purchaser shall be upon such terms and conditions as the Purchaser, in its sole discretion, shall determine, and nothing herein expressed or implied by this Agreement shall confer upon any Business Employee, or legal representative thereof, any rights or remedies, including any right to employment, or for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

**Section 11.2. Employee Welfare Benefit Plans.** Except with respect to any claim that is covered by an Assigned Contract or otherwise constitutes an Assumed Liability, the Sellers shall retain responsibility for all hospital, medical, life insurance, disability and other welfare plan expenses and benefits, and for all workers' compensation, unemployment compensation and other government mandated benefits (collectively referred to herein as

**"Welfare Type Plans"**), in respect of claims covered by Plans and which are incurred by Business Employees and their dependents prior to the Closing Date. The Purchaser shall be responsible for all claims incurred after the Closing Date by Transferred Employees and their dependents under all Welfare Type Plans that are maintained by the Purchaser for the Transferred Employees and their dependents. For purposes of this **Section 11.2**, claims shall be deemed to have been incurred: with respect to all death or dismemberment claims, on the actual date of death or dismemberment; with respect to all disability claims, other than short-term disability or salary continuation benefits, on the date the claimant became unable to (a) perform his or her regular duties of employment, in the case of an employee claimant or (b) perform the normal day-to-day responsibilities that would reasonably be expected of someone of similar age and lifestyle, in the case of a dependent claimant; with respect to short-term disability or salary continuation claims, on each day for which income benefits are payable to the claimant; with respect to all medical, drug or dental claims, on the date the service was received or the supply was purchased by the claimant; provided, however, that a medical claim relating to a claimant's hospitalization shall be deemed to be incurred on the date the claimant was first hospitalized; and with respect to workers' compensation claims, on the date the incident occurred Transferred Employees shall participate as of the Closing Date under Welfare Type Plans established or provided by the Purchaser without, to the extent practicable, any waiting periods, any evidence of insurability and any preexisting physical or mental condition restrictions (except to the extent applicable and unsatisfied under the Sellers' Welfare Type Plans), and the Purchaser shall provide credit, to the extent recognized by a similar Plan of the Sellers, for claims incurred prior to the Closing Date for purposes of applying deductibles, co-payments, out of pocket maximums and benefit maximums.

      **Section 11.3.  COBRA**. Except as provided below, the Purchaser shall have sole responsibility for "continuation coverage" benefits provided after the Closing Date under the Purchaser's group health plans to all Transferred Employees, and "qualified beneficiaries" of Transferred Employees, for whom a "qualifying event" occurs after the Closing Date. The Sellers shall have sole responsibility for "continuation coverage" benefits provided under the Sellers' group health plans to all employees of the Sellers, and "qualified beneficiaries" of employees of the Sellers, for whom a "qualifying event" has occurred on or prior to the Closing Date; provided, however, that in the event Sellers, or any member of Sellers' controlled group, cease to maintain a group health plan following the Closing Date, the Purchaser shall have sole responsibility for "continuation coverage" benefits under the Purchaser's group health plans to all "M&A qualified beneficiaries". The terms "continuation coverage", "qualified beneficiaries" and "qualifying event" shall have the meanings ascribed to them under Section 4980B of the Code and Sections 601-608 of ERISA, and the term "M&A qualified beneficiaries" shall have the meaning ascribed to it under Treas. Reg. § 54.4980B-9.

      **Section 11.4.  401(k) Plan**. MMI is currently a participating employer in a 401(k) plan known as the Maxxim Medical, Inc. 401(k) Plan (the **"Seller Savings Plan"**) which provides benefits for certain of the Transferred Employees. Effective as of the Closing Date, the Purchaser shall adopt or provide a savings plan or plans with a cash or deferred arrangement that is qualified under Section 401(a) of the Code on behalf of the Transferred Employees who participated in the Seller Savings Plan (the **"Purchaser Savings Plan"**) and that expressly provides that: (a) Transferred Employees who were participants in the Seller Savings Plans immediately prior to the Closing Date will continue their participation in the Purchaser Savings

Plan as of the Closing Date without interruption and (b) all Transferred Employees will have their months and years of service with the Sellers and their Affiliates which is recognized under the Seller Savings Plans credited for eligibility, vesting and other purposes for which service is taken into account under the Seller Savings Plans. As soon as practicable after the Closing Date, the Sellers shall cause the assets of the trust under the Seller Savings Plan in respect of the aggregate benefits accrued (including unvested benefits) under the Seller Savings Plan by the Transferred Employees to be valued and transferred to the trust under the Purchaser Savings Plan; provided, however, that the Purchaser shall first have provided the Sellers with either a copy of a favorable determination letter from the IRS or an opinion of counsel reasonably satisfactory to the Sellers regarding the qualification, in form, of the Purchaser Savings Plan under Section 401(a) of the Code. The assets to be transferred from the trust under the Seller Savings Plan pursuant to this **Section 11.4** shall be in cash or, to the extent mutually agreed to by the Sellers and the Purchaser, a combination of cash, securities and other property; provided, however, that any outstanding loans attributable to the accounts of the Transferred Employees shall be transferred in kind. The actual amount transferred from the trust under the Seller Savings Plan shall be adjusted to reflect any normal and reasonable administrative expenses properly attributable to the accounts of the Transferred Employees during the period following the Closing Date. At the time the assets that are held in the trust with respect to the Transferred Employees under the Seller Savings Plan are paid to the trust under the Purchaser Savings Plan, the Purchaser Savings Plan shall assume all liabilities of the Seller Savings Plan for the applicable benefits so transferred, and such transfer shall be in full discharge of all obligations of the Seller Savings Plan in respect thereof. During the period following the Closing Date and preceding the transfer of assets and liabilities pursuant to this **Section 11.4**, (i) the Sellers shall take such action as is necessary to prevent a default by any Transferred Employee with an outstanding loan from the Seller Savings Plan unless and until such Transferred Employee fails to make a timely payment on such loan and (ii) the Purchaser will cooperate with and assist the Sellers or their designee in the continued administration of the Seller Savings Plan, including, subject to the consent of the Transferred Employee, collecting and remitting to the trustee of the Seller Savings Plan payroll deductions relating to any outstanding loans. Notwithstanding the above, the amount transferred to the trust under the Purchaser Savings Plan shall in no event be less than the amount necessary to satisfy the requirements of Section 414(l) of the Code and the Sellers shall have first provided the Purchaser with an officer's certificate or an opinion of counsel to the effect that the Sellers either (A) have received a recent favorable determination letter as to the qualification of the Seller Savings Plan under the Code, and nothing has occurred since the date of such letter which would cause the loss of such qualification or (B) substantially complies by its terms with the relevant qualification provisions of the Code, and the plan sponsor has timely applied for a favorable determination letter with respect to Seller Savings Plan, and will make whatever changes to the plan as is requested by the IRS as a condition of qualification.

  **Section 11.5. Vacation and Sick Leave.** Each Transferred Employee will be credited by the Purchaser with any unused vacation and sick leave earned as of the Closing Date under the vacation and sick leave policy of the Sellers applicable to such Transferred Employee, and the Sellers shall have no Liability therefor following the Closing Date. The Purchaser shall recognize service by each Transferred Employee with the Sellers for purposes of determining entitlement to vacation and sick leave following the Closing Date under the applicable vacation and sick leave policy of the Sellers; provided, however, that this **Section 11.5** shall not be construed so as to entitle any Transferred Employee to be credited with any benefits under the

Purchaser's vacation and sick leave policy with respect to any period of employment prior to the Closing Date other than as provided in the preceding sentence.

Section 11.6. **Severance Benefits following the Closing Date.** The Purchaser agrees that in the event any Transferred Employee is terminated by the Purchaser, other than for cause, during the one-year period immediately following the Closing Date, the Purchaser will provide such person with a severance benefit which is not less than one week's salary for each year of such person's service with the Sellers and the Purchaser, with a minimum severance benefit of one week's salary and a maximum severance benefit of eight weeks' salary.

Section 11.7. **Sellers' Stock Option Plan.** The Sellers shall be responsible for any obligations or Liabilities to the Business Employees relating to the Sellers' stock option plans, and the Purchaser shall not be required to assume any such plan or award granted thereunder or to provide any substitute benefit or award with respect thereto.

Section 11.8. **No Third Party Beneficiaries.** The parties agree that nothing contained in this **Article XI** shall be deemed to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

Section 12.1. **Representations and Warranties.** The representations and warranties of the parties to this Agreement made in this Agreement, subject to the exceptions thereto, will not be affected by any information furnished to, or any investigation conducted by, any of them or their representatives in connection with the subject matter of this Agreement.

Section 12.2. **Notices.** All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) when sent to the recipient by telecopy (receipt electronically confirmed by sender's telecopy machine) if during normal business hours of the recipient, otherwise on the next Business Day, (c) one (1) Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid) or (d) two (2) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications will be sent to the Sellers and to the Purchaser at the addresses indicated below:

If to the Purchaser:

Lightyear Capital LLC
51 West 52nd Street
New York, NY 10019
Attention: Richard J. Sterne
Facsimile No.: (212) 882-5780

With copies (which shall not constitute notice) to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attention: Stephen M. Besen, Esq.
Facsimile No.: (212) 848-7179

If to the Sellers:

Maxxim Medical, Inc.
4750 118th Avenue North
Clearwater, FL 33762
Attention: Chief Executive Officer
Facsimile No. (727) 573-3506

With a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York 10019
Attention: Cornelius T. Finnegan, III
Facsimile No. (212) 728-8111

or to such other address as any party hereto may, from time to time, designate in writing delivered pursuant to the terms of this Section.

**Section 12.3. Amendments; Waiver.** (a) The terms, provisions and conditions of this Agreement may not be changed, modified or amended in any manner except (i) by an instrument in writing duly executed by each of the parties hereto or (ii) by waiver in accordance with **Section 12.3(b)**.

(b) Any party to this Agreement may (i) extend the time for the performance of any of the obligations or other acts of the other parties, (ii) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto or (iii) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

**Section 12.4. Assignment.** This Agreement is binding upon and inures to the benefit of the successors and assigns of each party to this Agreement (including any trustee appointed in respect of the Sellers under the Bankruptcy Code), but no rights, obligations or liabilities under this Agreement may be assigned by any party without the prior written consent of the other parties hereto, except that the Purchaser shall have the right, on or prior to the Closing Date, to assign all or any portion of its rights under this Agreement to one or more

wholly owned subsidiaries of the Purchaser; provided that no such assignment shall relieve the Purchaser of its obligations hereunder.

**Section 12.5. Announcements.** All press releases, notices to customers and suppliers and other announcements prior to the Closing Date with respect to this Agreement and the transactions contemplated by this Agreement shall be approved by both the Purchaser and MMI prior to the issuance thereof; provided that any party may make any public disclosure it believes in good faith is required by Law or regulation (in which case the disclosing party shall advise the other party (which shall be MMI in the case of disclosure proposed to be made by the Purchaser and the Purchaser in the case of disclosure proposed to be made by any of the Sellers) prior to making such disclosure and provide such other party an opportunity to review and comment on the proposed disclosure).

**Section 12.6. Expenses.** Except as otherwise set forth in this Agreement, each party to this Agreement shall bear all of its legal, accounting, investment banking and other expenses incurred by it or on its behalf in connection with the transactions contemplated by this Agreement, whether or not such transactions are consummated.

**Section 12.7. Entire Agreement.** This Agreement, the Ancillary Agreements and the Confidentiality Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede and are in full substitution for any and all prior agreements and understandings between them relating to such subject matter. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 12.8. Descriptive Headings.** The descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

**Section 12.9. Counterparts.** For the convenience of the parties, any number of counterparts of this Agreement may be executed by any one or more parties hereto (including by facsimile), and each such executed counterpart shall be, and shall be deemed to be, an original, but all of which shall constitute, and shall be deemed to constitute, in the aggregate but one and the same instrument.

**Section 12.10. Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof. For so long as the Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the Bankruptcy Court. After the Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the courts of the County of New York, State of New York or of the United States of America for the Southern District of New York.

**Section 12.11. Construction.** The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any references to any federal, state, local or foreign statute or law will also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless the context otherwise requires: (a) a term has the meaning assigned to it by this Agreement; (b) an accounting term not otherwise defined has the meaning assigned to by GAAP; (c) the word "or" is not exclusive; (d) the words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation"; (e) words in the singular include the plural and in the plural include the singular; (f) provisions apply to successive events and transactions; and (g) "$" means the currency of the United States of America.

**Section 12.12. Substantive Consolidation.** The Purchaser hereby acknowledges that the Cases may be substantively consolidated and agrees that the Sellers shall not be deemed to have breached any representations, warranties or covenants hereunder solely as a result of such substantive consolidation.

**Section 12.13. Severability.** In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

IN WITNESS WHEREOF, the Sellers and the Purchaser have executed and delivered this Agreement as of the day and year first written above.

**MAXXIM MEDICAL, INC.,**
**a Delaware corporation**

By:_____

    Name:

    Title:

**FABRITEK LA ROMANA, INC.**

By:_____

    Name:

    Title:

**MAXXIM INVESTMENT MANAGEMENT, INC.**

By:_____

    Name:

    Title:

**MAXXIM OPERATIONS EAST, INC.**

By:_____

    Name:

    Title:

**MAXXIM OPERATIONS WEST, INC.**

By:_____

    Name:

    Title:

**MAXXIM MEDICAL, LLC**

By:_____

    Name:

    Title:

**MMI ACQUISITION CORP.**

By:_____

    Name:

    Title:

**COPIES OF SCHEDULES ARE AVAILABLE UPON REQUEST**

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MAXXIM MEDICAL GROUP, INC., et al.,** | : | **Case Nos. 03-10438 (PJW)** |
| | : | |
| **Debtors.** | : | **Jointly Administered** |

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x     Re: Docket No. _____
```

### ORDER (A) APPROVING SALE PROCEDURES, INCLUDING, WITHOUT LIMITATION, EXPENSE REIMBURSEMENT AND BREAK-UP FEE; (B) APPROVING FORM AND MANNER OF NOTICE; (C) SCHEDULING A HEARING TO CONSIDER THE SALE OF THE PURCHASED ASSETS; AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), requesting entry of an order (a) approving the sale procedures (the "Sale Procedures") with respect to the proposed sale of substantially all of the Debtors' assets (the "Purchased Assets"), including the Expense Reimbursement and the Break-Up Fee, all as more fully set forth below and in the Asset Purchase Agreement, by and among MMI Acquisition Corp , (the "Purchaser") and certain of the Debtors, dated as of September 8, 2003 (the "Asset Purchase Agreement"), (b) approving the form and manner of notice of the auction (the "Auction") and the Sale Procedures, (c) scheduling a hearing (the "Sale Hearing") and objection deadline with respect to the proposed sale of the Purchased Assets (the "Proposed Asset Sale"), and (d) granting related relief; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and upon the record herein and of these chapter 11 cases; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion, Asset Purchase Agreement or the Sale Procedures

FOUND THAT:[2]

A.    This Court has jurisdiction over this matter and over the property of the Debtors and their respective estates pursuant to 28 U.S.C. §§ 157(a) and 1334;

B.    This is a core proceeding pursuant to, among others, 28 U.S.C. § 157(b)(2)(A), (N) and (O);

C.    Good and sufficient notice of the relief sought in the Motion has been given and no other or further notice is required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to parties-in-interest;

D.    The Debtors' proposed Notice of Auction and Sale Hearing, a copy of which is annexed to the Motion as Exhibit F, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Proposed Asset Sale, the assumption and assignment of the Assigned Contracts and the Sale Procedures to be employed in connection therewith;

E.    The Debtors have demonstrated a sound business justification for authorizing the payment of the Expense Reimbursement and Break-Up Fee to the Purchaser under those circumstances set forth in the Asset Purchase Agreement and the Motion;

F.    The Expense Reimbursement and Break-Up Fee are fair and reasonable, and were negotiated by the parties in good faith and at arms' length;

G.    The Debtors' payment of the Expense Reimbursement and Break-Up Fee to the Purchaser, as set forth in the Asset Purchase Agreement and the Motion, is (1) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the extent appropriate. See Fed. R. Bankr. Proc. 7052.

503(b) of the Bankruptcy Code, (2) of substantial benefit to the Debtors' estates, (3) reasonable and appropriate, in light of the size and nature of the Proposed Asset Sale and the efforts that have been and will be expended by the Purchaser because the Proposed Asset Sale is subject to higher or otherwise better offers, and (4) necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Purchased Assets and Assigned Contracts;

H       The Expense Reimbursement and Break-Up Fee were and are a material inducement for, and condition of, the Purchaser's entry into the Asset Purchase Agreement  The Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Asset Purchase Agreement unless it is assured of payment of the Expense Reimbursement and/or Break-Up Fee as more fully set forth in the Asset Purchase Agreement and the Motion  Assurance to the Purchaser of payment of the Expense Reimbursement and/or Break-Up Fee may promote more competitive bidding by inducing the Purchaser's bid that otherwise would not have been made, and without which bidding would have been and would continue to be limited  Further, because the Expense Reimbursement and Break-Up Fee induced the Purchaser to submit a bid that will serve as a minimum or floor bid for the Proposed Asset Sale on which other bidders and the Debtors can rely, the Purchaser has provided a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth;

I       Absent approval of the Expense Reimbursement and Break-Up Fee, the Debtors may lose the opportunity to obtain the highest or otherwise best available offer for the Purchased Assets and downside protection afforded by the Asset Purchase Agreement  In light of the benefit to the Debtors' estates realized by having a fully negotiated agreement, which will enable the Debtors to preserve the value of their businesses, ample support exists for the

approval of the Expense Reimbursement and Break-Up Fee as contemplated in the Asset Purchase Agreement and the Motion;

J.      The entry of this order is in the best interest of the Debtors, their estates, their creditors and other parties-in-interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Motion is granted.

2.      All objections to the entry of this order that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are denied and overruled on the merits with prejudice.

3.      The Sale Procedures attached to the Motion as <u>Exhibit C</u> are approved and shall apply with respect to the Proposed Asset Sale.

4.      The Expense Reimbursement and Break-Up Fee are approved.

5.      If the Asset Purchase Agreement is terminated, the Debtors shall pay the Expense Reimbursement and/or Break-Up Fee to the Purchaser as provided, and subject to the terms and conditions set forth, in the Asset Purchase Agreement.

6.      The Debtors are authorized to conduct an Auction in accordance with the Sale Procedures.

7.      The Sale Hearing shall be held before this Court on _____, at _____ p.m. (prevailing Eastern Time), or as soon thereafter as counsel and interested parties may be heard, to consider the approval of the Proposed Asset Sale to the Qualified Bidder that submits the highest or otherwise best offer (the "Successful Bidder"). The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties-in-interest other than

by announcement of such adjournment before this Court or on this Court's calendar on the date scheduled for such hearing

8    Not later than five (5) business days after the entry of this Order, the Debtors will cause the Auction and Sale Notice, substantially in the form attached to the Motion as Exhibit F, to be (a) sent by first-class mail postage prepaid to all of the Debtors' creditors and equity interest holders of record, all entities known by the Debtors to have expressed a bona fide interest in acquiring the Assets, all taxing authorities or recording offices which have a reasonably known interest in the relief requested, the Securities and Exchange Commission, the Office of the United States Trustee, counsel for the Committee, counsel for the Agent, all federal, state and local regulatory authorities with jurisdiction over the Debtors, the United States Attorney for the District of Delaware, all insurers, all non-debtor parties to contracts or leases (executory or otherwise), and otherwise known parties-in-interest in these bankruptcy cases; and (b) published in the national edition of The Wall Street Journal pursuant to Bankruptcy Rule 2002(l) Such notice is good and proper notice to such interested parties, including those whose identities are unknown to the Debtors

9    Not later than five (5) business days after the entry of this order, the Debtors shall cause the Cure Amount Notice, substantially in the form attached to the Motion as Exhibit G, to be served on the non-debtor parties to all unexpired leases, license agreements and executory contracts

10    Unless a non-debtor party to an Assigned Contract files an objection (the "Cure Amount Objection") to its scheduled Prepetition Cure Amount on or before 4.00 p m (prevailing Eastern Time) on _____ (the "Cure Objection Deadline") and serves a copy of the Cure Amount Objection so as to be received no later than 4:00 p m (prevailing

Eastern Time) on the same day, upon (a) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Michael Kelly, Esq (Fax No : (212) 728-9686); (b) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O Box 391, Wilmington, DE 19899-0391, Attn: Brendan Linehan Shannon, Esq (Fax No (302) 571-1253); (c) Greenhill & Co. LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer (Fax No : (212) 389-1700); (d) Maxxim Medical, Inc , 4750 118th Avenue, Clearwater, FL 33762, Attn: Thomas Cochill (Fax No : (727) 573-3506); (e) counsel to the Agent, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq (Fax No : (212) 450-3800); (f) counsel to the Committee, Milbank Tweed Hadley & McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq (Fax No : (212) 530-5219); and (g) counsel to the Purchaser, Shearman & Sterling, LLP 599 Lexington Avenue, New York, NY 10022, Attn: Stephen M. Besen, Esq (Fax No : (212) 848-7179), such non-debtor party shall be (i) forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such Assigned Contract and the Debtors shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) deemed to have consented to the assumption and assignment of such Assigned Contract and shall be forever barred and estopped from asserting or claiming against the Debtors, Purchaser or such other successful bidder or any other assignee of the relevant Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Assigned Contract

11. In the event that a Cure Amount Objection is filed, the Cure Amount Objection must set forth: (a) the basis for the objection; and (b) the amount the party asserts as the Prepetition Cure Amount In the event that the Debtors and a non-debtor party to an

Assigned Contract cannot consensually resolve the Cure Amount Objection, the Debtors will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties

12      Objections, if any, to the relief requested in the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Fifth Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p m (prevailing Eastern Time) on _____ __, 2003 and (d) be served so as to be received no later than 4:00 p m (prevailing Eastern Time) on the same day, upon (i) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Michael Kelly, Esq (Fax No : (212) 728-9686); (ii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P O Box 391, Wilmington, DE 19899-0391, Attn: Brendan Linehan Shannon, Esq (Fax No : (302) 571-1253); (iii) Greenhill & Co LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer (Fax No : (212) 389-1700); (iv) Maxxim Medical, Inc , 4750 118th Avenue, Clearwater, FL 33762, Attn: Thomas Cochill (Fax No : (727) 573-3506); (v) counsel to the Agent, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq (Fax No : (212) 450-3800); (vi) counsel to the Committee, Milbank Tweed Hadley & McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq (Fax No : (212) 530-5219) and (vii) counsel to the Purchaser, Shearman & Sterling, LLP 599 Lexington Avenue, New York, NY 10022, Attn: Stephen M Besen, Esq (Fax No : (212) 848-7179)

13      Hearings on Cure Amount Objections may be held (a) at the Sale Hearing, or (b) at such other date prior to the Sale Hearing as this Court may designate upon motion by the Debtors; provided, however, that if the subject Assigned Contract is assumed and assigned,

the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited with and held in a segregated account by the Debtors pending further order of this Court or mutual agreement of the parties

14    The Debtors' decision to assume and assign the Assigned Contracts is subject to this Court's approval and consummation of the Proposed Asset Sale. Absent consummation of the Proposed Asset Sale, each of the Assigned Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code

15    The Notice of Auction and Sale Hearing and the Cure Amount Notice, substantially in the forms of the notices annexed to the Motion as <u>Exhibits F and G</u>, respectively, are approved in all respects.

16    As provided by Bankruptcy Rules 6004(g) and 6006(d), this order shall not be stayed for ten (10) days after the entry thereof and shall be effective and enforceable immediately upon the entry thereof

17    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this order

Dated: Wilmington, Delaware
_____, 2003

_____
Honorable Peter J. Walsh
United States Bankruptcy Judge

# EXHIBIT C

# SALE PROCEDURES

**Initial Bid:** The Debtors believe that the bid (the "Initial Bid") proposed by MMI Acquisition Corp (the "Initial Bidder") represents the highest or otherwise best offer thus far received for substantially all of the assets of Maxxim Medical, Inc , a Delaware corporation, and certain of its subsidiaries, each of which is a Debtor (collectively, "Maxxim")

**Bidding Process:** The Debtors shall have the right to (i) determine whether any person is a Qualified Bidder (as defined herein), (ii) coordinate the efforts of potential bidders in conducting their respective due diligence reviews, (iii) receive offers from these Sale Procedures, or (c) notice all parties with respect to these "Sale Procedures" and the auction relating to Maxxim's assets (the "Auction"), and (v) evaluate and negotiate any bid (collectively, the "Bidding Process")

**Reservation of Rights:** Notwithstanding anything herein to the contrary, the Debtors may (i) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer (the "Successful Bid"), and (ii) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or these Sale Procedures, or (c) contrary to the best interests of the Debtors, their estates and creditors  Subject to approval of the Bankruptcy Court, Maxxim may enter into one or more agreements with a Qualified Bidder with respect to the Successful Bid (the "Successful Bidder") and, upon a determination that the Initial Bidder is not the Successful Bidder, may terminate the asset purchase agreement entered into with the Initial Bidder (the "Agreement") at any time prior to the time at which the Agreement would otherwise terminate pursuant to Section 9 4 thereof  The Debtors shall retain all rights to estate property that is not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court  The Debtors reserve the right to withdraw the motion to approve (the "Approval Motion"), among other things, the sale of the Purchased Assets (as defined in the Agreement) at any time prior to Bankruptcy Court approval without liability to the Debtors, except as set forth in the Agreement

**Due Diligence:** Unless a specific exception is granted by the Debtors, each bidder must complete all required due diligence prior to the submission of its bid  The Debtors will continue to provide due diligence information to potential bidders who execute satisfactory confidentiality agreements and so request by contacting the Debtors' financial advisors, Greenhill & Co  LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer ((212) 389-1500 (Tel); (212) 389-1700 (Fax), email:  mkramer@greenhill-co com)  The Debtors may also designate an employee or other representative of the Debtors to coordinate all reasonable requests for due diligence access from potential bidders  The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined herein) or to any person that the Debtors determine is not reasonably likely to be a Qualified Bidder  Bidders will have access to certain confidential information of the Debtors only upon execution of a confidentiality agreement in form and substance satisfactory to the Debtors

**Required Bid Documents:** Unless otherwise indicated below, all bids must include the following (the "Required Bid Documents"):

- A certified or bank cashier's check, representing a good faith deposit (the "Deposit"), in the amount of $2 million, payable to the order of the Maxxim Medical, Inc , a Delaware corporation, submitted with the bid  The Debtors reserve the right to request a higher Deposit

- A letter from the bidder stating that the bidder offers to purchase the Purchased Assets upon the material terms and conditions set forth in the Agreement (including, as applicable, the schedules and exhibits thereto) and a copy of the Agreement marked to the extent relevant to show changes that such bidder would require to consummate the sale (collectively, a "Marked Agreement")

- Written evidence of a commitment for financing or other evidence of the bidder's ability to consummate the sale and perform under the Marked Agreement, which shall include current financial statements of the bidder or, if the bidder is an entity formed for the purpose of entering into the proposed sale, current financial statements of the equity holder(s) of the bidder and those entities who shall guarantee the performance of such bidder, and such other form of financial information requested by the Debtors and its advisors

- The identity of each entity that will be participating in such bid, including any proposed designee(s)  Further, each bid must provide sufficient financial and other information regarding both the bidder and all other parties participating in the bid to satisfy the Debtors with respect to the requirements enumerated in sections 363(m), 365(b) and 365(f)(2) of the Bankruptcy Code or as otherwise provided for herein

- Written evidence that the bidder (or, if the bidder is an entity formed for the purpose of entering into the proposed sale, its equity holder(s)) has obtained authorization and approval from its Board of Directors (or comparable governing body) and any third parties from whom consent may be required, other than as set forth in the Agreement, with respect to the submission of its bid and execution and delivery of its Marked Agreement, or a representation that no such authorization and approval is required

**Bid Deadline:** To be considered a timely bid, the Required Bid Documents must be delivered to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Michael Kelly, Esq  (Fax No : (212) 728-9686; email: mkelly@willkie com) with copies delivered to each of (i) Greenhill & Co  LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer ((212) 389-1500 (Tel), (212) 389-1700 (Fax), email: mkramer@greenhill-co com); (ii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P O  Box 391, Wilmington, DE 19899-0391, Attn:  Brendan Linehan Shannon, Esq  ((302) 571-6696 (Tel), (302) 571-1253) (Fax), email: bshannon@ycst com); (iii) Maxxim Medical, Inc , 477 Commerce Boulevard (P O  Box 2067), Oldsmar, Florida 34677, Attn: Thomas Cochill ((727) 571-3717 (Tel), (727) 573-3506 (Fax), email: wyn dale@maxximmedical com); (iv) counsel to the Agent for the prepetition and postpetition lenders, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq  ((212) 450-4000 (Tel), (212) 450-3800 (Fax), email: nancy sanborn@dpw com); (v) counsel to the Official Committee of Unsecured Creditors, Milbank Tweed Hadley &

McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq ((212) 530-5000 (Tel), (212) 530-5219 (Fax), email: sblauner@milbank com) and (vi) counsel to the Initial Bidder, Shearman & Sterling, LLP, 599 Lexington Ave , New York, NY 10022, Attn: Stephen M Besen, Esq ((212) 848-8902 (Tel), (212) 848-7179 (Fax), email: sbesen@shearman com), so that they are received not later than noon (prevailing Eastern Time) on _____ ___, 2003 (the "Bid Deadline") The Marked Agreement may be submitted in hand mark-up or electronic mark-up form If provided in electronic mark-up form, the Marked Agreement must be submitted to those parties indicated above in hard copy and email format and must contain both a clean and marked copy The Debtors may extend the Bid Deadline once or successively without further notice, but are not obligated to do so

**Qualified Bids:** A "Qualified Bid" is a bid that provides the Required Bid Documents listed above and:

- equals or exceeds $96 07 million, representing the sum of (i) the Purchase Price (as defined in the Agreement), (ii) the amount of the Break-Up Fee (as defined herein) which, for purposes of determining this calculation, shall be deemed equal to $2 5 million, (iii) the amount of the Expense Reimbursement (as defined herein), which, for purposes of determining this calculation, shall be deemed to equal to $750,000, and (iv) an amount equal to 2% of the Purchase Price;

- if required by the Debtors (and the Debtors may impose such requirement with respect to any or all, or only one or more, bidders), evidence that the bidder has filed an application under the Hart-Scott-Rodino ("HSR") Act with respect to its bid and that the waiting period under the HSR Act has expired or terminated;

- is timely received by the parties listed in the preceding section entitled "Bid Deadline";

- with respect to the Marked Agreement, is on terms (taken as a whole) that are not materially more disadvantageous, burdensome or conditional than the terms of the Agreement;

- provides information satisfactory to the Debtors that the bidder is reasonably likely to be able to consummate the proposed sale if its bid is determined to be the Successful Bid;

- is not submitted subject to or conditioned upon any financing contingency;

- is not conditioned on the outcome of due diligence, except as otherwise permitted by the Debtors;

- if chosen as the second highest or otherwise best Qualified Bid, is irrevocable until the earlier of (x) the closing of the sale of the Purchased Assets pursuant to the Successful Bid and (y) 45 days from the date of entry of the Sale Order; and

- provides for the closing of such sale substantially in the same timeframe proposed in the Initial Bid

A bidder that submits a bid meeting the above criteria is a "Qualified Bidder "

The Initial Bid is a Qualified Bid and the Initial Bidder is a "Qualified Bidder"

**Auction:** After the Bid Deadline, the Debtors shall review each bid on the basis of financial and contractual terms and the factors relevant to the transaction process, including those factors affecting the speed and certainty of consummating the proposed sale in order to determine which bids are Qualified Bids. After all bids have been reviewed, the Debtors may conduct an Auction. The Debtors shall conduct the Auction two Business Days after the Bid Deadline or at such other date and time established by the Bankruptcy Court. Only Qualified Bidders will be eligible to participate in the Auction. At least one Business Day prior to the Auction, each Qualified Bidder who has submitted a Qualified Bid must inform the Debtors whether it intends to participate in the Auction.

**Auction Procedures:** All bids at the Auction shall exceed the previous bid by no less than $500,000; provided however, that if the Initial Bidder participates in the Auction, the Initial Bidder may credit the Break-Up Fee and the maximum Expense Reimbursement potentially payable to it for purposes of calculating the minimum increase over the then-highest bid.

Based upon the terms of the Qualified Bids received, the level of interest expressed at the Auction, and/or such other information as the Debtors may determine, the Debtors, in their sole discretion, may conduct the Auction in a manner they determine is designed to achieve the maximum value for the Purchased Assets.

**Break-Up Fee and Expense Reimbursement:** Upon the occurrence of the following events, and without further order of the Court, Maxxim agrees to be, jointly and severally, obligated to pay to the Initial Bidder (A) $2,500,000 or such other amount as is approved by the Bankruptcy Court (the "Break-Up Fee") and/or (B) the reimbursement of reasonable actual and documented expenses of the Initial Bidder (including, without limitation, professional fees) in connection with and arising out of all efforts to prepare, evaluate, negotiate, bid, implement and consummate the transactions contemplated by the Agreement, including, without limitation due diligence investigation, fees and expenses relating to obtaining financing, negotiation with Maxxim and other parties-in-interest, preparation and review of the Agreement and other documents necessary or appropriate to consummate the transactions contemplated by the Agreement, efforts relating to any other agreements between Maxxim and the Initial Bidder, costs of enforcing the Agreement or any order of the Bankruptcy Court contemplated hereby, and/or any litigation expenses incurred in connection with any matter brought before the Bankruptcy Court or any other court of competent jurisdiction with standing to hear matters pertaining hereto and involving the Initial Bidder, and including, without limitation, legal, investment banking, appraisal, professional advisory, consulting, accounting and other similar fees, expenses, and disbursements, in each case incurred or paid prior to the date on which the Agreement is terminated (collectively, the "Expense Reimbursement"), provided, however, that the Expense Reimbursement shall not exceed $750,000 or such other amount as is approved by the Bankruptcy Court, in each case payable as soon as practicable, but no later than three (3) Business Days following the termination of the Agreement as specified below (or, in the case of the Break-Up Fee payable pursuant to clause (i) below, upon consummation of the transaction or a stand-alone plan of reorganization) as follows:

(i)     Unless the Agreement has been terminated pursuant to Section 9 4(a) and 9 4(e), by the Initial Bidder pursuant to Section 9 4(c), (f)(ii), (g) or (h), or by Maxxim pursuant to Section 9 4(d), the Break-Up Fee and the Expense Reimbursement shall be payable in the event of a consummation of (A) an agreement providing for the sale of substantially all of Maxxim's assets or more than 50% of the voting power of the outstanding equity securities of MMI or (B) a stand-alone plan calling for the reorganization of Maxxim;

(ii)    The Break-Up Fee and the Expense Reimbursement shall be payable if prior to termination of the Agreement pursuant to Section 9 4, Maxxim seeks, supports or fails to oppose, any of the following actions that could reasonably cause the Purchased Assets not to be sold to the Initial Bidder pursuant to the Agreement: (A) dismissal of any of the Cases (as defined in the Agreement); (B) filing of a plan of reorganization or liquidation, dissolution, merger or substantially similar transaction that is inconsistent with the sale of the Purchased Assets to the Initial Bidder pursuant to the Agreement, except as permitted by the Sales Procedures Order or Approval Order (as defined in the Agreement); (C) the appointment of a trustee, receiver, liquidator or similar Person (as defined in the Agreement) for the purpose of liquidating the Purchased Assets; (D) piecemeal liquidation of the Purchased Assets pursuant to a proceeding under chapter 11 of the Bankruptcy Code or conversion of the Cases to a proceeding under chapter 7 of the Bankruptcy Code; or (E) the filing of any pleading authorizing any course of action materially inconsistent with the sale to Initial Bidder in accordance with the Agreement, except as permitted by the Sales Procedures Order and Approval Order;

(iii)   The Expense Reimbursement only (and not the Break-Up Fee) shall be payable in the event of a material breach by Maxxim (or any entity included in that term) of its obligations under the Agreement such that the Initial Bidder terminates the Agreement pursuant to Section 9 4(d); provided, however, if either matter set forth in clauses (i)(A) and (B) of Section 9 2(c) of the Agreement shall be consummated after such termination, the Break-Up Fee shall also be payable; or

(iv)    The Expense Reimbursement only (and not the Break-Up Fee) shall be payable in the event the Initial Bidder terminates the Agreement under the circumstances described in Sections 9 4(b) and 9 4(h); provided, however, that in the case of a termination under Section 9 4(b) of the Agreement, if either matter set forth in clause (i)(A) or (B) of the Section 9 2(c) of the Agreement shall be consummated after such termination, the Break-Up Fee shall also be payable

Notwithstanding anything herein to the contrary, in no event will Maxxim be required to pay the Break-Up Fee or the Expense Reimbursement on more than one occasion

**Acceptance of Qualified Bid:** The Debtors presently intend to seek approval of the bid which it believes is the highest or otherwise best Qualified Bid received  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court  The second highest or otherwise best Qualified Bid shall remain open and irrevocable through the earlier of

(x) consummation of the closing of the sale of the Purchased Assets to the Successful Bidder and (y) 45 days from the date of entry of the Sale Order Notwithstanding the foregoing, if the Initial Bid is designated the second highest or otherwise best bid, the Initial Bid shall remain open and irrevocable for a period of ten Business Days after the later of (x) the Bid Deadline and (y) the conclusion of the initially scheduled Auction

**Return of Deposit:** Maxxim shall return the Deposit (together with any interest thereon) within five (5) business days after the earlier of the following events: (a) the Debtors withdraw the Sale Motion; (b) the Debtors announce that the bid is not a Qualified Bid; (c) the Sale Hearing is concluded and the applicable bidder's bid is not designated the Successful Bid or the second highest or otherwise best Qualified Bid; and (d) solely with respect to the second highest or best Qualified Bid, the closing of the sale of the Purchased Assets pursuant to the Successful Bid Notwithstanding the foregoing, if the Initial Bid is designated the second highest or otherwise best bid and the Agreement is terminated by the Initial Bidder pursuant to Section 9 4(b), the Deposit will be remitted to the Initial Bidder on the eleventh Business Day after the later of (x) the Bid Deadline and (y) the conclusion of the initially scheduled Auction, unless the Closing (as defined in the Agreement) has occurred prior to such date

# EXHIBIT D

# CURE OBJECTION PROCEDURES

**Notice of Objection Deadline:** Not later than five (5) business days after the entry of an order approving these procedures (the "Cure Objection Procedures"), the Debtors shall cause the cure amount notice (the "Cure Amount Notice"), substantially in the form attached the Motion as Exhibit ___, to be served on the counterparties to all unexpired leases, license agreements and executory contracts of Maxxim (each a "Contract Party" and, together, the "Contract Parties"), notifying them of the requirement to file a Cure Objection (as defined herein) by the Cure Objection Deadline (as defined herein).

**Cure Objections:** Any Contract Party seeking to assert that any defaults, conditions or pecuniary losses under any of Maxxim's unexpired leases, license agreements and executory contracts (collectively, the "Executory Contracts") as of the February 11, 2003 (the "Petition Date") must be cured or satisfied in order for such contract to be assumed and/or assigned (collectively, the "Cure Obligation") or who objects to the potential assumption and assignment of such Executory Contract(s), shall be required to file and serve an objection (a "Cure Objection") setting forth with specificity any and all Cure Obligations which such party asserts must be cured or satisfied with respect to such Executory Contract and/or any and all objections to the potential assumption and assignment of such Executory Contract(s).

**Cure Objection Deadline:** To be considered a timely Cure Objection, one copy of the Cure Objection shall be required to be filed with the Court and delivered to each of (a) counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Michael Kelly, Esq. (Fax No.: (212) 728-9686); (b) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391, Attn: Brendan Linehan Shannon, Esq. (Fax No.: (302) 571-1253); (c) Greenhill & Co. LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer (Fax No.: (212) 389-1700); (d) Maxxim Medical, Inc., 477 Commerce Boulevard (P.O. Box 2067), Oldsmar, Florida 34677, Attn: Thomas Cochill (Fax No.: (727) 573-3506); (e) counsel to the agent under the Debtors' prepetition and postpetition secured credit facilities, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq. (Fax No.: (212) 450-3800); and (f) counsel to the Committee, Milbank Tweed Hadley & McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq. (Fax No.: (212) 530-5219), **so as to be received not later than 4:00 p.m. (prevailing Eastern Time) on_____ __, 2003** (the "Cure Objection Deadline"). The Debtors may, in their sole discretion, extend the Cure Objection Deadline once or successively without further notice, but are not obligated to do so.

**Failure to File Cure Objection:** Unless a Cure Objection is filed and served by a party to an Executory Contract by the Cure Objection Deadline, the Court may enter an order authorizing or effecting the assumption and assignment of such Executory Contract at the Sale Hearing without regard to any objection such party may have.

**Waiver of Cure Objection:** Parties who fail to file and serve Cure Objections as provided above shall be deemed to have waived and released any Cure Obligation and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder, or any other assignee of the relevant Executory Contract that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Executory Contract for the period prior to the Petition Date.

**Contents of Cure Objection:** The Cure Objections shall set forth the cure amount (other than the Unliquidated Charges (as defined below)) the objector asserts is due, the period(s) to which such amounts relate, the specific types and dates of any alleged defaults, pecuniary losses and conditions to assignment, and the support therefor. All documents or writings establishing the claim must be attached to the Cure Objection; provided, however, that although the underlying obligation itself must be asserted in detail, specific dollar amounts for unliquidated claims or adjustments for royalties not then known, percentage rent, real estate taxes, common area maintenance or similar adjustable charges (collectively, the "Unliquidated Charges"), as set forth in the relevant Executory Contract, need not be included in the Cure Obligations. A statement indicating the nature of the Unliquidated Obligation and the period(s) in which it accrued must be included. The amount of any Unliquidated Charges asserted in compliance with these procedures shall be determined by further order of the Court or by stipulation among the Debtors, the lenders under the Debtors' postpetition credit agreement and the affected Contract Party.

**Cure Objection Hearings:** Hearings on Cure Amount Objections may be held (a) at the Sale Hearing, or (b) at such other date prior to or after the Sale Hearing as this Court may designate upon motion by the Debtors.

**Reservation of Rights:** The Debtors reserve the right to remove any Executory Contract from any proposed asset sale and to withdraw the request to assume and assign any Executory Contract if the Debtors reasonably determine or the Court fixes a Cure Obligation that is materially greater than the Cure Obligation anticipated by the Debtors.

**Attorneys' Fees:** Cure Objections that assert entitlement to attorneys' fees shall be sustained only to the extent that (a) the relevant Executory Contract provides for the payment of such attorneys' fees, and (b) the fees are reasonable or documented; provided, however, that any dispute concerning attorneys' fees, whether as to entitlement, reasonableness or documentation, shall be subject to the jurisdiction of this Court.

**Limitation of Objection:** A timely filed and served Cure Objection shall reserve such party's rights respecting the Cure Obligation but shall not be deemed to constitute an objection to the relief generally requested in the Motion.

# EXHIBIT E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **MAXXIM MEDICAL GROUP, INC., et al.,** | : | **Case Nos. 03-10438 (PJW)** |
|  | : |  |
| **Debtors.** | : | **Jointly Administered** |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x     **Ref. Docket No. ____**

### ORDER APPROVING MOTION FOR ORDER, <u>INTER ALIA</u>:
### (A) APPROVING THE SALE OF THE PURCHASED ASSETS
### TO MMI ACQUISITION CORP. OR SUCH OTHER
### SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS,
### CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING AND
### AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
### THE ASSIGNED CONTRACTS; AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Motion"), of the above captioned debtors and debtors in

possession (collectively, the "Debtors"), requesting entry of an order under sections 105(a), 363,

365 and 1146(c) of the Bankruptcy Code (the "Sale Order"). (a) approving, among other things,

that certain Asset Purchase Agreement, dated as of September 8, 2003 (the "Asset Purchase

Agreement") among Maxxim Medical, Inc , a Delaware corporation, and certain of its

subsidiaries, each of which is a Debtor herein (collectively, "Maxxim") and MMI Acquisition

Corp ("MMAC") pursuant to which Maxxim has agreed to a sale of substantially all of Maxxim's

assets to MMAC or the Successful Bidder[1] (the "Purchaser"), (b) approving the Sale Procedures

with respect to the proposed sale of the Purchased Assets, including the Expense Reimbursement

and the Break-Up Fee, all as more fully set forth below and in the Asset Purchase Agreement; (c)

---

[1] To the extent not otherwise defined herein or in the Motion, capitalized terms shall have the meanings ascribed to them in the Asset Purchase Agreement, as applicable  The Asset Purchase Agreement is attached hereto as Exhibit A

approving the form and manner of notice of the Motion, the Auction, the objection deadline with respect to the Proposed Asset Sale, the Sale Procedures and the Cure Objection Procedures and the Auction; (d) scheduling the Sale Hearing and objection deadline with respect to the Proposed Asset Sale, and (e) granting related relief; and upon the order, dated _____ ___, 2003 (the "Sale Procedures Order") approving certain of the relief requested in the Motion, including: (a) approving the Sale Procedures; (b) approving the Cure Objection Procedures; (c) scheduling the Auction; (d) scheduling the Sale Hearing and objection deadline with respect to the Proposed Asset Sale; and (e) approving the form and manner of notice of the Motion, the Auction, the objection deadline with respect to the Proposed Asset Sale, the Sale Procedures and the Cure Objection Procedures and the Auction; and notice of the Motion, the Auction, the objection deadline with respect to the Proposed Asset Sale, the Sale Procedures and the Cure Objection Procedures and the Auction having been given in accordance with the Motion and the Sale Procedures Order; and the Debtors having conducted the Auction on _____ ___, 2003; and the Debtors having determined that the final bid of _____ for the Assets constitutes the highest or otherwise best bid received at the Auction; and the Debtors, pursuant to the Motion and sections 105(a), 363 and 365 of the Bankruptcy Code, having sought entry of an order: (i) authorizing and approving the sale of the Purchased Assets to the Purchaser, pursuant to section 363(b) of the Bankruptcy Code, in accordance with the terms and conditions of the Asset Purchase Agreement, a copy of which was filed on_____ ___, 2003, free and clear of all liens, claims, interests and encumbrances, with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, as more fully set forth in the Motion; (ii) authorizing Maxxim to assume, assign and sell to the Purchaser pursuant to section 365 of the Bankruptcy Code the Assigned Contracts, in accordance with the terms of the Asset Purchase Agreement and the Assumption and Assignment

2

Agreement; (iii) authorizing and approving the Asset Purchase Agreement; (iv) authorizing the

Debtors to execute, deliver and perform the Asset Purchase Agreement and to consummate all

transactions related to the above; and (v) granting related relief; and the Court having held the Sale

Hearing on _____ ___, 2003; and the appearances of all interested parties and all responses and

objections to. (a) the relief requested in the Motion; and/or (b) cure amounts relating to Maxxim's

leases and executory contracts having been duly noted in the record of the Sale Hearing; and upon

the record of the Sale Hearing, the Motion and said responses and objections; and after due

deliberation and sufficient cause appearing therefor, the Court hereby

### FINDS, DETERMINES, AND CONCLUDES THAT:

A       This Court has jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U S C §§ 157(b) and 1334

B       Venue of this case in this district is proper pursuant to 28 U S C §§ 1408

and 1409

C       Determination of this Motion is a core proceeding under 28 U S C § 157

(b)(2)(A), (M), (N) and (O)

D       The statutory predicates for the relief requested herein include sections 105,

363, 365 and 1146(c) of the Bankruptcy Code and rules 2002, 6004, 6006 and 9014 of the

Bankruptcy Rules

E       The findings and conclusions set forth herein constitute the Court's findings

of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014

3

F.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such

G.    Proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the objection deadline with respect to the Proposed Asset Sale, the Sale Procedures, and the Cure Objection Procedures has been given in accordance with Bankruptcy Rules 2002, 4001, 6004 and 6006, as modified by the Sale Procedures Order where applicable  The foregoing notice constitutes good, appropriate and sufficient notice, and no other or further notice need be given, nor is notice of the entry of this Order required

H.    Proper, timely, adequate and sufficient notice of the assumption and assignment of the Assigned Contracts and the cure payments to be made therefore has been provided in accordance with sections 105(a) and 365 of the Bankruptcy Code and Bankruptcy Rule 9014  The foregoing notice constitutes good, appropriate and sufficient notice, and no other or further notice of the assumption and assignment of the Assigned Contracts is or shall be required

I.    A reasonable opportunity has been afforded any interested party to make a higher or otherwise better offer to purchase the Purchased Assets, and to assert an objection to or be heard regarding: (i) the relief requested in the Motion, including, but not limited to, approval of the Asset Purchase Agreement; (ii) cure amounts relating to the Assigned Contracts; and (iii) procedures relating to the assumption and assignment of the Assigned Contracts

J.    The Debtors have marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order

4

K.      The Debtors have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the sale of the Purchased Assets and the transactions contemplated by the Asset Purchase Agreement have been duly and validly authorized by all necessary corporate action of the Debtors. The Debtors have all the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement and no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate such transactions.

L.      Entry into the Asset Purchase Agreement and consummation of the transactions contemplated thereby constitute the exercise by Debtors of sound business judgment and such acts, and the relief requested in the Motion, are in the best interests of the Debtors, their bankruptcy estates, their creditors, and other parties in interest.

M.      The Debtors have demonstrated both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for consummating the sale of the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code, in that, among other things: (a) prompt approval and consummation of the sale of Maxxim's assets will preserve the viability of the Debtors' businesses as a going concern, protect against deterioration in the value of the Debtors' assets due to uncertainty about their future and maximize the value of the estates, (b) Purchaser has made a substantial offer to acquire the Purchased Assets; and (c) the sale process conducted by the Debtors pursuant to the Sale Procedures Order, including subjecting the Purchased Assets to an auction, permitted Purchaser's offer to be tested against other offers and the market generally.

N.      The Agent and the Official Committee of Unsecured Creditors consent to the entry of an order, substantially in the form hereof, approving the Asset Purchase Agreement

5

O       The Asset Purchase Agreement represents the highest or otherwise best offer received by the Debtors for the Purchased Assets

P.      The terms and conditions of the Asset Purchase Agreement and the sale consideration to be realized by Maxxim pursuant to the Asset Purchase Agreement are fair and reasonable  The Asset Purchase Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other practical alternative available at this time

Q.      The sale of the Purchased Assets and other transactions contemplated by the Asset Purchase Agreement must be approved and consummated promptly in order to preserve the value of the Purchased Assets

R       The transactions contemplated by the Asset Purchase Agreement were proposed and negotiated and entered into by the Debtors and Purchaser at arm's length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code  The Purchaser is a purchaser in good faith of the Purchased Assets under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby

S       The Purchaser has not engaged in any conduct that would cause or permit the Asset Purchase Agreement and the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code

T       The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to the Purchaser were

6

not free and clear of all Interests (as defined herein) other than Permitted Transferred Liens[2] and the Assumed Liabilities, or if Purchaser would, or in the future could, be liable for any of the Interests.

U.    All amounts, if any, to be paid by the Debtors pursuant to the Asset Purchase Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Asset Purchase Agreement shall constitute administrative expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code and are payable, in accordance with the Asset Purchase Agreement, if and when any Debtor's obligation arises thereunder without further order of the Court.

V.    Consummation of the sale does not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind against the Debtors or their property or any affiliate of the Debtors or its property, whether known or unknown, contingent or otherwise, whether existing as of the date hereof or hereafter) arising, except that Purchaser shall be liable for payment of the Assumed Liabilities.

W.    Each of the Executory Contracts is an executory contract within the meaning of section 365(a) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, all restrictions on assignment in any of the Executory Contracts are unenforceable against the Debtors and all Assigned Contracts may be lawfully assigned to the Purchaser.

X.    The decision to assume and assign the Assigned Contracts pursuant to the Asset Purchase Agreement is based on the reasonable exercise of the Debtors' business judgment

---

[2]    For purposes of this Order "Permitted Transferred Liens" shall mean only those liens referenced in subsection (b) (to the extent such liens secure Assumed Liabilities) of the definition of Permitted Liens in the Asset Purchase Agreement.

and is in the best interests of the Debtors' bankruptcy estates. The Assigned Contracts are an integral part of the Purchased Assets and, accordingly, such assumption and assignment of Assigned Contracts is reasonable, enhances the value of the Debtors' estates and does not constitute unfair discrimination

Y. The cure amounts in respect of the Assigned Contracts that are either undisputed or will be determined by the Court at a hearing (the "Cure Amounts") or resolved by agreement among the Debtors and the claimants prior to such hearing, are the sole amounts necessary to cure all defaults (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2)) required to be cured under section 365 of the Bankruptcy Code, and to pay all actual or pecuniary losses that have resulted from such defaults, under the Assigned Contracts. Upon payment of the Cure Amounts by Maxxim or upon Maxxim providing adequate assurance that they will promptly cure, no defaults of the Debtors will exist under any of the Assigned Contracts.

Z. Pursuant to the Sale Procedures Order, those entities not having filed a Cure Objection in accordance with the Sale Procedures Order shall have a cure amount of zero

AA. The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) and (f)(2)(B) of the Bankruptcy Code

BB. No defaults exist in Maxxim's performance under the Assigned Contracts as of the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) other than the failure to pay amounts equal to the Cure Amounts

CC    The Debtors may sell the Purchased Assets free and clear of all Interests (as defined herein), other than Permitted Transferred Liens and the Assumed Liabilities, because, in each case, one or more of the standards set forth in subsections (1)-(5) of section 363(f) of the Bankruptcy Code has been satisfied  Those holders of Interests, other than Permitted Transferred Liens and the Assumed Liabilities, who did not object, or who withdrew their objections, to the sale or the Motion are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code  Those holders of Interests who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code and are adequately protected by delivery of the Mandatory Repayment as described in paragraph 4 below or by having their Interests, if any, attach to the proceeds of the sale as more fully described herein

DD    Except with respect to the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser will not subject Purchaser to any liability whatsoever with respect to the operation of the Debtors' business prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability

EE    The sale of the Purchased Assets to Purchaser is a prerequisite to the Debtors' ability to confirm and consummate a plan or plans of reorganization or liquidation  The transfer of the Purchased Assets and/or the Assigned Contracts pursuant to the Sale is not subject to taxation under any law imposing a stamp tax or similar tax on any of the Debtors' transfers or sales of real estate, personal property or other assets owned by it in accordance with sections 1146(c) of the Bankruptcy Code

9

For all of the foregoing and after due deliberation, the Court hereby

**ORDERS, ADJUDGES, AND DECREES THAT:**

1    The Motion, the Asset Purchase Agreement and the transactions contemplated thereby are hereby approved

2    The Asset Purchase Agreement, the Ancillary Agreements and all of the terms and conditions thereof, are hereby approved  Pursuant to section 363(b) of the Bankruptcy Code, Maxxim is authorized to sell the Purchased Assets to the Purchaser upon the terms and subject to the conditions set forth in the Asset Purchase Agreement

3    Pursuant to sections 363(b) and 365 of the Bankruptcy Code, each of the Debtors is hereby authorized and empowered on the Closing Date to perform under, consummate and implement the Asset Purchase Agreement, together with the Ancillary Agreements and all other additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the transactions contemplated thereby, and, pursuant to the Asset Purchase Agreement, to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, any or all of the Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement

4    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing under the Asset Purchase Agreement, the Purchased Assets shall be transferred to the Purchaser free and clear of all mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, restrictions or charges of any kind or nature (the foregoing collectively referred to as "Liens" herein) and all debts, liabilities,

10

objections, commitments, responsibilities, claims (as that term is defined in the Bankruptcy Code), counterclaims, defenses, and offsets of any kind and nature, arising prior to the Closing Date or relating in any way to acts of the Debtors occurring prior to the Closing Date, however arising (the foregoing collectively referred to as "Claims" herein) and all interests of any kind whatsoever (such Liens, Claims and other interests referred to collectively herein as "Interests") other than Permitted Transferred Liens and Assumed Liabilities; provided that (a) the Interests of the DIP Secured Parties and the Pre-Petition Secured Parties (each as defined in the DIP Order and collectively, the "Secured Parties") on the Purchased Assets shall be released, terminated and discharged only upon delivery to the Agent on behalf of the Secured Parties, as adequate protection, of the Mandatory Repayment from the proceeds of the sale of the Purchased Assets (the "Sale") contemporaneously with the closing of the Sale, which Mandatory Repayment shall be applied in accordance with the Documents or the Existing Agreements, as applicable (each as defined in the DIP Order) (except that if the Debtors do not give written notice of the amount of the Mandatory Repayment to the Purchaser at least two Business Days prior to the closing under the Asset Purchase Agreement, the Interests of the Secured Parties shall be released, terminated and discharged upon the closing of the Sale under the Asset Purchase Agreement), and (b) all other Interests (other than Permitted Transferred Liens and Assumed Liabilities) shall be released, terminated and discharged as to the Purchased Assets upon the closing of the Sale [3] All Interests

---

[3] "DIP Order" shall mean the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U S C §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C §363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U S C §§ 361, 362, 363 and 364

"Mandatory Repayment" shall mean the payment to the Agent, on behalf of the Secured Parties, of $50 million or, if less, the following amount: the aggregate amount of gross proceeds received by the Debtors

11

(other than Permitted Transferred Liens and Assumed Liabilities) (including the Interests of the Secured Parties unless the DIP Obligations and Pre-Petition Obligations are paid in full) shall attach to the proceeds of the Sale (except the Mandatory Repayment shall be paid to the Agent on behalf of the Secured Parties free and clear of all Interests), with the same validity, extent and priority as such Interests had immediately prior to the Sale (without prejudice to the rights, claims, defenses, offsets, demands and objections, if any, of the Debtors and all interested parties with respect to, among other things, the validity, extent and priority of such Interests); <u>provided</u> that the Secured Parties will not have any Interests attach to the Unsecured Creditors' Fund (as defined in footnote three) The Debtors are hereby directed to give written notice of the amount of the Mandatory Repayment and a reasonable estimate of the Emergence Costs and the Percentage Payment to the Purchaser, the Agent and the Official Committee of Unsecured Creditors no later than two Business Days prior to the closing under the Asset Purchase Agreement Purchaser shall remain liable for the Assumed Liabilities as provided in the Asset Purchase Agreement If Purchaser exercises the Maxxim Canada Option, the Agent is directed to release any and all Interests of the Secured Parties in the assets and capital shares of Maxxim Medical Canada

from the Sale, after deducting therefrom a reasonable estimate of (i) all cash expenditures by the Debtors from the closing date of the Sale through the effective date of the Debtors' plan of reorganization (the "Plan"), including any purchase price adjustment and closing and transaction costs associated with the Sale, (ii) all priority and administrative expense claims (including reserves therefor) to be payable pursuant to the Plan and (iii) all costs and expenses to be incurred after the effective date of the Plan that relate directly to the administration and liquidation of those remaining assets of the Debtors that are not sold pursuant to the Sale, the resolution of claims against the Debtors and the winding up of the Debtors' estates ((i), (ii) and (iii), collectively the "Emergence Costs") and (iv) if the Bankruptcy Court shall have approved a stipulation and consent order among the Debtors, the Official Committee of Unsecured Creditors and the Secured Parties providing for the creation of an escrow account containing the greater of $2 million and the Percentage Payment (as defined below) (the "Unsecured Creditors' Fund") for the benefit of the unsecured creditors of the Debtors, the amount of the Unsecured Creditors' Fund

"Percentage Payment" shall mean a payment equal to 7 5% of the Net Proceeds of the Sale For this Purpose, Net Proceeds means the aggregate amount of gross proceeds received by the Debtors from the Sale (including for this purpose the principal amount of any claims of the lenders assumed by the Purchaser, but excluding any other liabilities assumed by the Purchaser as well as closing and transaction costs associated with the Sale) less the sum of (i) $50 million and (ii) a reasonable estimate of Emergence Costs

12

Limited, with such Interests to attach to the proceeds of the exercise of such option, with the same validity, extent and priority as such Interests had immediately prior to the exercise of such option (without prejudice to the rights, claims, defenses, offsets, demands and objections, if any, of the Debtors and all interested parties with respect to, among other things, the validity, extent and priority of such Interests)

5. The transfer of the Purchased Assets and the assignment of the Assigned Contracts pursuant to the Asset Purchase Agreement (a) shall constitute legal, valid and effective transfers of property of the Debtors' estates to the Purchaser, and (b) except as expressly provided in the Asset Purchase Agreement with respect to Assumed Liabilities, shall vest the Purchaser with the Debtors' right, title and interest in the Purchased Assets and the Assigned Contracts free and clear of all Interests other than Permitted Transferred Liens and Assumed Liabilities (as more fully described in paragraph 4 above) including, among other things, those Interests (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or Purchaser's interest in such Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date

6. The sale of the Purchased Assets to the Purchaser under the Asset Purchase Agreement will constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia

7. In the event that the Debtors and the Purchaser consummate the transactions contemplated by the Asset Purchase Agreement, the Debtors and the Purchaser shall be entitled to the protections provided under section 363(m) of the Bankruptcy Code

13

8       The consideration provided by Purchaser for the Purchased Assets under the
Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy
Code

9       Except as expressly set forth in the Asset Purchase Agreement, all persons
and entities holding Interests against the Debtors or the Purchased Assets of any kind and nature
whatsoever, hereby are forever barred, estopped and permanently enjoined from asserting,
prosecuting or otherwise pursuing such Interests against the Purchaser, its successors or assigns,
their properties, or the Purchased Assets with respect to any Interest of any kind or nature
whatsoever such person or entity had, has, or may have against or in the Debtors, their estates,
officers, directors, shareholders, or the Assets, other than Permitted Transferred Liens and
Assumed Liabilities   Following the Closing Date no holder of an Interest in the Debtors, other
than Permitted Transferred Liens and Assumed Liabilities, shall interfere with Purchaser's title to
or use and enjoyment of the Purchased Assets based on or related to such Interest, or any actions
that the Debtors may take in their chapter 11 cases

10      Except as expressly set forth in the Asset Purchase Agreement, the
Purchaser is not assuming nor shall it in any way whatsoever be liable or responsible, as a
successor or otherwise, for any debts, liabilities, obligations, commitments or responsibilities of
the Debtors or any of their predecessors or affiliates or any debts, liabilities, obligations,
commitments, responsibilities or other Interests in any way whatsoever relating to or arising from
the Assets, or the Debtors' operations or use or ownership of the Assets (including, without
limitation, the Assigned Contracts), arising prior to consummation of the transactions
contemplated by the Asset Purchase Agreement, including, but not limited to, liabilities on

14

account of any taxes arising accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date

11    Except as expressly provided in the Asset Purchase Agreement, the Purchaser is not acquiring or assuming, and the consummation of the Sale shall not subject the Purchaser to, any Interests of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person under the laws of the United States, any state, territory or possession thereof or the District of Columbia applicable to such transactions including, but not limited to, liability based, in whole or in part, directly or indirectly, on any theory of equitable subordination or successor or transferee liability

12    Subject to the terms of the Asset Purchase Agreement, pursuant to sections 363(b), 363(f), 365(a), 365(b) and 365(f) of the Bankruptcy Code, the assumption, assignment and sale by Maxxim to the Purchaser of the Assigned Contracts free and clear of all Interests, other than Permitted Transferred Liens and Assumed Liabilities, in such property of an entity other than the Maxxim's estate shall be effected by this Order, provided, however, that if the Closing shall fail to occur, none of the Assigned Contracts shall be deemed to be assumed or assumed and assigned  The Debtors are hereby authorized to execute and deliver to the Purchaser such documents or other instruments as may be reasonably necessary to give full effect to the assignment and transfer of such Assigned Contracts to the Purchaser, all as of the Closing Date

13    The Debtors are authorized to assign and transfer to Purchaser all of the Debtors' rights, title and interest (including common law rights) in and to all of the intangible property of the Debtors to be assigned and transferred to the Purchaser under the Asset Purchase Agreement; provided, however, such rights shall not include the Excluded Assets

15

14. Pursuant to the terms of the Asset Purchase Agreement and consistent with the requirements of the Bankruptcy Code, the Debtors are hereby authorized and empowered to pay the Cure Amounts, if any, in respect of the assumption, assignment and sale to Purchaser of the Assigned Contracts, by paying all undisputed Cure Amounts prior to Closing or as otherwise ordered by the Court at a hearing to be held on _____ Purchaser shall have no obligation to pay, or any liability for, such Cure Amounts Subject to the foregoing, the Debtors shall have no cure obligations to non-Debtor parties to Assigned Contracts

15. Upon the closing of the Asset Purchase Agreement in accordance with this Order, any and all defaults under the Assigned Contracts shall be deemed cured in all respects

16. The Assigned Contracts shall, upon assignment to the Purchaser, be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer The Purchaser shall assume obligations of the Debtors arising from and after the Closing under the Assigned Contracts and shall not assume any obligation under the Assigned Contracts accruing thereunder prior to the Closing Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any liability for any breach of such Assigned Contracts occurring after such assignment

17. Non-Debtor parties to the Assigned Contracts who failed to file a Cure Objection in accordance with the Sale Procedures Order are forever barred from asserting an objection as to the cure amount or to the assumption and assignment of the applicable Assigned Contract

16

18      This Sale Order is and shall be effective as a determination that, on the

Closing Date, all Interests existing on the Purchased Assets prior to the Closing Date have been

unconditionally released from such Purchased Assets other than Permitted Transferred Liens and

Assumed Liabilities; provided that (a) the Interests of the Secured Parties on the Purchased Assets

shall be released, terminated and discharged only upon delivery to the Agent on behalf of the

Secured Parties, as adequate protection, of the Mandatory Repayment from the proceeds of the

Sale contemporaneously with the closing of the Sale, which Mandatory Repayment shall be

applied in accordance with the Documents or the Existing Agreements, as applicable, (except that

if the Debtors do not give written notice of the amount of the Mandatory Repayment to the

Purchaser at least two Business Days prior to the closing under the Asset Purchase Agreement, the

Interests of the Secured Parties shall be released, terminated and discharged upon the closing of

the Sale under the Asset Purchase Agreement) and (b) all other Interests (other than Permitted

Transferred Liens and Assumed Liabilities) shall be released, terminated and discharged as to the

Purchased Assets upon the closing of the Sale  All Interests (other than Permitted Transferred

Liens and Assumed Liabilities) (including the Interests of the Secured Parties unless the DIP

Obligations and Pre-Petition Obligations are paid in full) shall attach to the proceeds of the Sale

(except the Mandatory Repayment shall be paid to the Agent on behalf of the Secured Parties free

and clear of all Interests) with the same validity, extent and priority as such Interests had

immediately prior to the Sale (without prejudice to the rights, claims, defenses, offsets, demands

and objections, if any, of the Debtors and all interested parties with respect to, among other things,

the validity, extent and priority of such Interests); provided that the Secured Parties will not have

any Interests attach to the Unsecured Creditors' Fund

17

19     The Sale Order (a) is and shall be effective as a determination that the

conveyance of Purchased Assets described in decretal paragraph 3 has been effected upon the

Closing and (b) shall be binding upon and govern the acts of all entities including without

limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages,

recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual

property, administrative agencies, governmental departments, secretaries of state, federal, state,

and local officials, and all other persons and entities who may be required by operation of law, the

duties of their office, or contract, to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of title in or

to any of the Assets  At or prior to the closing of the sale of the Purchased Assets, each person is

authorized  to execute such documents and take all other actions as may be necessary or

appropriate to release its Interests against the Purchased Assets, other than Permitted Transferred

Liens and Assumed Liabilities, as such Interests may have been recorded or may otherwise exist.

20     If any person or entity having filed financing statements or other documents

or agreements evidencing Interests in the Assets shall not have delivered to the Debtors prior to

Closing, in proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, releases of all Interests which the person or entity has with respect to

the Assets, then (i) the Debtors are hereby authorized to execute and file such statements,

instruments, releases and other documents on behalf of the person or entity with respect to the

Assets and (ii) Purchaser is hereby authorized to file, register or otherwise record a certified copy

of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive

evidence of the release of all Interests of any kind or nature whatsoever in the Purchased Assets

18

21     All entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of said Purchased Assets to the Purchaser on the Closing Date

22     Nothing contained in any chapter 11 plan confirmed in these cases or the order of confirmation confirming any such chapter 11 plan or any other order entered in these cases shall conflict with or derogate from the Asset Purchase Agreement or the Sale Order

23     All objections and responses concerning the Motion, including, but not limited to, objections to cure amounts of Assigned Contracts, are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing and to the extent any such objection or response was not otherwise withdrawn, waived or settled, they and all reservations and rights therein are overruled and denied

24     The Purchaser has provided adequate assurance of its future performance under the Assigned Contracts and the proposed assumption and assignment of the Assigned Contracts satisfies the requirements of the Bankruptcy Code including, inter alia, sections 365(b)(1), 365(b)(3) and 365(f), to the extent applicable

25     There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser as a result of the assignment of the Assigned Contracts, and the validity of the assumption, assignment and sale to the Purchaser shall not be affected by any dispute between the Debtors and another party to an Assigned Contract regarding the payment of the Cure Amount

26     All parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Purchaser or its successors or assigns any violation under an acceleration clause, assignment fee, default or breach under, any Claim or pecuniary loss, or

19

condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the Closing or any Claim asserted or assertable against the Debtors

27      The Purchaser shall not be liable for any claims of the lessors or contract parties under the Assigned Contracts in respect of any claim or breach of an Assigned Contract that accrued prior to Closing

28      This Order shall be effective and enforceable immediately upon entry, shall not be subject to any stay of enforcement, including any stay provided by Bankruptcy Rules 6004 and 6006, and its provisions shall be self-executing

29      The Asset Purchase Agreement, and any related agreements, documents or instruments may be modified, amended or supplemented by parties thereto in accordance with the terms thereof without further order of the Court, provided that such modifications, amendments or supplements, if any, are not material and adverse to the Debtors

30      The transfer of the Purchased Assets and/or the Assigned Contracts pursuant to the Sale is not subject to taxation under any law imposing a stamp tax or similar tax on any of the Debtors' transfers or sales of real estate, personal property or other assets owned by it in accordance with sections 1146(c) of the Bankruptcy Code

31      Subject to the provisions of, and except as provided in the Asset Purchase Agreement, this Court shall retain exclusive jurisdiction (i) to interpret and enforce the provisions of this Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, (ii) to compel delivery of the Purchased Assets to the Purchaser, (iii) to protect the Purchaser against any Interest in the Purchased Assets, (iv) to compel delivery of the Purchase Price and all

20

adjustments to the Purchase Price under the Asset Purchase Agreement, (v) to compel delivery of the Mandatory Repayment to the Agent on behalf of the Lenders (vi) to interpret, implement and enforce the provisions of this Sale Order and (vii) to hear and determine any and all disputes between the Debtors and/or the Purchaser arising out of or relating to the Sale Order and the Asset Purchase Agreement, and any non-Debtor party arising out of or relating to, among other things, any Assigned Contracts concerning, inter alia, the Debtors' assumption and assignment thereof to the Purchaser under the Asset Purchase Agreement; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Asset Purchase Agreement or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter

32      The provisions of this Order are nonseverable and mutually dependent

33      The terms and provisions of the Asset Purchase Agreement and this Sale Order shall inure to the benefit of the Purchaser, the Debtors, and their respective successors and assigns, including but not limited to any chapter 7 or chapter 11 trustee that may be appointed in the Debtors' bankruptcy case and shall be binding upon any trustee, party, including, but not limited to, all persons asserting Interests in the Purchased Assets, entity or fiduciary that may be appointed in connection with this case or any other or further case involving the Debtors, whether under chapter 7 or chapter 11 of the Bankruptcy Code

34      Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Order

21

35     The terms and provisions of the Asset Purchase Agreement, together with all the terms and provisions of this Sale Order, shall be binding in all respects upon the Debtors, their estates and creditors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including but not limited to all non-Debtor parties to the Assigned Contracts, and all persons asserting an Interest in the Debtors' estates or any of the Purchased Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement  The Asset Purchase Agreement and the transactions contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estate

36     The Debtors are authorized to select new names and to modify the caption following notice of such name change

37     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Asset Purchase Agreement be approved in its entirety

38     The requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Motion is hereby waived

Date:     October __, 2003
          Wilmington, Delaware


                                        _____
                                        Honorable Peter J Walsh
                                        United States Bankruptcy Judge


22

# EXHIBIT F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| **In re** : | **Chapter 11** |
| : | **Case Nos. 03-10438 (PJW)** |
| **MAXXIM MEDICAL GROUP, INC., et al.,** : | **(Jointly Administered)** |
| : | Objection Deadline: _____ __, 2003 at __:__ _.m. |
| **Debtors.** : | Auction Date: _____ __, 2003 at __:__ _.m. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x   Hearing Date: _____ __, 2003 at __:__ _.m.

## NOTICE OF AUCTION AND SALE HEARING

PLEASE TAKE NOTICE THAT:

Pursuant to the ORDER (A) APPROVING SALE PROCEDURES, INCLUDING, WITHOUT LIMITATION, EXPENSE REIMBURSEMENT AND BREAK-UP FEE; (B) APPROVING FORM AND MANNER OF NOTICE; (C) SCHEDULING A HEARING TO CONSIDER THE SALE OF THE PURCHASED ASSETS; AND (D) GRANTING RELATED RELIEF (the "Sale Procedures Order"), approved by the United States Bankruptcy Court for the District of Delaware (the "Court") on _____ __, 2003, the above-captioned debtors and debtors in possession (collectively, the "Debtors") will conduct an auction for the Purchased Assets[1] of Maxxim Medical, Inc , a Delaware corporation, and certain of its subsidiaries, each of which is a Debtor herein (collectively, "Maxxim"), including the Assigned Contracts

The Sale   Under the terms of the Asset Purchase Agreement, by and between MMI Acquisition Corp (the "Purchaser"), an acquisition entity created and owned by Lightyear Capital LLC, and Maxxim (as amended from time to time, the "Asset Purchase Agreement"), Maxxim proposes to sell the Purchased Assets, and to assume and assign the Assigned Contracts, to the Purchaser, free and clear of liens, claims, encumbrances and interests (except for certain Assumed Liabilities and Permitted Transferred Liens), all as more fully set forth in the Asset Purchase Agreement, subject to higher or otherwise better offers and the Court's approval

The Bid Deadline   As set forth in the approved sale procedures (the "Sale Procedures"), a Qualified Bidder that desires to make a bid shall deliver written copies of its Qualified Bid to the following parties (the "Notice Parties"): (i) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Michael Kelly, Esq ((212) 728-9686 (fax), email: mkelly@willkie com); (ii) Greenhill & Co LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer ((212) 389-1700 (fax), email: mkramer@greenhill-co com); (iii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P O Box 391, Wilmington, DE 19899-0391, Attn: Brendan Linehan Shannon, Esq ((302) 571-1253 (fax), email: bshannon@ycst com); (iv) Maxxim Medical, Inc , 477 Commerce Boulevard, P O Box 2067, Oldsmar, Florida 34677, Attn: Thomas Cochill ((727) 573-3506 (fax), email: wyn dale@maxximmedical com); (v) counsel to the Agent for the prepetition and postpetition lenders, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq ((212) 450-3800 (fax), email: nancy sanborn@dpw com); (vi) counsel to the Official Committee of Unsecured Creditors, Milbank Tweed Hadley & McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq ((212) 530-5219 (fax), email: sblauner@milbank com) and (vii) counsel to the Purchaser, Shearman & Sterling, LLP, 599

---

[1]   To the extent not otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Asset Purchase Agreement, Sale Procedures Order, the Sale Procedures or the proposed Sale Order, as applicable

Lexington Ave., New York, NY 10022, Attn: Stephen M. Besen, Esq. ((212) 848-7179 (fax), email: sbesen@shearman.com), **so that they are received not later than noon (prevailing Eastern Time) on _____ \_\_, 2003** (the "Bid Deadline").

The Auction. If a Qualified Bid (other than the Initial Bid) is received, the Debtors may conduct an auction (the "Auction") for the Purchased Assets, including the Assigned Contracts, beginning on _____ \_\_, 2003 at \_\_:\_\_ \_ m. (prevailing Eastern Time) at the offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19899-0391. Attendance and participation at the Auction is subject to certain terms, conditions and procedures described in the Sale Procedures. All interested parties are invited to prequalify for the Auction and to present competing offers to purchase the Purchased Assets, including the Assigned Contracts, in accordance with the Sale Procedures.

Objections to the Sale of the Purchased Assets. All objections to the entry of an order approving, among other things, the Asset Purchase Agreement and the assumption and assignment of the Assigned Contracts (the "Sale Order"), if any, must: (a) be in writing; (b) conform to the requirements of the title 11 of the United States Code, the Federal Rules of Bankruptcy Procedure Rules and the Local Rules of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the clerk of the Court; and (d) be served upon the Notice Parties, so that it is received not later than \_\_:\_\_ \_ m. (prevailing Eastern Time) on _____ \_\_, 2003. Only timely filed and served responses, objections or other pleadings will be considered by the Court at the Sale Hearing (as defined below).

The Sale Hearing. A hearing (the "Sale Hearing") to approve the sale of the Purchased Assets, including the assumption and assignment of the Assigned Contracts, to the Successful Bidder will be held on _____ \_\_, 2003 at \_\_:\_\_ \_ m. (prevailing Eastern Time) in the United States Bankruptcy Court for the District of Delaware before the Honorable Peter J. Walsh, United States Bankruptcy Judge, 824 Market Street, Wilmington, Delaware 19801.

This notice is qualified in its entirety by the Sale Procedures Order. All persons and entities are urged to read the Sale Procedures Order and the provisions thereof carefully. To the extent this notice is inconsistent with the Sale Procedures Order, the terms of the Sale Procedures Order shall govern.

Copies of the Sale Procedures Order, the Sale Procedures, the Asset Purchase Agreement and the motion seeking approval of the same are available upon written request to Bankruptcy Services LLC, 757 Third Avenue, Third Floor, New York, NY 10017.

Dated: _____ \_\_, 2003
      Wilmington, Delaware

                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
                    The Brandywine Building, 17th Floor
                    1000 West Street
                    Wilmington, DE 19801

                        and

                    WILLKIE FARR & GALLAGHER LLP
                    787 Seventh Avenue
                    New York, New York 10019-6099
                    (212) 728-8000

                    Co-Counsel for Debtors and Debtors in Possession

# EXHIBIT G

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
|   |   |   |
|---|---|---|
| **In re** | : | **Chapter 11** |
|   | : |   |
| **MAXXIM MEDICAL GROUP, INC., et al.,** | : | **Case No. 03-10438 (PJW)** |
|   | : | **Jointly Administered** |
| **Debtors.** | : |   |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### NOTICE OF (I) POSSIBLE ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES, LICENSE AGREEMENTS, AND EXECUTORY CONTRACTS; (II) PROPOSED CURE OBLIGATIONS; AND (III) SALE HEARING

PLEASE TAKE NOTICE that on September ___, 2003, Maxxim Medical Group,

Inc , *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"),

filed their Motion for Order. (I) Approving the Sale of Substantially All of the Debtors' Assets

to the Successful Bidder; (II) Approving the Assumption and Assignment Procedures; (III)

Approving the Sale Procedures, Including, Without Limitation, Expense Reimbursement and

Breakup Fee; (IV) Approving Form and Manner of Notice; (V) Scheduling a Hearing to

Consider the Sale of Substantially All of the Debtors' Assets; and (VI) Granting Related Relief

(the "Sale Motion") with the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court") An Order approving the sale procedures as set forth in the Sale Motion

(the "Sale Procedures Order") was entered on September ____, 2003

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court has scheduled a

hearing to be held on October ____, 2003, at _____ (prevailing Eastern Time) (the "Sale

Hearing") to consider approval of the sale of substantially all of the Debtors' assets to MMI

Acquisition Corp (the "Purchaser"), pursuant to the terms of that certain Asset Purchase

Agreement, dated as of September 8, 2003 (the "Agreement"), or such higher or better offer

You may obtain a copy of the Agreement by making a written request to the undersigned counsel for the Debtors

PLEASE TAKE FURTHER NOTICE that pursuant to the Sale Motion, the Debtors intend to assume and assign certain of their unexpired leases, license agreements, and executory contracts (collectively, the "Potential Executory Contracts") upon satisfaction of the cure amounts required under section 365(b)(1)(A) of the Bankruptcy Code (the "Proposed Cure Obligations") The Potential Executory Contracts that the Debtors may seek to assume and assign and corresponding Proposed Cure Obligations are listed on the attached Exhibit A

PLEASE TAKE FURTHER NOTICE that any objections to the relief requested in the Sale Motion, including the assumption and assignment of the Potential Executory Contracts and the corresponding Proposed Cure Obligations, must be filed with the Bankruptcy Court and delivered to each of (a) counsel to the Debtors, Willkie Farr & Gallagher, 787 Seventh Avenue, New York, NY 10019, Attn: Michael Kelly, Esq (Fax No : (212) 728-9686); (b) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P O Box 391, Wilmington, DE 19899-0391, Attn: Brendan Linehan Shannon, Esq (Fax No : (302) 571-1253); (c) Greenhill & Co LLC, 300 Park Avenue, New York, NY 10022, Attn: Michael Kramer (Fax No : (212) 389-1700); (d) Maxxim Medical, Inc , 4750 118th Avenue, Clearwater, FL 33762, Attn: Thomas Cochill (Fax No : (727) 573-3506); (e) counsel to the agent under the Debtors' prepetition and postpetition secured credit facilities, Davis Polk & Wardwell, 450 Lexington Avenue, New York, NY 10017, Attn: Nancy Sanborn, Esq (Fax No : (212) 450-3800); and (f) counsel to the Committee, Milbank Tweed Hadley & McCloy, 1 Chase Manhattan Plaza, New York, NY 10005, Attn: Stephen Blauner, Esq (Fax No : (212) 530-5219), **so as to**

2

**be received not later than 4:00 p.m. (prevailing Eastern Time) on_____ __, 2003** (the "Objection Deadline")

PLEASE TAKE FURTHER NOTICE that any person or entity receiving notice of the Sale Hearing and/or this Notice that fails to file an objection on a timely basis shall (a) be forever barred from objecting to the Proposed Cure Obligations and from asserting any additional cure or other amounts with respect to the assumption and assignment of such Potential Executory Contracts and the Debtors shall be entitled to rely solely upon the Proposed Cure Obligations, and (b) be deemed to have consented to the assumption and assignment of such Potential Executory Contracts and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchaser, or such other successful bidder or any other assignee of the relevant Potential Executory Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Potential Executory Contract.

PLEASE TAKE FURTHER NOTICE that in the event that a Cure Amount Objection is filed, the Cure Amount Objection must set forth: (a) the basis for the objection; and (b) the amount the party asserts as the prepetition cure amount.

PLEASE TAKE FURTHER NOTICE that hearings on Cure Amount Objections may be held (a) at the Sale Hearing, or (b) at such other date prior or after the Sale Hearing as the Court may designate upon motion by the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors' decision to assume and assign the Potential Executory Contracts is subject to the Court's approval and consummation of the Proposed Asset Sale. Absent consummation of the Proposed Asset Sale, each of the

3

Potential Executory Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code

PLEASE TAKE FURTHER NOTICE that Debtors reserve the right to remove any Potential Executory Contract from any proposed asset sale and to withdraw the request to assume and assign any such Potential Executory Contract

PLEASE TAKE FURTHER NOTICE that the Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of said adjournment in the Bankruptcy Court or on the Bankruptcy Court's calendar on the date scheduled for the Sale Hearing

Dated: Wilmington, Delaware
      September __, 2003

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Brendan Linehan Shannon (No. 3136)
Edward J. Kosmowski (No. 3849)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

-and-

WILLKIE FARR & GALLAGHER LLP
Michael J. Kelly
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

Co-Counsel for Debtors and Debtors in Possession

4