# EXHIBIT A


ASSET PURCHASE AGREEMENT

AMONG

MAXXIM MEDICAL, INC.,

THE SUBSIDIARIES OF MAXXIM MEDICAL, INC. NAMED HEREIN,

MAXMED ACQUISITION, LLC,

MEDLINE INDUSTRIES, INC. AND

ARGON MEDICAL DEVICES, INC.

Dated as of _____, 2003

**ARTICLE I.** DEFINITIONS .................................................................................................1
  **Section 1.1.** Definitions .................................................................................................1

**ARTICLE II.** SALE AND PURCHASE OF PURCHASED ASSETS AND
              ASSUMPTION OF ASSUMED LIABILITIES ..........................................14
  **Section 2.1.** Purchase and Sale of Purchased Assets.................................................15
  **Section 2.2.** Assumption of Liabilities........................................................................15
  **Section 2.3.** Purchase Price .........................................................................................16
  **Section 2.4.** Adjustments to Purchase Price................................................................16
  **Section 2.5.** Deposit......................................................................................................18
  **Section 2.6.** Allocation of Purchase Price ..................................................................18
  **Section 2.7.** Sale at Closing Date ...............................................................................19
  **Section 2.8.** Discharge of Liens...................................................................................19
  **Section 2.9.** Casualty and Condemnation....................................................................19
  **Section 2.10.** Deemed Consents and Cures .................................................................20

**ARTICLE III.** REPRESENTATIONS AND WARRANTIES OF THE SELLERS.................20
  **Section 3.1.** Authority of the Sellers ...........................................................................20
  **Section 3.2.** MMI Subsidiary Sellers..........................................................................20
  **Section 3.3.** No Conflict or Violation..........................................................................21
  **Section 3.4.** Consents and Approvals..........................................................................21
  **Section 3.5.** Compliance with Law ..............................................................................21
  **Section 3.6.** Schedule of Assets and Liabilities.........................................................21
  **Section 3.7.** Financial Statements and Related Matters .............................................21
  **Section 3.8.** Title to Assets; Assets Necessary to Business........................................22
  **Section 3.9.** Material Adverse Change .........................................................................22
  **Section 3.10.** Assigned Contracts.................................................................................22
  **Section 3.11.** Intellectual Property. .............................................................................22
  **Section 3.12.** Labor Relations. ....................................................................................23
  **Section 3.13.** Personnel Matters ..................................................................................23
  **Section 3.14.** Employee Benefits. ................................................................................24
  **Section 3.15.** Real Property Assets. .............................................................................25
  **Section 3.16.** Health Care Matters...............................................................................26
  **Section 3.17.** Environmental Matters ...........................................................................27
  **Section 3.18.** Absence of Undisclosed Liabilities.......................................................28
  **Section 3.19.** Insurance ................................................................................................28
  **Section 3.20.** Accounts Receivable ..............................................................................28
  **Section 3.21.** Litigation ................................................................................................28
  **Section 3.22.** Tax Matters.............................................................................................29
  **Section 3.23.** Interim Operations.................................................................................29
  **Section 3.24.** Brokers ...................................................................................................29
  **Section 3.25.** Customers and Suppliers........................................................................29
  **Section 3.26.** Bankruptcy Matters. ..............................................................................30

**Section 3.27.** Disclaimer of Additional Representations and Warranties; Schedules..............30
**Section 3.28.** No Survival...................................................................................................30

**ARTICLE IV.** REPRESENTATIONS AND WARRANTIES OF THE
               PURCHASER...........................................................................................31
**Section 4.1.** Authority of the Purchaser ................................................................31
**Section 4.2.** No Conflict or Violation....................................................................31
**Section 4.3.** Consents and Approvals....................................................................31
**Section 4.4.** Litigation ...........................................................................................31
**Section 4.5.** Brokers ..............................................................................................31
**Section 4.6.** Adequate Assurances Regarding Executory Contracts.......................32
**Section 4.7.** Closing Date; No Survival ................................................................32

**ARTICLE V.** CERTAIN COVENANTS OF THE SELLERS....................................32
**Section 5.1.** Conduct of Business Before the Closing Date....................................32
**Section 5.2.** Consents and Approvals....................................................................33
**Section 5.3.** Information and Access; Certain Tax Disclosures...............................33
**Section 5.4.** Further Assurances ............................................................................34
**Section 5.5.** Commercially Reasonable Efforts......................................................34
**Section 5.6.** Assignment of Contracts ...................................................................35
**Section 5.7.** Cure of Defaults ................................................................................35
**Section 5.8.** Accounts Receivable .........................................................................35
**Section 5.9.** Transition Arrangements; Maxxim Medical Canada ...........................35
**Section 5.10.** Bankruptcy Actions..........................................................................36
**Section 5.11.** Business Relations............................................................................36
**Section 5.12.** [Intentionally Omitted].....................................................................36
**Section 5.13.** Customers and Suppliers...................................................................36
**Section 5.14.** Payment of Accrued Payroll and Other Compensation......................36

**ARTICLE VI.** CERTAIN COVENANTS OF THE PURCHASER.............................37
**Section 6.1.** [Intentionally Omitted].......................................................................37
**Section 6.2.** Commercially Reasonable Efforts......................................................37
**Section 6.3.** Consents and Approvals....................................................................37
**Section 6.4.** Employees of Sellers.........................................................................37
**Section 6.5.** Adequate Assurances Regarding Executory Contracts.......................38
**Section 6.6.** Performance Under Assigned Contracts ............................................38
**Section 6.7.** Further Assurances ............................................................................38
**Section 6.8.** Transition Arrangements; Maxxim Medical Canada ...........................38
**Section 6.9.** Transfer of the Vascular Business.......................................................38

**ARTICLE VII.** CONDITIONS TO THE SELLERS' OBLIGATIONS....................38
**Section 7.1.** Representations and Warranties..........................................................38
**Section 7.2.** Compliance with Agreement...............................................................39
**Section 7.3.** Corporate Documents.........................................................................39
**Section 7.4.** Entry of the Sale Order.......................................................................39
**Section 7.5.** [Intentionally Omitted].......................................................................39
**Section 7.6.** No Order.............................................................................................39

ii

**Section 7.7.** [Intentionally Omitted]........................................................................39
**Section 7.8.** Ancillary Agreements..........................................................................39
**Section 7.9.** Consideration......................................................................................39

**ARTICLE VIII.** CONDITIONS TO THE PURCHASER'S OBLIGATIONS..........................40
**Section 8.1.** Representations and Warranties. .........................................................40
**Section 8.2.** Compliance with Agreement...............................................................40
**Section 8.3.** Consents .............................................................................................40
**Section 8.4.** Corporate Documents..........................................................................40
**Section 8.5.** Entry of the Sale Order.......................................................................41
**Section 8.6.** [Intentionally Omitted]........................................................................41
**Section 8.7.** Ancillary Agreements..........................................................................41
**Section 8.8.** No Order.............................................................................................41
**Section 8.9.** FIRPTA Affidavit................................................................................41

**ARTICLE IX.** THE CLOSING; EXPENSE REIMBURSEMENT; TERMINATION..............41
**Section 9.1.** The Closing .........................................................................................41
**Section 9.2.** Expense Reimbursement .....................................................................41
**Section 9.3.** Deliveries by the Sellers.....................................................................42
**Section 9.4.** Deliveries by Purchaser.......................................................................42
**Section 9.5.** Form of Instruments ...........................................................................43
**Section 9.6.** Termination .........................................................................................43
**Section 9.7.** Effects of Termination.........................................................................44

**ARTICLE X.** TAXES; INFORMATION .........................................................................44
**Section 10.1.** Taxes Related to Purchase of Assets..................................................44
**Section 10.2.** Real Estate Apportionments and Proration of Real and Personal
Property Taxes .........................................................................................44
**Section 10.3.** Information and Cooperation ..............................................................45
**Section 10.4.** Payment of Taxes ..............................................................................45

**ARTICLE XI.** EMPLOYEES AND EMPLOYEE BENEFIT PLANS .......................................45
**Section 11.1.** Employment ......................................................................................45
**Section 11.2.** Employee Welfare Benefit Plans .......................................................46
**Section 11.3.** COBRA .............................................................................................47
**Section 11.4.** 401(k) Plan .......................................................................................47
**Section 11.5.** [Intentionally Omitted]......................................................................48
**Section 11.6.** Severance Benefits following the Closing Date..................................48
**Section 11.7.** No Third Party Beneficiaries..............................................................48

**ARTICLE XII.** MISCELLANEOUS PROVISIONS ............................................................48
**Section 12.1.** Representations and Warranties .........................................................48
**Section 12.2.** Expiration of Offer ............................................................................48
**Section 12.3.** Notices..............................................................................................49
**Section 12.4.** Amendments......................................................................................51
**Section 12.5.** Assignment........................................................................................51
**Section 12.6.** Announcements.................................................................................51

**Section 12.7.** Expenses.................................................................................................................51

**Section 12.8.** Entire Agreement .....................................................................................................51

**Section 12.9.** Descriptive Headings ..............................................................................................51

**Section 12.10.** Counterparts ...........................................................................................................51

**Section 12.11.** Governing Law; Jurisdiction...................................................................................51

**Section 12.12.** Construction ...........................................................................................................52

**Section 12.13.** Substantive Consolidation......................................................................................52

**Section 12.14.** Severability.............................................................................................................52

iv

| SCHEDULE NUMBER | SCHEDULE NAME |
|---|---|
| 1.1 | MMI Subsidiary Sellers |
| 1.2 | Excluded Assets |
| 1.3 | Leases |
| 1.6 | Owned Real Property |
| 1.7 | Schedule of Assets and Liabilities |
| 2.2 | Excluded Liabilities |
| 2.6 | Allocation of Purchase Price |
| 3.1 | Jurisdictions of Qualification |
| 3.4 | Consents and Approvals |
| 3.5 | Compliance with Law |
| 3.10 | Material Other Contracts |
| 3.11 | Company Intellectual Property |
| 3.12 | Labor Relations |
| 3.14 | Employee Benefit Plans |
| 3.15 | Permits: Real Property, Other |
| 3.16 | Health Care Matters |
| 3.17 | Environmental Matters |
| 3.18 | Undisclosed Liabilities |
| 3.19 | Insurance |
| 3.20 | Accounts Receivable |
| 3.21 | Litigation |
| 3.22 | Tax Matters |
| 3.23 | Interim Operations |
| 3.25 | Customers and Suppliers |
| 8.3 | Required Consents |

**EXHIBIT**    **EXHIBIT NAME**

A    Adjustment Escrow Agreement

B    Deposit Escrow Agreement

C    Assignment and Assumption Agreement

C-1    Assignment and Assumption of Lease Agreement

D    Bill of Sale and Assumption Agreement

E    Bidding Procedures Order

F    Sale Order

G    Option Agreement

H    Maxxim Canada Supply Agreement

I    Transition Services Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the **"Agreement"**) is made and entered into as of _____ __, 2003 among **Maxxim Medical, Inc.**, a Delaware corporation (**"MMI"**) and a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code, each of the subsidiaries of MMI specified on **Schedule 1.1** (each an **"MMI Subsidiary Seller"** and collectively the **"MMI Subsidiary Sellers"**), each of which is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (MMI, together with the MMI Subsidiary Sellers, each a **"Seller"** and collectively the **"Sellers"**) and MaxMed Acquisition, LLC, a Delaware limited liability company (the **"Purchaser"**), Medline Industries, Inc. (**"Medline"**) and Argon Medical Devices, Inc. (**"Argon"**).

## PRELIMINARY STATEMENT

**WHEREAS**, the Sellers are engaged primarily in the business of developing, manufacturing and marketing specialty medical products, including custom procedure trays, surgical and examination gloves, interventional radiology and critical care products and drapes and gowns (the **"Existing Business"**);

**WHEREAS**, MMI owns all of the issued and outstanding shares of capital stock of, or other ownership interest in, each MMI Subsidiary Seller;

**WHEREAS**, on February 11, 2003, the Sellers filed voluntary petitions with the Bankruptcy Court initiating cases under chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell, convey, assign, transfer and deliver to the Purchaser, substantially all of the assets of the Sellers and the Purchaser will assume, and the Sellers will assign to the Purchaser, certain liabilities, all on the terms and subject to the conditions set forth herein; and

**WHEREAS**, upon the terms and subject to the conditions set forth herein, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, the Purchaser will purchase from the Sellers the assets and the Purchaser will assume from the Sellers certain liabilities;

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## DEFINITIONS

**Section 1.1.** **Definitions**. Unless otherwise defined herein, the terms defined in the preamble and the recitals to this Agreement shall have the respective meanings specified therein, and the following terms shall have the meanings specified below:

**"Acquisition Proposal"** means a proposal (other than the MMI Acquisition Corp. Agreement) relating to any merger, consolidation, business combination, sale or other disposition of 10% or more of the Purchased Assets pursuant to one or more transactions, the sale of 10% or more of the outstanding shares of capital stock of any Seller (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more Third Parties and any Seller.

**"Adjustment Escrow Agent"** means M&T Bank.

**"Adjustment Escrow Agreement"** means the escrow agreement in the form attached hereto as of **Exhibit A.**

**"Adjustment Escrow Amount"** means $4,300,000.

**"Affiliate"** means "affiliate" as defined in Rule 405 promulgated under the Securities Act of 1933, as amended, and, when used with reference to the Purchaser, includes each Purchaser Assignee and its Affiliates.

**"Agreement"** has the meaning set forth in the preamble and shall include all Schedules and Exhibits attached hereto.

**"Allocation"** has the meaning set forth in **Section 2.6.**

**"Ancillary Agreements"** means, collectively, the Assignment and Assumption Agreement, the Bill of Sale and Assumption Agreement, the Adjustment Escrow Agreement, the Deposit Escrow Agreement, the Maxxim Canada Option, the Supply Agreement, the Transition Services Agreement and the side letters referred to in **Section 11.1** hereof.

**"Argon"** has the meaning set forth in the preamble.

**"Assignment and Assumption Agreements"** means the Assignment and Assumption Agreement and the Assignment and Assumption of Lease Agreement, each to be executed at Closing by the Purchaser and the Sellers in substantially the forms attached hereto as **Exhibits C and C-1,** respectively.

**"Assigned Contracts"** means the Leases and the Other Contracts.

**"Assumed Facilities"** means the Owned Real Property and the Leased Property, Notwithstanding anything to the contrary herein, the term "Assumed Facilities" shall not include the Excluded Real Property.

**"Assumed Liabilities"** has the meaning set forth in **Section 2.2.**

**"Auction"** means the auction conducted by the Sellers pursuant to the Bidding Procedures Order.

**"Bankruptcy Code"** means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. **Section 101,** *et seq.*

2

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

**"Bidding Procedures Order"** means the order of the Bankruptcy Court attached hereto as **Exhibit E** (i) setting a deadline for the filing of objections to the entry of the Sale Order, (ii) scheduling the Auction, (iii) scheduling the Sale Hearing, (iv) approving the competitive bidding procedures pursuant to which Acquisition Proposals were solicited, made and accepted and (v) approving cure objection procedures pursuant to which parties to Leases and Other Contracts were required to notify the Sellers of cure obligations.

**"Bill of Sale and Assumption Agreement"** means the Bill of Sale and Assumption Agreement to be executed at Closing by the Purchaser and the Sellers in substantially the form attached hereto as **Exhibit D**.

**"Books and Records"** means, including such books, records and lists as are contained in computerized storage media, (a) all records and lists of any Seller pertaining to the Purchased Assets, (b) all records and lists pertaining to the Business (including, without limitation, merchandise and analysis reports, marketing analysis reports, creative material, inventory, purchasing, accounting, sales, manufacturing, pricing, research and development, quality control, engineering, maintenance, repairs, marketing, banking, Company Intellectual Property and shipping records) or customers, suppliers or personnel of any Seller (including, without limitation, customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (c) all product, business and marketing plans, literature and correspondence of any Seller related to or used in connection with the Business and (d) all books, ledgers, files, reports, plans, drawings and operating records of every kind maintained by any Seller related to or used in connection with the Business, but excluding the originals of the minute books, stock books and all Tax Returns of any Seller.

**"Business"** means that portion of the Existing Business constituting or conducted with the Purchased Assets.

**"Business Day"** means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in The City of New York.

**"Business Employees"** means employees of the Sellers who, on the applicable date, perform services primarily for the Business.

**"Cases"** means the chapter 11 cases of each of the Sellers pending in the Bankruptcy Court and being jointly administered for procedural purposes as In re Maxxim Medical Group, Inc., et al., Case No. 03-10438 (PJW).

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.).

**"Claim"** has the meaning set forth in section 101(5) of the Bankruptcy Code.

**"Closing"** has the meaning set forth in **Section 9.1**.

**"Closing Date"** has the meaning set forth in **Section 9.1.**

**"Closing Net Working Capital"** has the meaning set forth in **Section 2.4.**

**"Closing Net Working Capital Statement"** has the meaning set forth in **Section 2.4.**

**"COBRA"** has the meaning set forth in **Section 3.14.**

**"Code"** means the Internal Revenue Code of 1986, as heretofore or hereafter amended.

**"Company Intellectual Property"** has the meaning set forth in **Section 3.11.**

**"Confidentiality Agreements"** means collectively, the confidentiality agreement dated May 22, 2003 between Medline and the Parent or an Affiliate thereof and the confidentiality agreement dated February 27, 2003 between RoundTable Healthcare Management, LLC and the Parent or an Affiliate thereof, each as amended.

**"Deposit"** means the deposit delivered by the Purchaser to the Deposit Escrow Agent on the date this Agreement is signed by the Purchaser as provided in **Section 2.5.**

**"Deposit Escrow Agent"** means M&T Bank.

**"Deposit Escrow Agreement"** means the escrow agreement in the form attached hereto as **Exhibit B.**

**"Deposit Escrow Amount"** means $8,500,000.

**"DIP Lenders"** means JPMorgan Chase Bank and the other financial institutions from time to time party to the Revolving Credit and Guaranty Agreement.

**"Effective Date"** means the date on which the Sellers execute and deliver this Agreement to the Purchaser.

**"Environmental Claim"** means any and all actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, notices of liability or potential liability, investigations, proceedings, consent orders or consent agreements, by, from or with any Person, relating in any way to an Environmental Law, and Environmental Permit or any Hazardous Material.

**"Environmental Laws"** means all federal, state, local and foreign statutes, Regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all common law, in each case concerning public health and safety, worker health and safety, pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances, each as amended

4

and in effect prior to or as of Closing. Environmental Laws shall include, without limitation, the Federal Insecticide, Fungicide, Rodenticide Act, Resource Conservation & Recovery Act, Clean Water Act, Safe Drinking Water Act, Atomic Energy Act, Occupational Safety and Health Act, Toxic Substances Control Act, Clean Air Act, CERCLA, Emergency Planning and Community Right-to-Know Act, Hazardous Materials Transportation Act and all analogous or related federal, state or local laws, each as amended and in effect prior to or as of Closing.

"**Environmental Liabilities**" means all Liabilities, whether accrued, contingent, absolute, determined, determinable or otherwise, arising out of or relating in any way to: (i) a violation of or liability under any Environmental Law; (ii) a failure to obtain, maintain, or comply with any Permit required or issued pursuant to any Environmental Law, any directive, order or notice of violation under, or any requirement of, any Environmental Law or (iii) a Release or threatened Release of any Hazardous Substance that requires environmental response, including any environmental investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Agency (including without limitation Governmental Agency oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse).

"**Environmental Permits**" means all permits, licenses and other authorizations that may be required pursuant to Environmental Laws.

"**Environmental Reports**" means all material investigations, audits, and reports related to Seller's compliance with and potential liability in connection with Environmental Laws.

"**Equipment and Fixtures**" means, to the extent used in the Business, (i) building operating systems and equipment, other systems and equipment, furniture, furnishings, fixtures, trade fixtures and improvements and selling and other supplies, including items leased by the Sellers (but only to the extent assignable), and other tangible personal property owned by the Sellers and used in connection with the Business, wherever located and including any such Equipment and Fixtures in the possession of any of the Sellers' suppliers and (ii) to the extent assignable, any rights of the Sellers to the warranties, licenses and other similar rights with respect thereto.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and all regulations issued thereunder.

"**Escrow Closing Amount**" means all amounts in the escrow account established under the Deposit Escrow Agreement on the Closing Date (including interest accrued on the Deposit).

"**Excluded Assets**" means (a) any cash or cash equivalents and all bank accounts of the Sellers (including for this purpose all collected funds (including checks), at or prior to 12:01 a.m., New York City time, on the Closing Date received in lockboxes of the Sellers), (b) any capital stock, securities or other interests held by any Seller in any subsidiary thereof or any other Person, (c) corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records and such other books and records as pertain to the organization,

5

existence or share capitalization of any of the Sellers, (d) any rights of the Sellers or any of their Affiliates to any refunds of Taxes due to (or to be claimed by) the Sellers or any of their Affiliates, other than rights to refunds that relate to Taxes that are assumed by the Purchaser pursuant to **Section 2.2** of this Agreement and rights to refunds with respect to Taxes that are allocated to the Purchaser pursuant to **Section 10.2** of this Agreement, (e) any assets of any Plan maintained by any Seller or any of its Affiliates, unless such Plan is required to be assumed pursuant to Article XI or to the extent that any assets relating to any Plan are transferred to any Plan maintained by the Purchaser pursuant to Article XI, (f) except as otherwise provided in **Schedule 1.7**, any property, casualty, workers' compensation or other insurance policy or related insurance services contract relating to any Seller or any of its Affiliates or any of such Seller's property and any rights (including prepaid premiums and deposits) of any Seller or any of its Affiliates under such insurance policy or contract, in each case to the extent relating to periods prior to the Closing Date, (g) any rights of the Sellers under this Agreement, the Ancillary Agreements or any other agreement between any Seller and the Purchaser, (h) any assets, or other rights of any Seller which do not relate to the Business, (i) intercompany claims of the Sellers, including claims involving non-debtor Affiliates, (j) any business of the Sellers and/or their respective Affiliates other than the Business, (k) any asset of any Seller that would constitute Purchased Assets (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the Effective Date until the Closing Date (1) in the Ordinary Course of Business and not in violation of the terms of this Agreement or (2) as otherwise permitted by the terms of this Agreement, (l) contracts referred to in clause (iii) of the definition of the term "Other Contracts" and each agreement, license or Permit listed in section (a) or (c) on **Schedule 3.4** as to which consent to assignment has not been obtained as of the Closing Date, (m) any books, records and information related primarily to any of the Excluded Assets or Excluded Liabilities, provided that the Sellers shall deliver to the Purchaser and the Purchaser shall be entitled to retain copies of such books, records and information to the extent they relate to the Purchased Assets or Assumed Liabilities or are otherwise required in the operation or administration of the Business, (n) without limiting the generality of the other provisions of this definition, any assets, properties, claims or rights of the Sellers listed on **Schedule 1.2**, (o) any avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code, including actions to avoid transfers pursuant to section 502, 510, 541, 542, 544, 545, 547, 548, 549 or 550-553, inclusive, of the Bankruptcy Code or to recover property transferred pursuant to section 550 of the Bankruptcy Code, (p) the Excluded Real Property, and (q) without limiting any of the foregoing, any of the following, to the extent that they relate solely to any Excluded Assets or Excluded Liabilities: contracts, licenses, permits, approvals, claims, deposits, prepayments, prepaid assets, refunds, causes of action, rights of recovery, rights of setoff and rights of recoupment of the Sellers as of the Closing Date.

**"Excluded Environmental Liabilities"** means any Liability or investigatory, corrective or remedial obligation, whenever arising or occurring, arising under Environmental Laws with respect to the Sellers or any of their predecessor(s) or Affiliates(s), the Business (including without limitation any arising from any off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of Hazardous Substances) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any disclosure schedule attached hereto, except to the extent that the facts or circumstances underlying any such Liability or obligation are caused or occur after the Closing Date.

**"Excluded Liabilities"** has the meaning set forth in **Section 2.2**.

**"Excluded Real Property"** means all of the Seller's right, title and interest in and to the premises located at Eaton, Ohio and the improvements constructed thereon.

**"Excluded Taxes"** has the meaning set forth in **Section 10.4**.

**"Executive Officer"** of a Person means its chairman, chief executive officer, president, any vice president, director or head of any business function, or general counsel.

**"Executory Contracts"** means all Assigned Contracts entered into by or assigned to a Seller before the Petition Date and which are executory or, to the extent a Lease, unexpired as of the Closing Date.

**"Existing Business"** has the meaning set forth in the recitals hereto. For the avoidance of doubt, the term "Existing Business" shall not include the portion of the Existing Business conducted by Maxxim Medical Canada.

**"Expense Reimbursement"** has the meaning set forth in **Section 9.2(c)**.

**"FDA"** has the meaning set forth in **Section 3.16.**

**"Federal Funds Rate"** means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York.

**"Final Allocation"** has the meaning set forth in **Section 2.6**.

**"FIRPTA Affidavit"** has the meaning set forth in **Section 8.9**.

**"GAAP"** means United States generally accepted accounting principles, as in effect from time to time.

**"Governmental Agency"** means (a) any international, foreign, federal, state, county, local or municipal governmental or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

**"Governmental Order"** means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Agency.

**"Hazardous Substance"** means (a) any element, compound, or chemical, whether solid, liquid or gas, that is defined, listed, or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, medical waste, bio-hazardous or infectious waste, or special waste

under Environmental Laws; (b) any other substance, material or waste with respect to which liability is imposed under any Environmental Laws or that is subject to regulation, control or remediation under Environmental Laws; (c) petroleum, petroleum-based or petroleum derived products or by-products; (d) polychlorinated biphenyls; (e) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials (f) any infectious, carcinogenic, or mutagenic substances; and (g) any raw materials, building components and manufactured products containing Hazardous Substances, including but not limited to asbestos or asbestos-containing materials, urea formaldehyde and lead-based paint.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Independent Accounting Firm**" has the meaning set forth in **Section 2.4.**

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world; (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (b) trademarks, service marks, trade dress, logos, slogans, trade names, internet domain names and corporate names, together with all goodwill associated therewith, and applications, registrations and renewals in connection therewith; (c) copyrights, mask works and copyrightable works, and applications, registrations and renewals in connection therewith; (d) trade secrets and confidential business information (including ideas, research and development, know-how, inventions, formulas, compositions, manufacturing and production processes and techniques, designs, drawings and specifications); (e) proprietary computer software (including but not limited to source code, executable code data, databases and documentation); (f) copies and tangible embodiments of any of the foregoing in whatever form or medium; (g) rights to exclude others from appropriating any of such Intellectual Property including the rights to sue for and remedies against past, present and future infringements of any or all of the foregoing and rights of priority and protection of interests therein; and (h) any other proprietary, intellectual property and other rights related to any or all of the foregoing.

"**IRS**" means the Internal Revenue Service of the United States Department of the Treasury.

"**Knowledge**" as applied to any Seller means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of MMI and as applied to the Purchaser means the actual knowledge of the corresponding officers of the Purchaser, in each case after (i) reasonable inquiry of the officers of MMI and the Purchaser, as applicable, having responsibility over the matter in question and (ii) reasonable review of the files of MMI and the Purchaser, as applicable, relating to the matter in question.

"**Leased Property**" means all of the Sellers' right, title and interest, as tenant or sub-tenant, under the real property Leases described on **Schedule 1.3.**

"**Leases**" means those real property leases and equipment leases more particularly described on **Schedule 1.3**.

**"Liability"** means any liability or obligation (whether known or unknown, asserted or unasserted, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

**"Liability Schedule Date"** means July 27, 2003.

**"Liens"** means liens (including liens for Taxes), encumbrances (including, without limitation, any leasehold interests, licenses or other rights, in favor of a Third Party or a Seller, to use any portion of the Purchased Assets), Claims, security interests, of whatever kind or nature, mortgages, pledges, restrictions, charges, community property interest, condition, covenant, easements, instruments, licenses, encroachments, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental authority, interest, products and Taxes (including foreign, federal, state and local Taxes), in each case of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, and including all claims based on any theory that the Purchaser is a successor, transferee or continuation of the Sellers or the Business, in each case, other than the Assumed Liabilities expressly assumed herein.

**"Material Adverse Change"** means any condition, circumstance or change in, or effect on, the Business or the Sellers, that, individually or in the aggregate, is or is reasonably likely to be materially adverse to the business, operations, assets or liabilities, results of operations, or condition (financial or otherwise) of the Business, taken as a whole, other than any condition, circumstance, change or effect arising or resulting from (a) general economic or political conditions, events, circumstances, changes or effects not relating particularly to the Sellers or the Business (including those relating to the economy and acts of war, terrorism or other like acts of hostility), (b) conditions affecting the medical supply industry generally and (c) changes in applicable law, rule or regulation; provided that (i) any loss, or expected or possible loss, after July 27, 2003 and prior to the Closing Date, of any customer, employee, sales representative or channel partner of any of the Sellers shall not constitute a Material Adverse Change and (ii) a decline in gross customer revenues of Sellers and Maxxim Medical Canada shall not constitute a Material Adverse Change unless a Material Revenue Loss shall have occurred. As used herein, a "Material Revenue Loss" shall be deemed to have occurred if as of the Closing Date the gross customer revenues from all customers for the 20 consecutive Business Days immediately prior to the Closing Date shall be less than $17 million.

**"Material Other Contracts"** means Other Contracts (other than those terminable by a Seller within 90 days without penalty) (i) from which the Sellers received revenues from the other party or parties thereto, or made payments to such other party or parties, that exceeded $250,000 for the year ended December 31, 2002 or that could reasonably be expected to result in revenues or payments, as the case may be, in excess of such amount for the year ending December 31, 2003 or (ii) in the case of Other Contracts not involving the purchase or sale of goods or services, that are deemed by management of the Sellers to be material to the Business.

**"Maxxim Canada Option"** means an option to purchase all of the issued and outstanding common shares of Maxxim Medical Canada, which option shall be substantially in the form of the agreement attached hereto as **Exhibit G**.

**"Maxxim Medical Canada"** means Maxxim Medical Canada Limited, a company organized under the laws of Canada.

**"Medline"** has the meaning set forth in the preamble.

**"MMG"** means Maxxim Medical Group, Inc., a Delaware corporation.

**"MMI"** has the meaning set forth in the preamble.

**"MMI Acquisition Corp. Agreement"** means the Asset Purchase Agreement among Maxxim Medical, Inc., the Subsidiaries named therein and MMI Acquisition Corp., dated as of September 8, 2003.

**"MMI Subsidiary Sellers"** has the meaning set forth in the preamble.

**"Net Working Capital"** means the working capital assets included in the Purchased Assets minus the working capital liabilities included in the Assumed Liabilities (including Taxes), determined in accordance with GAAP consistently applied and the Schedule of Assets and Liabilities, the amount and calculation of Net Working Capital as of the Liability Schedule Date being set forth in the Schedule of Assets and Liabilities. In determining the working capital assets and the working capital liabilities hereunder, (a) only the accounts reflected on the Schedule of Assets and Liabilities shall be taken into account regardless of their amount and all known errors and omissions shall be corrected, (b) all known proper adjustments to such accounts shall be made and (c) all levels of reserves for any known and quantifiable liabilities and obligations shall be maintained unless a change in underlying circumstances necessitates a change in the levels of reserves.

**"Officer"** of a Person means its chairman, chief executive officer, president, any vice president, director or head of any business function, general counsel, or any other Person exercising policy making functions on behalf of such Person or having responsibility over the matter in question.

**"Ordinary Course of Business"** means the operation of the Business by the Sellers in the usual and ordinary course in a manner substantially similar to the manner in which the Sellers operated since the commencement of the Cases and prior to the Effective Date.

**"Other Contracts"** means, collectively, all contracts, agreements, commitments, arrangements, instruments, guaranties, bids and proposals to which any Seller is a party and relating to the Business as of the Closing Date, all unfilled orders outstanding as of the Closing Date for the purchase of goods or services by any Seller relating to the Business and all unfilled orders outstanding as of the Closing Date for the sale of goods or services by any Seller in connection with the Business; provided, however, that Other Contracts shall not include (i) Leases, Excluded Assets or Excluded Liabilities, (ii) agreements relating to the provision of professional or other services to the Sellers, or (iii) such contracts, the assignment of which requires consent of the other party thereto pursuant to Section 365(c)(1) of the Bankruptcy Code, which consent has not been obtained as of the Closing Date.

**"Owned Real Property"** means all of the Seller's right, title and interest in and to the real property described on **Schedule 1.6**. Notwithstanding anything to the contrary herein, the term "Owned Real Property" shall not include the Excluded Real Property.

**"Parent"** means Maxxim Medical, Inc., a Texas corporation.

**"Permit"** has the meaning set forth in **Section 3.15**.

**"Permitted Liens"** means, with respect to (a) any Purchased Asset, liens for Taxes that are not yet due and payable or that the Sellers are contesting in good faith, (b) insurance premiums and policies, liens incurred in connection with the Premium Finance Agreements listed on **Schedule 3.4** and any additional premium finance agreements entered into by a Seller on or prior to the Closing Date and (c) with respect to the Owned Real Property, the Leased Property and personal property: (i) any covenants, conditions, restrictions, easements, encroachments, encumbrances, rights of way, reversions, rights of first refusal, options to purchase or other imperfections of title with respect to any such asset which, individually or in the aggregate, does not materially detract from the value of, or materially interfere with the present operation or use of, such asset or which, in the case of Leased Property, are set forth in the respective Leases, (ii) mechanics', carriers', workers', repairers', materialmen's and similar liens with respect to amounts that are not yet due and payable or that the Sellers are contesting in good faith and (iii) any zoning, entitlement, building and other land use regulations imposed by a Governmental Agency.

**"Person"** means any individual, partnership, corporation, trust, association, limited liability company, joint venture, estate, unincorporated organization, Governmental Agency or other entity.

**"Petition Date"** means February 11, 2003.

**"Plan"** has the meaning set forth in **Section 3.14.**

**"Proceedings"** means any and all Claims, disputes, demands, actions, liabilities, damages, suits in equity or at law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees and/or causes of action of whatever kind or character.

**"Proposed Adjustments"** has the meaning set forth in **Section 2.4**.

**"Purchase Price"** has the meaning set forth in **Section 2.3**.

**"Purchased Assets"** means all of the Sellers' right, title and interest in and to their properties, assets, goodwill, rights and claims of whatever kind and nature, real or personal, tangible or intangible, known or unknown, actual or contingent and wherever situated, including the Sellers' rights under Leases (including Sellers' rights to the Leased Property), as the same may exist on the Closing Date and to the extent related to the Business , including the following:

(a) all Leases, Leased Property and improvements and other appurtenances thereto and rights in respect thereof;

(b)     all Owned Real Property (together with the buildings, structures, fixtures and all other improvements thereto);

(c)     all inventories (including inventory in transit) and other tangible personal property;

(d)     all Equipment and Fixtures;

(e)     all rights to products sold or leased and to any products or services under research or development for the Business  prior to the Closing Date;

(f)     all accounts receivable and notes receivable and other claims for money or other obligations due to the Sellers, including construction allowances from landlords under Leases, vendor credits pursuant to Assigned Contracts and, in each case, all proceeds thereof (other than the proceeds of accounts receivable described in clause (a) of the definition of "Excluded Assets");

(g)     all Company Intellectual Property, including the items listed on **Schedule 3.11**, as well as all goodwill associated with the Business;

(h)     all right, title and interest in, to and under the Assigned Contracts;

(i)     all Books and Records related to the Business; provided, however, that the Sellers shall be entitled to make and retain copies of such books, records and lists to the extent they relate to Excluded Assets or Excluded Liabilities or are otherwise required in the administration of the estates of the Sellers and their Affiliates and the Cases.

(j)     to the extent legally assignable, all Permits;

(k)     to the extent that any of the following relate to any Assumed Liability or any of the Purchased Assets: contracts, licenses, approvals, claims, deposits, prepayments, prepaid assets, refunds (excluding Tax refunds in respect of Excluded Taxes and refunds of insurance premiums in respect of Excluded Assets), causes of action, rights of recovery, rights of setoff and rights of recoupment of the Sellers as of the Closing Date;

(l)     all lockboxes of the Sellers (excluding the cash described in clause (a) of the definition of "Excluded Assets" and all cash received by the Sellers from collection of accounts receivable on or after the Closing Date (other than cash from checks received by the Sellers prior to the Closing Date));

(m)     all other assets shown on or reflected in the Schedule of Assets and Liabilities, except to the extent disposed of since the Liability Schedule Date in the Ordinary Course of Business and in compliance with the terms of this Agreement;

(n)     all computer systems, programs, networks, hardware, software, software engines, databases, operating systems, Internet Web sites, Web site content and links and equipment used to process, store, maintain and operate data, information and functions ("**IT Systems**") owned by or licensed to (if assignable), a Seller and primarily used in the Business,

including systems to operate payroll, accounting, billing/receivable, payables, inventory, asset tracking, customer service and human resources functions (the **"Transferred IT Systems"**); and

        (o)     the Maxxim Canada Option;

in each case, as the same may exist as of the Closing Date; provided, however, that notwithstanding any of the foregoing provisions of this definition, the Purchased Assets shall not include any Excluded Assets.

        **"Purchaser"** has the meaning set forth in the preamble.

        **"Purchaser Savings Plan"** has the meaning set forth in **Section 11.4**.

        **"Regulation"** means any law, statute, ordinance, regulation, ruling, rule, or order of, administered or enforced by or on behalf of, any court or Governmental Agency.

        **"Release"** has the meaning set forth in CERCLA.

        **"Revolving Credit and Guaranty Agreement"** means the Revolving Credit and Guaranty Agreement, dated as of February 14, 2003, as the same has been and may be amended or modified, among Maxxim Medical Group, Inc., a Delaware corporation, as borrower, Parent, the subsidiaries of Maxxim Medical Group, Inc., the DIP Lenders and JPMorgan Chase Bank, for itself and as fronting bank, administrative agent and collateral agent for the other financial institutions named therein.

        **"Rule"** or **"Rules"** means the Federal Rules of Bankruptcy Procedure.

        **"Sale Hearing"** means the hearing of the Bankruptcy Court approving the transactions contemplated by this Agreement.

        **"Sale Order"** means the order of the Bankruptcy Court, in the form attached hereto as **Exhibit F** or with such changes as Purchaser reasonably deems acceptable, to be entered by the Bankruptcy Court pursuant to sections 105, 363 and 365, of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Purchased Assets to the Purchaser free and clear of all Liens, Claims, encumbrances and interests (other than Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to the Purchaser of the Assigned Contracts, without adequate assurance of future performance liability pursuant to section 365(f)(2) of the Bankruptcy Code, except the Purchaser's promise to perform following the Closing obligations under the Assigned Contracts; (iv) transferring and assigning the Assigned Contracts such that the Assigned Contracts will be in full force and effect from and after the Closing; (v) finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (vi) confirming that the Purchaser is acquiring the Purchased Assets free and clear of the Excluded Liabilities and providing for a full release of the Purchaser with respect to the Excluded Liabilities; (vii) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived; (viii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (ix) approving the provisions of **Section 9.2**.

**"Schedule of Assets and Liabilities"** means the Schedule of Assets and Liabilities of the Sellers as of July 27, 2003, attached hereto as **Schedule 1.7** (without regard to the columns set forth on such schedule which refer to "Canada" or Maxxim Medical Canada).

**"Schedules"** means the various Schedules referred to in this Agreement delivered separately to the Purchaser on or before the date of the entry of the Sale Order.

**"Seller"** has the meaning set forth in the preamble.

**"Seller Savings Plan"** has the meaning set forth in **Section 11.4**.

**"Supply Agreement"** has the meaning set forth in **Section 5.9**.

**"Tax Return"** means any report, return, information return or other information required to be supplied to a taxing authority in connection with Taxes, including any schedule or attachment thereto and including any amendment thereof.

**"Tax and Taxes"** means all federal, state, local and foreign taxes, including without limitation net or gross income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, social security, unemployment, disability, real property, personal property, ad valorem, occupation, premium, capital stock, profits, value added, custom duties, registration and alternative or add-on minimum, estimated or other tax, fees, assessment or other charges, including any interest, penalties or additions thereto, whether disputed or not.

**"Third Party"** means any Person other than the Sellers, the Purchaser or any of their respective Affiliates.

**"Transaction Taxes"** has the meaning set forth in **Section 10.1**.

**"Transferred Employees"** has the meaning set forth in **Section 11.1(b)**.

**"Transition Services Agreement"** has the meaning set forth in **Section 6.8**.

**"Transferred IT Systems"** has the meaning set forth in the definition of Purchased Assets.

**"Vascular Business"** means the business of developing, manufacturing and/or marketing specialty medical products related to interventional radiology and critical care.

**"WARN"** has the meaning set forth in **Section 11.1(a)**.


## ARTICLE II.

## SALE AND PURCHASE OF

## PURCHASED ASSETS AND
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 2.1.    Purchase and Sale of Purchased Assets.** On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall purchase from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver to the Purchaser, all of the Sellers' right, title and interest in and to the Purchased Assets.

**Section 2.2.    Assumption of Liabilities.** On the terms and subject to the conditions set forth in this Agreement, from and after the Closing, the Purchaser will assume and pay, perform, discharge, hold the Sellers harmless against and be responsible solely for the liabilities of the Sellers specifically set forth on the Schedule of Assets and Liabilities (the **"Assumed Liabilities"**), which liabilities include the following liabilities of the Sellers:

(a)    all Liabilities shown or reflected in the Schedule of Assets and Liabilities, as increased or decreased in the Ordinary Course of the Business after the Liability Schedule Date, and all like Liabilities incurred after such date in the Ordinary Course of the Business;

(b)    all Liabilities and obligations accruing or arising from and after the Closing Date under any and all Assigned Contracts;

(c)    all Liabilities and obligations for refunds, adjustments, allowances, repairs, exchanges, returns or warranties in respect of products manufactured or assembled and sold in the Business (before, on or after the Closing Date) and returned after the Closing Date, all as shown on or reflected in the Schedule of Assets and Liabilities; and

(d)    all Liabilities and obligations arising from and after the Closing Date in connection with the operation of the Business by the Purchaser or its successors or assigns.

Notwithstanding the preceding clauses (a) through (d), Assumed Liabilities shall not include (i) Liabilities with respect to Taxes (except to the extent shown on or reflected in the Schedule of Assets and Liabilities or specified in Sections 10.1 and 10.2), (ii) Liabilities of the Sellers ~~(x)~~ relating to any litigation or legal proceeding pending on the Closing Date, and ~~(x)~~ ~~Liabilities~~ ~~arising from the operation of business prior to the Closing Date, except to the extent shown or reflected in the Schedule of Assets and Liabilities~~, (iii) cure obligations pursuant to **Section 5.7** and all other obligations of the Sellers under the Assigned Contracts arising prior to the Closing Date and required to be performed thereunder prior to the Closing Date, other than those specifically assumed by the Purchaser or shown on or reflected in the Schedule of Assets and Liabilities, and (iv) Liabilities set forth on **Schedule 2.2**; and all such Liabilities shall constitute Excluded Liabilities as defined below.

For the avoidance of doubt, Assumed Liabilities shall include all unfilled orders as of the Closing Date for the purchase by the Seller of goods or services or both goods and services relating to the Business.

All the Liabilities of the Sellers of whatever kind or nature, other than the Assumed Liabilities, are hereinafter referred to as the **"Excluded Liabilities"**. The Purchaser

shall not assume or pay, perform or discharge, or hold the Sellers harmless against, or be responsible for, any of the Excluded Liabilities.

**Section 2.3.    Purchase Price.** Subject to the provisions of **Section 2.4**, the total purchase price for the Purchased Assets is $99,500,000, payable in cash (such cash portion, as the same may be adjusted, the **"Purchase Price"**) plus the amount of Assumed Liabilities. At the Closing and subject to the conditions set forth in this Agreement, the Purchaser shall assume the Assumed Liabilities and pay, by wire transfer of immediately available funds to an account (designated by MMI at least two Business Days prior to the Closing Date), an amount equal to (a) the Purchase Price minus (b) the Escrow Closing Amount minus (c) the Adjustment Escrow Amount and minus (d) an amount equal to the portion of the Transaction Taxes and property Taxes allocated to the Sellers under Section 10.1 and 10.2, respectively, which amount shall be applied by the Purchaser on the Closing Date to pay such Transaction Taxes and property Taxes in discharge of the Sellers' liability therefor, including, without limiting the generality of the foregoing, liabilities under Section 10.1 or 10.2 and the applicable Tax laws. In addition, at the Closing, the Deposit Escrow Agent shall deliver to Sellers the Escrow Closing Amount pursuant to the Deposit Escrow Agreement and the Purchaser shall deliver (i) to the Adjustment Escrow Agent the Adjustment Escrow Amount and (ii) to the appropriate Tax authorities the amount equal to the portion of the Taxes described in clause (d) above in satisfaction of any and all liability of the Sellers for such Taxes.

**Section 2.4.    Adjustments to Purchase Price.** The Purchase Price shall be subject to adjustment as follows:

(a)    **Post-Closing Determination.** Within thirty (30) calendar days after the Closing Date, the Purchaser shall prepare and deliver to the Sellers a statement (the **"Closing Net Working Capital Statement"**) setting forth the Net Working Capital as of 12:01 a.m., New York City time, on the Closing Date (the **"Closing Net Working Capital"**). From and after the Closing Date, the Purchaser shall provide the Sellers full access to the books, records, facilities and employees of the Business and shall cooperate with the Sellers to the extent reasonably requested by the Sellers to determine Closing Net Working Capital or to investigate the basis of any dispute in connection therewith. Not later than thirty (30) calendar days after receipt of the Closing Net Working Capital Statement, the Sellers shall provide the Purchaser with a list of those items, if any, to which the Sellers take exception and the Sellers' proposed adjustments (the **"Proposed Adjustments"**). If the Sellers fail to deliver to the Purchaser the Proposed Adjustments within thirty (30) calendar days following receipt of the Closing Net Working Capital Statement, the Sellers shall be deemed to have accepted the Closing Net Working Capital Statement for purposes of any Purchase Price adjustment under subsection (b) below. If the Purchaser does not give the Sellers notice of objections within fifteen (15) calendar days following receipt of the Proposed Adjustments, the Purchaser shall be deemed to have accepted the Proposed Adjustments for purposes of any such Purchase Price adjustment. If the Purchaser gives the Sellers notice of objections to the Proposed Adjustments, and if the Purchaser and the Sellers are unable, within fifteen (15) calendar days after receipt by the Sellers of the notice by the Purchaser of such objections, to resolve the disputed exceptions, the Purchaser and the Sellers shall each, within thirty (30) calendar days after the end of such fifteen (15) day period, submit its or their determination of the Closing Net Working Capital, the calculation thereof and a written summary of the items so in dispute to a firm of independent certified public accountants

16

mutually acceptable to the Purchaser and the Sellers (the **"Independent Accounting Firm"**). The Independent Accounting Firm shall, within sixty (60) days following its selection, deliver to the Purchaser and the Sellers a written report resolving the items so in dispute and determining, based on such resolution, the resulting Closing Net Working Capital, and its determinations will be conclusive and binding upon the parties hereto for purposes of any such Purchase Price adjustment. To the extent appropriate, the determinations of the Independent Accounting Firm will be made and articulated in accordance with GAAP consistently applied and the provisions of the Schedule of Assets and Liabilities. The fees and expenses of the Independent Accounting Firm shall be borne proportionately by the Purchaser, on the one hand, and the Sellers, on the other hand, based on the extent to which the Purchaser's and the Seller's respective determinations of Closing Net Working Capital differ from the Closing Net Working Capital as determined by the Independent Account Firm.

(b) **Purchase Price Adjustment.** Within three (3) calendar days following the final determination, pursuant to subsection (a) above, of the Closing Net Working Capital, and based upon such final determination:

(i) if the Closing Net Working Capital is less than the Net Working Capital as set forth on the Schedule of Assets and Liabilities, then the Sellers shall pay to the Purchaser an amount equal to such deficiency up to $4,300,000 by wire transfer of immediately available funds to an account designated by the Purchaser, which amount shall be satisfied out of the Adjustment Escrow Amount, and the Purchaser shall instruct the Adjustment Escrow Agent to deliver any remaining portion of the Adjustment Escrow Amount to the Sellers after such payment to the Purchaser;

(ii) if the Closing Net Working Capital exceeds the Net Working Capital as set forth on the Schedule of Assets and Liabilities, then the Purchaser shall pay to the Sellers by wire transfer of immediately available funds to an account designated by the Sellers an amount equal to such excess, and the Purchaser shall instruct the Adjustment Escrow Agent to deliver the entire amount of the Adjustment Escrow Amount to the Sellers.

(c) **Interest.** Any payment by the Sellers or the Purchaser required by **Section 2.4(b)** shall bear interest at a rate per annum equal to the Federal Funds Rate as in effect on the Closing Date for the period from the Closing Date through the day prior to the date of payment. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed, without compounding. Any payment pursuant to **Section 2.4(b)** (excluding payments attributable to interest) shall be treated by the parties as an increase or decrease in the Purchase Price.

(d) **Joint Instructions.** The Purchaser and the Sellers agree to prepare, execute and deliver joint written instructions to the Adjustment Escrow Agent (pursuant to the terms of the Adjustment Escrow Agreement) with respect to the distribution of the entire Adjustment Escrow Amount promptly following the date the Closing Net Working Capital Statement is determined to be final pursuant to **Section 2.4(a)** in accordance with **Section 2.4(b)**.

17

(e)  **Fees.** The fees and charges of the Adjustment Escrow Agent shall be paid one-half by the Sellers and one-half by the Purchaser.

**Section 2.5.  Deposit.** (a) Concurrently with or prior to the execution and delivery of this Agreement by the Purchaser, the Purchaser shall deposit with the Deposit Escrow Agent an amount equal to the Deposit Escrow Amount (the "**Deposit**") in accordance with the Deposit Escrow Agreement, and in connection with such deposit the Deposit Escrow Agreement shall be executed by the parties thereto.

(b)  **Closing.** If the Closing occurs, the Deposit shall be applied as provided in **Section 2.3.** If the Closing does not occur as a result of (i) a breach by the Purchaser of any of its obligations under this Agreement, or (ii) subject to the following sentence, a failure of any of the conditions set forth in **Section 7.1 or 7.2** to be satisfied or waived, or (iii) the Purchaser terminating this Agreement pursuant to **Section 9.6(h)**, the Deposit Escrow Agent shall disburse the Deposit and all interest accrued thereon to Sellers to be retained by Sellers for their own account on the date which is three (3) Business Days following the Deposit Escrow Agent's receipt of instructions in connection therewith. If the Closing does not occur solely as a result of the failure of the condition set forth in **Section 7.1** to be satisfied as it relates to the failure of **Section 4.4** to be true as of the Closing Date, the Deposit Escrow Agent shall, on the date which is three (3) Business Days following the Deposit Escrow Agent's receipt of instructions in connection therewith, disburse $2,000,000 of the Deposit and all interest accrued thereon to Sellers to be retained by Sellers for their own account and return to the Purchaser the balance of the Deposit (together with all interest thereon). If the Closing does not occur for any other reason, the Deposit Escrow Agent shall upon termination of this Agreement and on the date which is three (3) Business Days following the Deposit Escrow Agent's receipt of instructions in connection therewith return to the Purchaser the Deposit (together with all interest thereon) and the Purchaser shall have no further obligation or Liability of any kind to Sellers or any of their Affiliates.

(c)  **Interest.** Pending its application or disposition pursuant to subsection (b) above, the Deposit shall be held by the Deposit Escrow Agent in an interest-bearing bank account in which no other funds are held.

(d)  **Joint Instructions.** The Purchaser and the Sellers agree to prepare, execute and deliver joint written instructions to the Deposit Escrow Agent (pursuant to the terms of the Deposit Escrow Agreement) with respect to the distribution of the Deposit in accordance with **Section 2.5(b)**.

(e)  **Fees.** The fees and charges of the Deposit Escrow Agent shall be paid one-half by Sellers and one-half by Purchaser.

**Section 2.6.  Allocation of Purchase Price.** On or prior to the Closing Date, the Sellers and the Purchaser shall agree on the allocation of the Purchase Price and the amount of the Assumed Liabilities that are deemed assumed for U.S. federal income tax among the Purchased Assets as shall be set forth on **Schedule 2.6** (the agreed allocation hereinafter referred to as the "**Allocation**"). Any subsequent adjustment to the Purchase Price pursuant to **Section 2.4(b)** of this Agreement shall be allocated among the Purchased Assets as mutually determined

by the Sellers and the Purchaser based on the Allocation and in accordance with Section 1060 of the Code and the regulations thereunder (the **"Final Allocation"**). The Purchaser and the Sellers further agree to act in accordance with the Final Allocation in any Tax Returns or similar filings, provided, however that nothing contained herein shall prevent the Purchaser or the Sellers from settling any proposed deficiency or adjustment by any taxing authority based upon or arising out of the Final Allocation, and neither the Purchaser nor the Sellers shall be required to litigate before any court, any proposed deficiency or adjustment by any taxing authority challenging such Final Allocation. In the event that any tax authority disputes the Final Allocation, the Sellers or the Purchaser, as the case may be, shall promptly notify the other party of the nature of such dispute.

The Purchaser and the Sellers shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the regulations thereunder and shall file such statements or forms with their respective federal income Tax Returns. The parties shall prepare such statements or forms consistently with the Final Allocation. Each party shall provide the other party with a copy of such statements or forms as filed.

**Section 2.7.    Sale at Closing Date.**  The sale, transfer, assignment and delivery by the Sellers of the Purchased Assets to the Purchaser, and the assumption by the Purchaser of the Assumed Liabilities, as herein provided shall be effected on the Closing Date by (a) the execution and delivery by the Sellers and the Purchaser of an assignment and assumption of the Assigned Contracts substantially in the form attached hereto as **Exhibit C** (including a separate assignment and assumption of the Leases substantially in the form attached hereto as **Exhibit C-1**), free and clear of all Liens, to the extent effected by the Sale Order, (b) the execution and delivery by the Sellers and the Purchaser, if applicable, of quitclaim deeds or similar instruments of conveyance with respect to the Owned Real Property, free and clear of all Liens, to the extent effected by the Sale Order, and (c) with respect to the other Purchased Assets and Assumed Liabilities, by the execution and delivery by the Sellers and the Purchaser of the Bill of Sale and Assumption Agreement.

**Section 2.8.    Discharge of Liens.**  Notwithstanding anything to the contrary in this Agreement, if as of the Closing Date there are any Liens that the Sellers are obligated to pay and discharge under this Agreement, subject to the Sale Order, the Sellers may use any portion of the Purchase Price to discharge the same, either by way of payment, escrow or by bonding.

**Section 2.9.    Casualty and Condemnation.**  In the event of any damage or destruction by reason of any casualty to any of the Purchased Assets after the Effective Date, or if there shall be any taking by condemnation or eminent domain of any of the Purchased Assets, the Sellers shall (i) in the case of damage or destruction, pay over to the Purchaser at the Closing any insurance proceeds received by the Sellers prior to the Closing Date (including the amount of any applicable deductible or self-insurance retention) and assign to the Purchaser all of the Sellers' right, title and interest in and to any additional proceeds related to such damage or destruction and (ii) in the case of condemnation or eminent domain, pay over to the Purchaser at the Closing all awards received by the Sellers on account of such condemnation or eminent domain prior to the Closing Date and assign to the Purchaser all of the Sellers' right to receive any additional awards related to such condemnation or eminent domain.

**Section 2.10. Deemed Consents and Cures.** For all purposes of this Agreement (including all representations and warranties of the Sellers contained herein), the Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assigned Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court order, the Sellers are authorized to assign the Assigned Contracts to the Purchaser pursuant to section 365 of the Bankruptcy Code and any applicable cure cost has been satisfied by the Sellers or as to which the Sellers have provided adequate assurance that they will cure any and all defaults in accordance with the Sale Order and the Bankruptcy Code.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers represent and warrant to the Purchaser on and as of the Effective Date and the Closing Date, respectively, as follows:

**Section 3.1. Authority of the Sellers.** Each Seller is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its state of organization. Each Seller is qualified to do business and is in good standing in each of the jurisdictions set forth on **Schedule 3.1** below such Seller's name, which are all of the jurisdictions in which the ownership of the Purchased Assets or the conduct of the Business requires such qualification, except where the failure to be so qualified or in good standing does not constitute a Material Adverse Change. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full corporate or limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements, and the execution and delivery by each Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate or limited liability company action on the part of each Seller. Subject to any necessary authorization from the Bankruptcy Court, this Agreement constitutes, and each of the Ancillary Agreements upon its execution will constitute, the legal, valid and binding obligation of each Seller enforceable in accordance with its terms, subject to entry of the Sale Order, the receipt of the consents, waivers and approvals specified on **Schedule 3.4**, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or similar laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full corporate or limited liability company power and authority to own its properties, to carry on the Business presently being conducted by it and, subject to obtaining the Sale Order, to perform its obligations hereunder and under the Ancillary Agreements.

**Section 3.2. MMI Subsidiary Sellers.** All of the outstanding shares of capital stock of, or other ownership interests in, each MMI Subsidiary Seller are owned by MMI, directly or indirectly. All of the issued and outstanding shares and interests (as applicable) of the MMI Subsidiary Sellers have been duly authorized, are validly issued, fully paid and non-assessable, were issued free of pre-emptive or similar rights and are held of record or beneficially by MMI. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require

any of the MMI Subsidiary Sellers to issue, sell or otherwise cause to become outstanding any of its capital stock or other ownership interests or rights in respect thereof. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the MMI Subsidiary Sellers.

**Section 3.3. No Conflict or Violation.** The execution, delivery and performance by each of the Sellers of this Agreement and the Ancillary Agreements do not and will not violate any provision of the certificate or articles of incorporation or formation or by-laws (or equivalent documents) of such Seller and, after giving effect to the Sale Order and assuming that the consents, waivers, authorizations, approvals, declarations, filings and registrations referred to in **Section 3.4** are obtained or made, do not and will not (i) violate any provision of law, or any order, judgment or decree of any court or other Governmental Agency applicable to such Seller, or (ii) violate or result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any Assigned Contract, loan agreement, mortgage, security agreement, indenture or other instrument to which such Seller is a party or by which it is bound or to which any of the Purchased Assets is subject.

**Section 3.4. Consents and Approvals.** Assuming the entry of the Sale Order, **Schedule 3.4** sets forth a true and complete list of each material consent, waiver, authorization or approval of (i) any Governmental Agency and each declaration to or filing or registration with any such Governmental Agency, or (ii) any other Person in connection with any Assigned Contract involving the payment by any Seller of more than $250,000 in any calendar year, that is required for the execution and delivery of this Agreement by the Sellers or the performance by the Sellers of their obligations hereunder.

**Section 3.5. Compliance with Law.** To the Knowledge of the Sellers, except as set forth on **Schedule 3.5,** each Seller is in material compliance with, and is not in default in any material respect under, all material Regulations and Governmental Orders of any Governmental Agency that are applicable to the Business, the Purchased Assets, or any owned or leased properties of any Seller and to which any Seller may be subject, and no Claims have been filed against any Seller alleging a material violation of any such laws, Regulations, or Governmental Orders and no Seller has received notice of any such violations.

**Section 3.6. Schedule of Assets and Liabilities.** The Schedule of Assets and Liabilities was prepared in accordance with GAAP consistently applied and presents fairly the matters set forth therein as of the Liability Schedule Date.

**Section 3.7. Financial Statements and Related Matters.** MMI has furnished the Purchaser with copies of the (a) consolidated and consolidating balance sheets of MMG and its consolidated Subsidiaries for each accounting month beginning January 2003 and ending September 28, 2003, (b) related consolidated and consolidating statements of income, cash flows and EBITDA for each such accounting month and the then-elapsed portions of the fiscal quarter and fiscal year and (c) statements of income and EBITDA for each line of business for each such accounting month. Such financial statements are accurate and complete in all material respects and present fairly the financial condition and results of operations of MMG and its consolidated Subsidiaries as of such dates and for such periods, in each case in accordance with GAAP consistently applied except as stated therein and as further noted in Note 1 to the financial

statements, subject to normal year-end audit adjustments and except that footnote and schedule disclosure may be abbreviated.

## Section 3.8.   Title to Assets; Assets Necessary to Business.

(a)   Subject, and after giving effect, to the Sale Order, the applicable Seller will have at Closing good and marketable title to, or a valid leasehold interest in, the Purchased Assets, except for assets disposed of, in the Ordinary Course of Business and consistent with this Agreement, prior to the Closing Date, and except with respect to Permitted Liens. Since the Liability Schedule Date, no Seller has purchased any material amount of assets except in the Ordinary Course of Business and consistent with past practice.

(b)   Except for the Excluded Assets, the Purchased Assets constitute all of the assets, agreements, licenses and properties related to the Business owned by the Sellers and necessary in connection with the conduct of the Business immediately following the Closing in the same manner as conducted by the Sellers prior to the Closing.

(c)   The Purchaser will acquire good and marketable title to, or a valid leasehold interest in, the Purchased Assets, free and clear of all Liens to the extent effected by the Sale Order.

(d)   This Agreement and the documents contemplated hereby, when duly executed by the Sellers and delivered to the Purchaser at the Closing, and properly recorded or filed with any applicable Governmental Agency or third party, as necessary, with respect to the Assumed Facilities, will effectively vest in the Purchaser good and marketable title to the Purchased Assets, to the extent effected by the Sale Order.

**Section 3.9.   Material Adverse Change.** Since the Liability Schedule Date, there has not occurred any Material Adverse Change.

**Section 3.10.   Assigned Contracts.  Schedule 3.10** sets forth a true and complete list of the Material Other Contracts. True and complete copies of the Assigned Contracts or summaries thereof have been made available by the Sellers to the Purchaser. Other than as set forth on **Schedule 3.10**, neither the Sellers nor, to the Knowledge of the Sellers, any other party under any of the Assigned Contracts has commenced any action against the other or given or received any written notice of default or violation under any Assigned Contract which was not withdrawn or dismissed, except for those defaults which will be cured prior to the Closing or as to which the Sellers shall have provided adequate assurance that they will cure in accordance with the Sale Order (or which need not be cured under the Bankruptcy Code to permit the assumption and assignment of Assigned Contracts).

## Section 3.11.   Intellectual Property.

(a)   **Schedule 3.11** sets forth a true and complete list of all patents and patent applications, trademark, copyright and domain name applications and registrations, and material unregistered copyrights, trademarks and trade secrets that the Sellers own and use in the Business and all licenses, sublicenses and other agreements concerning Intellectual Property used in the Business (the **"Company Intellectual Property"**). The Company Intellectual Property

includes all Intellectual Property necessary to the continued operation of the Business consistent with past practice. Except as set forth on **Schedule 3.11**, the Sellers either own or have the right to use by license, sublicense, agreement or other permission all of the Company Intellectual Property and no Seller has granted any license or other right to any third party with respect to the Company Intellectual Property other than the licenses listed on **Schedule 3.11**. Except as set forth on **Schedule 3.11**, none of the Sellers has been charged with, nor to the Knowledge of the Sellers is threatened to be charged with, and the conduct of the Business does not result in, the infringement or other violation of the Intellectual Property of any other Person that constitutes a Material Adverse Change. Except as set forth on **Schedule 3.11**, to the Knowledge of the Sellers no other Person has committed an infringement or other violation of the Company Intellectual Property that constitutes a Material Adverse Change.

(b)     The Transferred IT Systems include all IT Systems material to the continued operation of the Business consistent with past practice. Subject to the Sale Order or obtaining the requisite approval for licenses requiring consent, waiver, authorization or approval to assign, such licenses being set forth on **Schedule 3.4** or **Schedule 3.11**, the consummation of the transactions contemplated in this Agreement will not impair or interrupt (i) access and use of the Transferred IT Systems in connection with the Business and (ii) to the extent applicable, access and use of the Transferred IT Systems by customers and suppliers of the Business.

### Section 3.12.  Labor Relations.

(a)     To the Knowledge of the Sellers, except as set forth on **Schedule 3.12**, there is currently no material investigation being conducted or material investigation or material claim being threatened by any Governmental Agency concerning the Sellers' compliance with wage and hours laws or regulations, occupational safety or health laws or regulations, human rights or anti-discrimination laws or regulations, or any other laws or regulations affecting Business Employees.

(b)     Except as set forth on **Schedule 3.12**, none of the Sellers are a party to a collective bargaining agreement governing the terms and conditions of employment of a Business Employee. Except as set forth on **Schedule 3.12**, to the Knowledge of the Sellers, there is no pending union representational activity relating to the Business, and no material grievances or pending unfair labor practices or other material employment-related claims against any Seller with respect to the Business.

**Section 3.13.  Personnel Matters**. The Sellers have made available to the Purchaser an accurate and complete list of the wage rates, base compensation, and any supplemental or bonus compensation (including, without limitation, any retention or stay bonus arrangements) for all persons employed in the Business including all employment agreements, consulting agreements, independent contractor agreements, retainers and severance agreements, under which any Seller has any obligation to provide wages, salary, commissions, or other compensation, remuneration or benefits to any employee, former employee, consultant or contractor.

## Section 3.14.  Employee Benefits.

(a)      **Schedule 3.14** attached hereto, sets forth a complete and accurate list of each "employee benefit plan", as defined in Section 3(3) of ERISA, and all other material employee benefit arrangements relating to the Business, including any such arrangements providing severance pay, sick leave, vacation pay, salary continuation for disability, retirement benefits, deferred compensation, bonus pay, incentive pay, stock options, hospitalization insurance, medical insurance, life insurance or scholarships or tuition reimbursements, maintained by a Seller or to which a Seller is obligated to contribute to or have any liability or potential liability to any current or former Business Employee (each a **"Plan"** and collectively, the **"Plans"**).  The Sellers have made available to the Purchaser true and correct copies, if applicable, of (i) each Plan and its related trust document, including any amendments thereto, (ii) the most recent IRS Form 5500 filed with the Internal Revenue Service and (iii) the most recent summary plan description.

(b)      None of the Plans is a multiemployer plan, as defined in Section 3(37) of ERISA, or a single-employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA and, to the Knowledge of the Sellers, no Seller has any material liability or potential liability under Title IV of ERISA.

(c)      Each Plan that is intended to qualify under Section 401(a) of the Code and the trust maintained pursuant thereto has received, has an application pending, or remains within the remedial amendment period for obtaining, a favorable determination letter from the IRS that it is so qualified and that its trust is exempt from tax under Section 501(a) of the Code and to the Knowledge of the Sellers, no fact exists or event has occurred with respect to the operation of any such Plan that could reasonably be expected to cause such Plan and related trust not to qualify or be so exempt from tax.

(d)      To the Knowledge of the Sellers, each Plan has been maintained in material compliance with its terms and with the provisions of ERISA and the Code and other applicable federal and state laws and regulations.  There are no unpaid contributions, premiums, or payments due prior to the Effective Date with respect to any Plan that are required to have been made under the terms of the Plan or any applicable law except for incurred but unreported medical benefits claims.

(e)      The Sellers have no obligation to provide any deferred compensation, pension or non-pension benefits to retired or other former employees, except for health benefits as specifically required by Part 6 of Title I of ERISA (**"COBRA"**) or other applicable law or pension benefits payable from a Plan intended to be "qualified" within the meaning of Section 401(a) of the Code.

(f)      All group health plans covering employees of the Sellers have been operated in material compliance with the requirements of Section 4980B of the Code (and any predecessor provisions) and COBRA.

(g)      Neither the Sellers nor, to the Knowledge of the Sellers, any other "disqualified person" or "party in interest," as defined in Section 4975 of the Code and Section

24

3(14) of ERISA, respectively, has engaged in any "prohibited transaction," as defined in Section 4975 of the Code or Section 406 of ERISA, with respect to any Plan nor, to the Knowledge of the Sellers, have there been any fiduciary violations under ERISA which could subject any Seller (or any officer, director or employee thereof) to any penalty or tax under Section 502(i) of ERISA or Sections 4971 and 4975 of the Code.

(h) With respect to any Plan: (i) no filing, application or other matter is pending with the IRS, the Pension Benefit Guaranty Corporation, the United States Department of Labor or any other Governmental Agency; (ii) there is no action, suit or claim pending (nor, to the Knowledge of the Sellers, any basis for such a claim), other than routine claims for benefits; and (iii) there are no outstanding liabilities for taxes or penalties under ERISA or the Code.

## Section 3.15. Real Property Assets.

(a) **Schedule 1.6** lists all Owned Real Property of the Sellers. With respect to each parcel of Owned Real Property: (i) at Closing, the identified Seller shall have good and marketable title to the parcel of Owned Real Property, free and clear of any Liens to the extent effected by the Sale Order and (ii) there are no leases, subleases, licenses or any other agreements granting to any Person the right of use or occupancy of any portion of the parcel of Owned Real Property, except those noted on **Schedule 1.6**. The Sellers have delivered to Purchaser correct and complete copies of each of the deeds and other instruments (as recorded) in Sellers' possession by which the Sellers acquired the Owned Real Property, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Sellers relating to all of the Owned Real Property.

(b) To the Knowledge of the Sellers, all permanent certificates of occupancy have been issued for the Assumed Facilities and are in full force and effect.

(c) Except as set forth on **Schedule 3.15**, the Sellers have all material permits, licenses, certificates of authority, consents, authorizations, orders and approvals of, and have made all filings, applications and registrations with governmental agencies or departments necessary for each Seller to own, lease and operate the Purchased Assets, including the Assumed Facilities, and to conduct the Business as presently conducted (collectively, the **"Permits"**). Subject to **Schedule 3.15**, the Sellers are in compliance in all material respects with all Permits and no suspension or cancellation of any of the Permits is pending or, to the Knowledge of the Sellers, threatened.

(d) To the Knowledge of the Sellers, the Sellers' operation and use of the buildings and other improvements constituting the Owned Real Property do not violate, in any material respect, any zoning, subdivision, building or similar law, ordinance, order, Regulation or recorded plat or any certificate of occupancy issued with respect to the Owned Real Property, except for violations that would not constitute a Material Adverse Change.

(e) (i) Sellers have heretofore delivered to the Purchaser true and complete copies of each of the Leases (or in the case of an oral lease, a written summary of the material terms of such lease) in the Sellers' possession and none of such leases has been otherwise amended, modified or terminated; (ii) to the extent provided in, and after giving effect to the Sale

Order, the Assumed Facility Leases on the Closing Date shall be legal, valid, enforceable and in full force and effect unless any such Assumed Facility Lease shall have expired in accordance with its terms (and not because of any termination or other acceleration of the stated expiration date thereof); and (iii) except as set forth on **Schedule 3.15**, there is no option to purchase, right of first offer, right of first refusal or other provision granting any Seller or, to the Knowledge of the Sellers, any other Person any right to acquire the Owned Real Property or any portion thereof or interest therein.

### Section 3.16. Health Care Matters.

(a) Sellers have not received any adverse written communications from any Governmental Agency, including without limitation the United States Food and Drug Administration (the **"FDA"**), with respect to any submissions made by the Sellers to such agency. To the Knowledge of the Sellers, there have been no material adverse episodes or complications resulting from any clinical trials or tests performed to date with respect to the Sellers' products or procedures. The Sellers reasonably believe that they will not experience any material difficulty in identifying and recruiting patients to participate in clinical trials or tests with respect to the Sellers' products or procedures.

(b) Except as set forth on **Schedule 3.15**, the operations of the Sellers are in substantial compliance in all material respects with all applicable Regulations of the FDA and all Governmental Agencies which have jurisdiction over their products. The Sellers are not aware of any actual or threatened enforcement action by the FDA or other Governmental Agencies which have jurisdiction over its medical products concerning its products, including, without limitation, any fines in excess of $100,000, injunctions, civil or criminal penalties, recalls, seizures, detentions, investigations or suspensions. All products of the Sellers are in substantial compliance with all premarketing, facility registration and product listing requirements, as well as manufacturing laws and regulations of the FDA and Governmental Agencies.

(c) Except as set forth on **Schedule 3.15,** the Sellers possess such certificates, authorizations, licenses or permits issued by the appropriate local, state, federal or foreign Governmental Agencies or bodies including, without limitation, the FDA, the Health Care Financing Administration and the National Supplier Clearinghouse, as are material to, or legally required for, the operation of its Business. The Sellers have not received any notice, or otherwise have Knowledge that any Governmental Agency is considering, limiting, suspending, modifying or revoking any such certificate, authorization, license or permit.

(d) To the Knowledge of the Sellers, all material reports, documents, claims and notices required to be filed, maintained, or furnished to any applicable Governmental Agency by the Sellers have been so filed, maintained or furnished. All such reports, documents, claims and notices were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing) such that the Sellers are not aware of any basis for liability with respect to such filing.

(e) Neither the Sellers nor its officers, directors or managing employees have engaged in any activities which are prohibited under federal or state criminal or civil health care laws (including without limitation the federal Anti-Kickback statute, Stark law and federal False

26

Claims Act and any state laws prohibiting kickbacks or certain referrals), or the regulations promulgated pursuant to such laws, or are cause for civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other state or federal health care program (collectively, the **"Programs"**).

(f) To the Knowledge of the Sellers, the Sellers meet all requirements of participation and payment of the Programs and other third party payment programs and are a party to valid participation agreements for payment by such Programs and other payment programs. The Sellers have not received notice from any of the Programs or other third party payment programs of any pending or threatened investigations which would result in exclusion from any of such Programs or other third party payment programs, and have no reason to believe that any such investigations are pending, threatened or imminent. There is no civil, criminal, administrative, or other action, suit, demand, claim, hearing, notice of violation, proceeding, notice or demand pending, received or to the Knowledge of the Sellers threatened against the Sellers which would reasonably result in their exclusion from participation in any of the Programs or other third party payment programs. There is no civil or criminal investigation of the Sellers relating in any way to any violation of any Medicare or Medicaid law or regulation.

**Section 3.17. Environmental Matters.** (a) Except as set forth on **Schedule 3.17**, including the Environmental Reports listed therein, each Seller is in compliance in all material respects with all applicable Environmental Laws, except to the extent any such noncompliance has been fully and finally resolved. To the Sellers' Knowledge, there is no requirement proposed for adoption or implementation under any Environmental Law or Environmental Permit that constitutes a Material Adverse Change.

(b) Except as set forth on **Schedule 3.17**, including the Environmental Reports listed therein, each Seller is in compliance in all material respects with all permits, licenses and other authorizations that may be required pursuant to Environmental Laws (**"Environmental Permits"**) for the occupation of the Assumed Facilities and the operation of the Business, except to the extent any such noncompliance has been fully and finally resolved.

(c) Except as set forth on **Schedule 3.17**, including the Environmental Reports listed therein, no Seller has received any written notice of any Environmental Claim arising under Environmental Laws and relating to the Business, except to the extent any such notice has been fully and finally resolved.

(d) No Seller has assumed or undertaken any material liability or corrective or remedial obligation of any other Person relating to Environmental Laws.

(e) To the Knowledge of the Sellers, there is no asbestos or asbestos-containing material at any of the Owned Real Property or Leased Property, that requires removal or encapsulation under any Environmental Law.

(f) Except as set forth on **Schedule 3.17,** neither the execution of this Agreement nor the consummation of the transactions contemplated herein will require any notice to or consent of any Governmental Agency (other than the Bankruptcy Court), pursuant to any

applicable Environmental Law or Environmental Permit, including pursuant to the Connecticut Property Transfer Act or the New Jersey Industrial Site Recovery Act.

(g)     This **Section 3.17** contains the sole and exclusive representations and warranties of the Sellers with respect to any environmental, health or safety matters, including without limitation, any arising under Environmental Laws.

**Section 3.18. Absence of Undisclosed Liabilities.** Except as otherwise disclosed on **Schedule 3.18**, no Seller has any obligations or Liabilities arising out of transactions entered into at or prior to the Closing, or any action or inaction at or prior to the Closing, which will affect the Purchased Assets, whether by operation of law or otherwise, except (a) obligations under executory contracts or commitments described on **Schedule 3.18** attached hereto or under executory contracts and commitments which are not required to be disclosed thereon (but not liabilities for breaches thereof), (b) liabilities reflected on the liabilities side of the Schedule of Assets and Liabilities, (c) liabilities which have arisen after the Liability Schedule Date in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement (none of which constitutes a material liability for breach of contract, breach of warranty, tort or infringement or a claim or lawsuit or an environmental liability or a material violation of any Regulations and none of which, individually or in the aggregate, constitutes a Material Adverse Change in respect of the Business or the Purchased Assets) or (d) any liabilities which will be extinguished by the Sale Order, or (e) Permitted Liens.

**Section 3.19. Insurance. Schedule 3.19** sets forth a list of all material policies of insurance insuring the properties or operations of the Business, including the type and amount of coverage and the expiration dates of the policies. No Seller has received any notice within the last 90 days threatening suspension, revocation, modification or cancellation of any insurance policy or a material increase in any premium in connection therewith or informing any Seller that any coverage listed on **Schedule 3.19** attached hereto will or may not be available in the future on substantially the same terms as now in effect.

**Section 3.20. Accounts Receivable.** Except as set forth on **Schedule 3.20** attached hereto or reserved on the Schedule of Assets and Liabilities, each account receivable arising from services and/or sales of products or goods by the Sellers or any of their Subsidiaries, whether or not earned by the Sellers on the Effective Date or on the Closing Date, constitutes a bona fide receivable resulting from a bona fide sale to a customer in the Ordinary Course of Business on commercially reasonable terms, the amount of which was actually due on the date thereof.

**Section 3.21. Litigation.** Except as set forth on **Schedule 3.21** attached hereto, or as otherwise listed on the docket of these Cases or on the claims docket maintained in these Cases, there are no actions, suits, complaints, charges, Proceedings, orders, investigations, audits or claims pending or, to the Knowledge of any Seller, threatened against or affecting any Seller at law or in equity, in the United States or elsewhere, or before or by any court, arbitrator, governmental or regulatory official, office, department, commission, board, bureau, agency or instrumentality (including, without limitation, any actions, suits, complaints, charges, Proceedings or investigations with respect to the transactions contemplated by this Agreement) in which the damages sought exceed $100,000 or that otherwise constitutes a Material Adverse

Change. No Seller is subject to any judgment, order or decree of any court or other Governmental Agency (or settlement enforceable therein), and to the Knowledge of the Sellers, no Seller nor any of its Subsidiaries has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed, from a legal standpoint, to any liability or disadvantage which may be material to the Business.

**Section 3.22. Tax Matters.** (a) Other than Permitted Liens and after giving effect to the Sale Order, no Tax Liens (i) will attach to the Purchased Assets after the Closing or (ii) are currently attached to the Purchased Assets and will be attached to the Purchased Assets after the Closing. No Seller has received any written notice or inquiry from any jurisdiction where the Seller does not currently file income or franchise Tax Returns to the effect that such filings are required with respect to the Business or that the Business may otherwise be subject to taxation by such jurisdiction. There are no material Tax investigations, inquiries or audits by any Tax authority in progress relating to the Purchased Assets or the Business, nor has any Seller received any written notice from any Tax authority that it intends to conduct such an audit or investigation, except as set forth on **Schedule 3.22**.

(b) The Sellers have withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other Third Party, and all Forms W-2 and 1099 required to be filed before the Closing Date with respect to such amounts have been filed.

**Section 3.23. Interim Operations.** Taking into account the Sellers' status as debtors in possession under the Bankruptcy Code and matters reflected in the docket for the Cases, since the Petition Date, the Business has been operated in the Ordinary Course of Business, except as set forth on **Schedule 3.23**. Except in the Ordinary Course of Business (including the execution and delivery of post-petition leases and/or lease renewals) or except as approved by the Bankruptcy Court, since the Liability Schedule Date, none of the Sellers has, with respect to the Business, mortgaged or pledged any of the Purchased Assets, except pursuant to the Revolving Credit and Guaranty Agreement or sold or transferred or agreed to sell or transfer any of the Purchased Assets (other than pursuant to this Agreement and the MMI Acquisition Corp. Agreement).

**Section 3.24. Brokers.** Except for the services provided by Greenhill & Co., LLC in connection with the transactions contemplated by this Agreement (the responsibility for any fee due to Greenhill & Co., LLC being an obligation of the Sellers), all negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by the Sellers without the intervention of any other Person acting on the Sellers' behalf in such manner as to give rise to any valid claim by any such Person against the Purchaser for a finder's fee, brokerage commission or other similar payment based on an arrangement with the Sellers.

## Section 3.25. Customers and Suppliers.

(a) **Schedule 3.25(a)** lists the names of (i) the 10 largest customers by dollar volume of the Sellers for the period from January 1, 2003 through the Liability Schedule Date and (ii) all customers purchasing products, goods or services from the Sellers under agreements having a gross profit margin to the Sellers of less than 10%.

29

(b)     **Schedule 3.25(b)** lists for each line of Business identified therein the names of the suppliers from which the Sellers ordered raw materials, supplies, merchandise and other goods representing, in each case, at least 70% by dollar volume of the Sellers' aggregate purchases for such line of Business for the period from January 1, 2003 through the Liability Schedule Date.

### Section 3.26.  Bankruptcy Matters.

Each Seller represents that, other than the transactions contemplated by this Agreement and by the MMI Acquisition Corp. Agreement, it is not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of the Business or the Purchased Assets.

### Section 3.27.  Disclaimer of Additional Representations and Warranties; Schedules.

(a)     Except as expressly set forth in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements, and any certificate or instrument delivered pursuant to the terms hereof or thereof, the Sellers make no representations or warranties with respect to the Business, or their operations, assets (including the Purchased Assets), liabilities (including the Assumed Liabilities) or environmental matters (including the presence or absence of Hazardous Substances) or other conditions, including, with respect to the Purchased Assets, any representation or warranty of merchantability, suitability or fitness for a particular purpose or quality, or as to the condition or workmanship thereof, or the absence of any defects therein, whether latent or patent. Except as provided in this Agreement, the Schedules and Exhibits hereto, the Ancillary Agreements and any other certificate or instrument delivered pursuant to the terms hereof or thereof, the Purchased Assets are to be conveyed hereunder "AS IS" on the Effective Date and in their present condition, subject to reasonable use, wear and tear between the Effective Date and the Closing Date, and the Purchaser shall rely upon its own examination thereof.

(b)     Notwithstanding anything to the contrary contained in this Agreement, no matter primarily relating to any of the Excluded Assets or Excluded Liabilities is required to be disclosed on any Schedule. In addition, each section of the Schedules shall be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent that the applicability of such disclosure to any other section is reasonably apparent from the face of such disclosure. Disclosure of an item in any Schedule shall not be deemed to be an admission that such item is material or otherwise required to be disclosed on such Schedule.

**Section 3.28.  No Survival.** All of the representations and warranties of the Sellers contained in this Agreement, the Schedules and Exhibits hereto or in any certificate or other instrument delivered by any Seller pursuant to the terms hereof or thereof shall terminate immediately after, and none of such representations or warranties shall survive, the Closing.

# ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Sellers as follows:

**Section 4.1.    Authority of the Purchaser.** The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of its state of organization. The Purchaser has full limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements, and the execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action on the part of the Purchaser. This Agreement constitutes, and each of the Ancillary Agreements upon its execution will constitute, the legal, valid and binding obligation of the Purchaser enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or similar laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies. The Purchaser has full limited liability company power and authority to own its properties and to carry on the business presently being conducted by it.

**Section 4.2.    No Conflict or Violation.** The execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements do not and will not violate any provision of the certificate of formation or limited liability company operating agreement of the Purchaser and do not and will not violate any provision of law, or any order, judgment or decree of any court or other Governmental Agency applicable to the Purchaser, or violate or result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any loan agreement, mortgage, security agreement, indenture or other instrument to which the Purchaser is a party or by which it is bound.

**Section 4.3.    Consents and Approvals.** The execution, delivery and performance by the Purchaser of this Agreement do not require the consent or approval of, or filing with, any Governmental Agency or other Person except (i) as may be required to effect the transfer of any Permits and (ii) as required pursuant to the HSR Act.

**Section 4.4.    Litigation.** There are no actions, causes of action, suits, proceedings, orders, writs, injunctions, or decrees pending or, to the Knowledge of the Purchaser, threatened against the Purchaser at law or in equity or before or by any Governmental Agency, which seeks to restrain or enjoin the consummation of the transactions contemplated hereby.

**Section 4.5.    Brokers.** All negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by the Purchaser without the intervention of any other Person acting on its behalf in such manner as to give rise to any valid claim by any such Person against the Sellers or their Affiliates or any other party in interest in the Cases for a finder's fee, brokerage commission or other similar payment based on an arrangement with the Purchaser.

**Section 4.6.    Adequate Assurances Regarding Executory Contracts.** The Purchaser is and will be capable of satisfying the conditions contained in section 365(b) of the Bankruptcy Code with respect to the Executory Contracts.

**Section 4.7.    Closing Date; No Survival.** All of the representations and warranties contained in this **Article IV** and elsewhere in this Agreement and all information delivered in any schedule, attachment or Exhibit hereto or in any writing delivered by Purchaser to Sellers are true and correct on the date this Agreement is signed by Purchaser and shall be true and correct on the Closing Date. All of the representations and warranties of the Purchaser contained in this Agreement, the Schedules and Exhibits hereto or in any certificate or other instrument delivered by the Purchaser pursuant to the terms hereof or thereof shall terminate immediately after, and none of such representations or warranties shall survive, the Closing.

## ARTICLE V.

## CERTAIN COVENANTS OF THE SELLERS

Each Seller covenants with the Purchaser that from and after the Effective Date through the Closing Date (or after the Closing Date to the extent expressly so provided herein):

**Section 5.1.    Conduct of Business Before the Closing Date.** Without the prior written consent of the Purchaser, which consent will not be unreasonably withheld or delayed, or unless otherwise ordered by the Bankruptcy Court sua sponte or on motion by a third party, notice of which order or motion shall be promptly delivered by the Sellers to the Purchaser, or except as set forth on **Schedule 3.23**, between the Effective Date and the Closing Date, the Sellers shall not, except as required or permitted pursuant to the terms hereof, make any material change in the Purchased Assets or the Business as it relates to the Purchased Assets, or enter into any transaction respecting the Business, other than in any such case in the Ordinary Course of Business consistent with the Sellers' past practices, and shall continue to operate the Business as it relates to the Purchased Assets in the Ordinary Course of Business. Subject to any obligations as a debtor or debtor in possession under the Bankruptcy Code or order of the Bankruptcy Court, without limiting the generality of, but subject to, the foregoing, unless otherwise consented to in writing by the Purchaser or as would not constitute a Material Adverse Change, the Sellers shall, consistent with their past practices:

(a)    Subject to clause (c) below, perform all of their material post-petition obligations under the Leases and Other Contracts in accordance with their terms, except to the extent that such obligations are not required to be performed under the Bankruptcy Code or are being disputed by the Sellers in good faith;

(b)    Comply in all material respects with all statutes, laws, ordinances, rules and regulations applicable to the Purchased Assets and Assumed Liabilities except to the extent that compliance is being disputed by the Sellers in good faith or excused by the Bankruptcy Code or other applicable law;

(c) Not amend or modify, in any material respect, or terminate any of the Leases or Material Other Contracts or agree or consent to any material amendments or modifications or terminations thereof;

(d) Not change, in any material respect, any of their methods or procedures relating to accounting for accounts receivable or inventory in the Business, other than such changes required by GAAP;

(e) Promptly notify the Purchaser if the Sellers receive any notices from any lessor, Governmental Agency, insurance company or any other Person indicating any default that could reasonably be expected to materially and adversely affect the Purchased Assets, or that any of the Owned Real Property or Leased Properties are or may be in material violation of any law, and cause compliance at the Sellers' cost, except where compliance is being disputed by the Sellers in good faith or will be cured prior to or at the Closing;

(f) Not enter into any material agreements that would be binding on the Purchaser or affect any of the Purchased Assets after the Closing Date, other than in the Ordinary Course of Business;

(g) Promptly notify the Purchaser of any order of the Bankruptcy Court entered in the Cases that affects or will affect the operation of the Business or the Purchased Assets and promptly deliver a copy of any such order to the Purchaser;

(h) Maintain in full force and effect insurance comparable in amount and scope to coverage maintained by it (or on its behalf) with respect to the Business on the Effective Date;

(i) Not terminate any Business Employees except for cause and consistent with past practices; and

(j) Not change, in any material respect, the management of working capital assets or working capital liabilities from the management of such since the commencement of the Cases.

**Section 5.2. Consents and Approvals.** Subject to **Article IX**, the Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court.

**Section 5.3. Information and Access; Certain Tax Disclosures.** (a) The Sellers will permit representatives of the Purchaser to have reasonable access during normal business hours after reasonable notice from the Purchaser to the Sellers, and in a manner so as not to interfere with normal operations, to all premises, properties, personnel, accountants, books, records, contracts and documents of or pertaining to the Business, subject to any requirements of applicable law. The Purchaser and each of its representatives will treat and hold as confidential such information in accordance with the terms and provisions of the Confidentiality Agreements, which Confidentiality Agreements remain in full force and effect. If the Purchaser discovers any breach of any representation or warranty contained in this Agreement, or any circumstance or condition that upon the Closing would constitute such a breach, the Purchaser covenants that it will promptly so inform the Sellers. The Purchaser shall

33

reimburse the Sellers for any reasonable out-of-pocket costs incurred by the Sellers (but not for overhead or cost of salaries or benefits of the Purchaser's personnel) in providing such access. The Purchaser shall indemnify, defend and hold harmless the Sellers, the lessors under the Leases and their respective Affiliates from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), suffered or incurred by such Persons in connection with any and all activities undertaken by the Purchaser or the Purchaser's representatives pursuant to this **Section 5.3**. The parties hereto agree and acknowledge that the provisions of this **Section 5.3** shall in no way affect the conditions set forth in **Articles VIII.**

(b)     Notwithstanding anything in this Agreement to the contrary, the Purchaser and each Seller (and each employee representative, or other agent of such Persons) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein and all materials of any kind (including opinions or other tax analyses) that are provided to the Purchaser or the Seller relating to such tax treatment and tax structure except to the extent necessary to comply with any applicable federal or state securities laws. This authorization is not intended to permit disclosure of any other information including (i) any portion of any materials to the extent not related to the Tax treatment or Tax structure of the transactions, (ii) the identities of participants or potential participants in the transactions, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the Tax treatment or Tax structure of the transactions), or (v) any other term or detail not relevant to the Tax treatment or the Tax structure of the transactions.

(c)     Without limiting the generality of the foregoing, the Purchaser will have the right at its cost and expense, to (i) conduct tests of the soil surface or subsurface waters and air quality at, in, on, beneath and about the Purchased Assets or the Assumed Facilities, and to conduct such other procedures as may be reasonably recommended by a qualified, independent environmental consultant engaged by the Purchaser or its legal counsel (ii) inspect records, reports, permits, applications, monitoring results, studies, correspondence, data and other information or documents relevant to environmental conditions of the Purchased Assets or environmental noncompliance of the Business, and (iii) inspect all buildings and equipment included in the Purchased Assets and Assumed Facilities including, without limitation, the visual inspection of the physical plants for asbestos-containing construction materials; provided, that in each case such tests and inspections shall be subject to the rights of other parties having a property interest in the Purchased Assets or the Assumed Facilities or surrounding areas and shall be conducted only (A) during regular business hours and upon reasonable notice and (B) in a manner that will not interfere with the operation of the Business.

**Section 5.4.     Further Assurances.** Upon the request of the Purchaser at any time after the Closing Date, the Sellers shall forthwith execute and deliver such documents and take such actions as the Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

**Section 5.5.     Commercially Reasonable Efforts.** Upon the terms and subject to the conditions of this Agreement, the Sellers will use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper,

34

including without limitation obtaining all consents, approvals and authorizations of Third Parties, making all filings with and giving all notices to Third Parties in accordance with the terms of this Agreement, and consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby. Without limiting the foregoing, the Sellers will (i) take or cause to be taken by others all reasonable actions required to obtain or satisfy all consents and to continue such efforts as may be required after the Closing Date to facilitate the full and expeditious transfer of legal title, or the sublease or sublicense as the case may be, of the Purchased Assets and (ii) use commercially reasonable efforts to assist Purchaser in obtaining Permits, approvals and certifications listed in sections (a) and (c) of **Schedule 3.4**.

**Section 5.6. Assignment of Contracts**. At the Closing and effective as of the Closing Date, the Sellers shall sell, assign and transfer to the Purchaser all their rights under the Assigned Contracts, free from all prior defaults by the Sellers and all claims by third parties against the Purchaser or the Purchased Assets relating to any prior defaults by the Sellers thereunder, in each case, in accordance with and as required by section 365 of the Bankruptcy Code.

**Section 5.7. Cure of Defaults**. The Sellers shall, on or prior to the Closing, cure any and all defaults or provide adequate assurance that they will cure any and all defaults with respect to Assigned Contracts as provided in and required by section 365 of the Bankruptcy Code and as required by the Bankruptcy Court, so that such Assigned Contracts may be assumed by the Sellers and assigned to the Purchaser as applicable in accordance with the provisions of section 365 of the Bankruptcy Code and so that the Purchaser shall have no obligations for defaults existing prior to the assignment.

**Section 5.8. Accounts Receivable**. Each Seller shall promptly remit in kind to the Purchaser any payments received by such Seller after the Closing in respect of accounts receivable constituting a part of the Purchased Assets, excluding cash from checks received by the Sellers at or prior to 12:01 a.m., New York City time, on the Closing Date.

**Section 5.9. Transition Arrangements; Maxxim Medical Canada**. (a) From and after the Closing Date, the Sellers shall maintain all checking accounts (with sufficient funds therein) until all checks drawn on such accounts on or prior to November 20, 2003 have cleared. In addition, the Sellers, with their then available personnel, shall cooperate with the Purchaser in the establishment of such other reasonable transition arrangements (including, without limitation, with respect to insurance, medical, payroll and banking matters) as the Purchaser shall reasonably request, for a period of up to one hundred twenty (120) days following the Closing Date. The Purchaser, Medline and Argon, as appropriate, shall compensate the Sellers for their actual costs incurred in providing such services, including direct costs and liabilities incurred in providing such transition services, labor costs and related overhead costs.

(b) The Parent will enter into the Maxxim Canada Option at or prior to the Closing.

35

(c)     The Sellers shall cause Maxxim Medical Canada to enter into a supply agreement, substantially in the form attached hereto as **Exhibit H** (the **"Supply Agreement"**), with Medline at or prior to the Closing.

**Section 5.10. Bankruptcy Actions.** (a) The Sellers will provide the Purchaser with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Sellers relating to this Agreement (including forms of orders and notices to interested parties) prior to the filing thereof in the Cases.

(b)     From the Effective Date until the Closing Date and provided that the Purchaser is proceeding in good faith to consummate the transactions contemplated hereby in a timely manner, no Seller or any of its Affiliates shall discuss, negotiate or consummate any transaction involving (i) the issuance, redemption, sale or exchange or other disposition of any equity interest in any Seller or (ii) the sale, exchange, liquidation, reorganization, or other disposition of all or any part of the Purchased Assets, other than with respect to the second highest or otherwise best bidder designated at the Auction.

**Section 5.11. Business Relations.** The Sellers shall not terminate its relations with its suppliers, customers, distributors and any others with whom or with which it has business relations, other than in the Ordinary Course of Business.

## Section 5.12. [Intentionally Omitted]

**Section 5.13. Customers and Suppliers.** On or prior to the Closing Date, the Sellers shall provide to the Purchaser a list of the names and addresses of all (a) customers of the Business which ordered products, goods or services from the Sellers during the period from January 1, 2003 through the Liability Schedule Date and the amount for which each such customer was invoiced during such period and (b) suppliers from which the Sellers (in connection with the lines of Business described on **Schedule 3.25**) ordered raw materials, supplies, merchandise and other goods for such lines of Business during the period from January 1, 2003 through the Liability Schedule Date and the amount for which each such supplier invoiced the Sellers during such period.

## Section 5.14. Payment of Accrued Payroll and Other Compensation.

(a)     On or prior to the Closing Date, the Sellers shall pay to the Business Employees all salaries, wages and vacation compensation earned by such Business Employees prior to the Closing Date but not yet paid by the Sellers.

(b)     All commissions earned by such Business Employees for the period ending on October 26, 2003 and all commissions earned by such Business Employees for the period from October 27 2003 through and including date that is one day prior to the Closing Date shall be paid by the Sellers or the estates of the Sellers in accordance with past payment practices.

## ARTICLE VI.

## CERTAIN COVENANTS OF THE PURCHASER

**Section 6.1.  [Intentionally Omitted]**

**Section 6.2.  Commercially Reasonable Efforts**. Upon the terms and subject to the conditions of this Agreement, the Purchaser will use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby. The Purchaser shall cooperate as reasonably necessary or requested in (a) obtaining Bankruptcy Court approval of the Sale Order and (b) securing any consents, including the provision of financial information regarding the Purchaser and its intended use of the Purchased Assets.

**Section 6.3.  Consents and Approvals**. The Purchaser will use commercially reasonable efforts to provide, at the Sellers' request, assistance in obtaining the Sale Order in order to effect the transactions contemplated by this Agreement. Without limiting the foregoing, the Purchaser agrees that it will promptly take all actions that are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the Purchaser's employees and representatives available to testify before the Bankruptcy Court. Other than as expressly permitted in this Agreement, the Purchaser shall not take any action that could reasonably be expected to materially hinder or impair the Sellers ability to obtain the Sale Order.

**Section 6.4.  Employees of Sellers.**

(a)  The Purchaser agrees that, unless this Agreement is terminated by the Purchaser pursuant to **Section 9.6(d)**, it will not, and it will cause each of its Affiliates not to, during the period beginning on the Effective Date and ending on the first to occur of (x) the Closing Date and (y) the date that is six months after the Effective Date, hire any person who is a current officer or employee of any of the Sellers to be an officer, employee, independent contractor or agent of (or otherwise to work or perform services for) the Purchaser or any such Affiliate, other than any such current officer or employee of any of the Sellers who has been terminated with or without cause by any of the Sellers.

(b)  The Purchaser agrees that, unless this Agreement is terminated by the Purchaser pursuant to **Section 9.6(d)**, it will not, and it will cause each of its Affiliates not to, during the period beginning on the Effective Date and ending on the first to occur of (x) the Closing Date and (y) the first annual anniversary of the Effective Date, solicit, other than through a general solicitation not specifically targeting any of the Sellers' officers or employees, any person who is a current officer or employee of any of the Sellers to be an officer, employee, independent contractor or agent of (or otherwise to work or perform services for) the Purchaser or any such Affiliate, other than any such current officer or employee of any of the Sellers who has been terminated with or without cause by any of the Sellers.

(c)     If this Agreement is terminated for any reason other than by the Purchaser pursuant to **Section 9.6(d),** this **Section 6.4** shall survive such termination.

**Section 6.5.    Adequate Assurances Regarding Executory Contracts.** With respect to each Executory Contract and without limiting **Section 6.3,** the Purchaser shall provide adequate assurance as required under the Bankruptcy Code of the future performance of such Executory Contract by the Purchaser.

**Section 6.6.    Performance Under Assigned Contracts.** Each of the Purchaser, Medline and Argon agrees that from and after the Closing Date the Purchaser, Medline and Argon, as appropriate, shall take all actions necessary to satisfy its obligations under the terms and conditions of each of the Assigned Contracts.

**Section 6.7.    Further Assurances.** Upon the request of the Sellers at any time after the Closing Date, each of the Purchaser, Medline and Argon, as appropriate, shall forthwith execute and deliver such documents as the Sellers or their counsel may reasonably request to effectuate the purposes of this Agreement.

**Section 6.8.    Transition Arrangements; Maxxim Medical Canada.** (a) From and after the Closing Date, the Purchaser, Medline and Argon, with the appropriate personnel, shall cooperate with the Sellers in the establishment of reasonable transition arrangements pursuant to an agreement substantially in the form attached hereto as **Exhibit I** attached hereto (the **"Transition Services Agreement"**).

(b)     Medline shall enter into the Maxxim Canada Option and the Supply Agreement at or prior to the Closing.

**Section 6.9.    Transfer of the Vascular Business.** The Purchaser shall, in a transaction effectively simultaneous with its purchase of the Purchased Assets, assign or otherwise transfer to Argon or its designee all of the Purchased Assets that are, or have been used by, any Seller in connection with the Sellers' Vascular Business. As soon as practicable, but no later than three (3) days after the Closing Date, the Purchaser shall provide written notice to the Sellers that the transfer to Argon or its designee has occurred.

## ARTICLE VII.

## CONDITIONS TO THE SELLERS' OBLIGATIONS

The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by the Sellers) of each of the following conditions on or prior to the Closing Date:

**Section 7.1.    Representations and Warranties.** The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date except for changes expressly permitted by this Agreement and except that any such representation and warranty which is itself qualified as to materiality or similar qualifier shall not be deemed so qualified for purposes of this condition and

any representation and warranty that addresses matters only as of a certain date shall be so true and correct as of that certain date. The Purchaser shall have delivered to the Sellers a certificate signed by an executive officer of the Purchaser, dated the Closing Date, to the foregoing effect.

**Section 7.2. Compliance with Agreement.** The Purchaser shall have performed and complied in all material respects (and in all respects in the case of **Article II**) with all covenants and conditions to be performed or complied with by it on or prior to the Closing Date. The Purchaser shall have delivered to the Sellers a certificate signed by an executive officer of the Purchaser, dated the Closing Date, to the foregoing effect and stating that all actions that the Purchaser is required to have taken on or prior to the Closing Date have been taken.

**Section 7.3. Corporate Documents.** The Sellers shall have received from the Purchaser certified copies of the resolutions duly adopted by the managers or members of the Purchaser approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

**Section 7.4. Entry of the Sale Order.** (a) The Bankruptcy Court shall have entered the Sale Order and (b) the Sale Order shall not have been vacated, reversed, modified, amended or stayed.

**Section 7.5. [Intentionally Omitted]**

**Section 7.6. No Order.** No Governmental Agency shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated by this Agreement or the Ancillary Agreements illegal or otherwise restraining or prohibiting the consummation of such transactions.

**Section 7.7. [Intentionally Omitted]**

**Section 7.8. Ancillary Agreements.** The Purchaser, Medline and Argon, where appropriate, shall have executed and delivered to the Sellers each of the Ancillary Agreements and such agreements shall be in full force and effect as of the Closing.

**Section 7.9. Consideration.** (a) The Purchaser shall have delivered to the Sellers an amount equal to the Purchase Price less the sum of (i) the Escrow Closing Amount, (ii) the Adjustment Escrow Amount and (iii) the portion of the Transaction Taxes and property Taxes described in **Section 2.3**, (b) the Deposit Escrow Agent shall have delivered to the Sellers the Escrow Closing Amount and (c) the Purchaser shall have delivered (i) to the Adjustment Escrow Agent the Adjustment Escrow Amount and (ii) to the appropriate Tax authorities the portion of the Transaction Taxes and property Taxes described in **Section 2.3** in satisfaction of any and all liability of the Sellers for such Taxes.

# ARTICLE VIII.

## CONDITIONS TO THE PURCHASER'S OBLIGATIONS

The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by the Purchaser) of each of the following conditions on or prior to the Closing Date:

**Section 8.1.** **Representations and Warranties.**

(a) **Material Adverse Change. Section 3.9** shall be true and correct on and as of the Effective Date and on and as of the Closing Date with the same effect as though such representation and warranty were made on and as of the Closing Date.

(b) **Other Representations and Warranties.** Except for any inaccuracy that does not constitute a Material Adverse Change, the representations and warranties of the Sellers set forth in this Agreement (other than in **Section 3.9** hereof), shall be true and correct in all respects on the Closing Date with the same effect as though such representations and warranties were made on and as of the Closing Date (other than any representation and warranty that addresses matters as of a certain date, which shall be so true and correct as of that certain date), except for changes permitted by this Agreement and except that any such representation and warranty which is itself qualified as to Material Adverse Change or materiality or similar qualifier shall not be deemed so qualified for purposes of this condition.

(c) **Certificate.** The Sellers shall have delivered to the Purchaser a certificate signed by an executive officer of the Sellers, dated the Closing Date, to the foregoing effect of (a) and (b) of this **Section 8.1.**

**Section 8.2.** **Compliance with Agreement.** The Sellers shall have performed and complied in all material respects (and in all respects in the case of **Article II**) with all covenants and conditions to be performed or complied with by them on or prior to the Closing Date. The Sellers shall have delivered to the Purchaser a certificate signed by an executive officer of each of the Sellers, dated the Closing Date, to the foregoing effect and stating that all actions that the Sellers are required to have taken on or prior to the Closing Date have been taken.

**Section 8.3.** **Consents.** Other than the entry of the Sale Order (which is addressed in Section 8.5), all consents, waivers, authorizations and approvals of any Governmental Agency or any other Person set forth on **Schedule 8.3**, shall have been duly obtained and shall be in full force and effect on the Closing Date.

**Section 8.4.** **Corporate Documents.** The Purchaser shall have received from Sellers certified copies of the resolutions duly adopted by the boards of directors or managers of Sellers approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

**Section 8.5.** **Entry of the Sale Order.** (a) The Bankruptcy Court shall have entered the Sale Order, (b) the Sale Order shall not have been vacated, reversed, modified, amended or stayed and (c) the Sale Order as entered by the Bankruptcy Court, shall not modify the terms and conditions of this Agreement or the transactions contemplated hereby in any material respect that adversely affects the Purchaser.

**Section 8.6.** **[Intentionally Omitted]**

**Section 8.7.** **Ancillary Agreements.** Each Seller shall have executed and delivered to the Purchaser the respective Ancillary Agreements to which it is a party and such agreements shall be in full force and effect as of the Closing.

**Section 8.8.** **No Order.** No Governmental Agency shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated by this Agreement or the Ancillary Agreements illegal or otherwise restraining or prohibiting the consummation of such transactions.

**Section 8.9.** **FIRPTA Affidavit.** Each Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code (the **"FIRPTA Affidavit"**) so that Purchaser is exempt from withholding any portion of the Purchase Price thereunder.

## ARTICLE IX.

## THE CLOSING; EXPENSE REIMBURSEMENT; TERMINATION

**Section 9.1.** **The Closing.** The Closing of the purchase and sale of the Purchased Assets (the **"Closing"**) shall be held on the later of November 10, 2003 and the day that is two (2) Business Days after each of the conditions precedent set forth in **Articles VII** and **VIII** have been satisfied or waived (the **"Closing Date"**). The Closing shall be held at the offices of Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019. At the Closing, all of the transactions provided for in **Article II** (other than **Section 2.4**) and the sale of the Vascular Business pursuant to Section 6.9 shall be consummated on a substantially concurrent basis and shall, upon the occurrence of the Closing, be deemed effective as of 12:01 a.m., New York City time, on the Closing Date.

**Section 9.2.** **Expense Reimbursement.** Subject to entry of the Sale Order, if this Agreement is terminated for any reason other than (i) as a result of a failure of any of the conditions set forth in **Section 7.1 or 7.2** to be satisfied or waived, (ii) pursuant to **Section 9.6(a)** or **9.6(h)** or (iii) by the Sellers pursuant to **Section 9.6(d) or 9.6(g)**, the Purchaser shall be entitled to receive reimbursement of the reasonable, actual out-of-pocket costs and expenses paid or incurred by the Purchaser, commencing as of July 3, 2003 and ending on the date this Agreement is terminated, and directly incident to, under or in connection with this Agreement and the transactions contemplated hereby (including reasonable fees and disbursements of counsel, accountants and financial advisors but not including any filing fee under the HSR Act) in an amount not to exceed $2 million in the aggregate (the **"Expense Reimbursement"**). The

Expense Reimbursement shall be payable as soon as reasonably practicable and as otherwise due following termination of this Agreement in accordance with the foregoing; provided, that, the Purchaser shall have presented to the Sellers fully detailed invoices or other documentation supporting the Expense Reimbursement.

### Section 9.3. Deliveries by the Sellers.

At the Closing, the Sellers shall deliver or procure delivery to the Purchaser of:

(a)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(b)     the Bill of Sale and Assumption Agreement conveying in the aggregate all of the owned personal property of each Seller included in the Purchased Assets, duly executed by each Seller, and such other bills of sale, quitclaim deeds, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer, in form and substance, reasonably satisfactory to Purchaser and its counsel, as are necessary to vest in Purchaser good and marketable title to all of the interest of Sellers in the Purchased Assets (subject to the Permitted Liens);

(c)     the Assignment and Assumption Agreements, duly executed by the relevant Sellers;

(d)     the FIRPTA Affidavit for each Seller;

(e)     certificates of title and title transfer documents to all titled motor vehicles;

(f)     a signed copy of the Sale Order;

(g)     an assignment and assumption agreement with respect to Permits in form and substance reasonably acceptable to Purchaser, whereby Sellers shall assign to Purchaser all of their respective rights in and to any Permits relating to the Purchased Assets or the Business, to the extent such Permits are assignable;

(h)     assignment agreements with respect to all patents and patent applications, trademark registrations and applications, copyright registrations and applications and domain name registrations that are included in the Purchased Assets, in form and substance reasonably acceptable to Purchaser, for recordation with the applicable Intellectual Property registries;

(i)     all Books and Records related to the Business; and

(j)     such other instruments as shall be reasonably requested by Purchaser to vest in Purchaser title in and to the Purchased Assets in accordance with the provisions hereof.

**Section 9.4.     Deliveries by Purchaser.** At the Closing, Purchaser will deliver to Sellers (i) the Assignment and Assumption Agreements duly executed by Purchaser and (ii) an amount equal to the Purchase Price minus (i) the Escrow Closing Amount, (ii) the Adjustment Escrow Amount and (iii) the portion of the Transaction Taxes and property Taxes described in

**Section 2.3,** by wire transfer of immediately available funds to an account which was designated by Sellers at least one Business Day prior to the Closing Date. In addition, at the Closing, the Purchaser will deliver (i) the Adjustment Escrow Amount to the Adjustment Escrow Agent in accordance with the Adjustment Escrow Agreement and (ii) the portion of the Transaction Taxes and the property Taxes described in **Section 2.3** to the appropriate Tax authorities in satisfaction of any and all liability of the Sellers for such Taxes.

        **Section 9.5.**   **Form of Instruments.** To the extent that a form of any document to be delivered hereunder is not attached as an exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to the Purchaser and the Sellers.

        **Section 9.6.**   **Termination.** Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time before the Closing and in no other manner:

        (a)    By mutual written consent of the Purchaser and the Sellers;

        (b)    **[Intentionally Omitted];**

        (c)    By the Purchaser or the Sellers (if such terminating party is not then in breach or default of any of its obligation hereunder), if the Closing has not occurred on or before November 12, 2003;

        (d)    By the Sellers or the Purchaser (if such terminating party is not then in breach or default of any of its obligations hereunder), if the other party is in breach of any of its representations made in this Agreement, or is in breach or default of any of its obligations hereunder, in each case such that the corresponding condition to Closing set forth in **Section 7.1, 7.2, 8.1 or 8.2,** as applicable, would not be satisfied and such breach or default, if curable, is not cured within ten (10) calendar days following written notice to the party committing such breach;

        (e)    **[Intentionally Omitted];**

        (f)    By the Purchaser (provided that the Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in **Article VIII** has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

        (g)    By the Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if the Sellers shall have reasonably determined that one or more conditions set forth in **Article VII** has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied); or

        (h)    By the Purchaser for any other reason not specifically covered by another subsection of this **Section 9.6** as long as concurrent with such termination, the Purchaser releases the Deposit to the Sellers as liquidated damages for the termination and as full and complete

satisfaction for any liability whatsoever under this Agreement or otherwise in connection with the transactions contemplated hereby.

**Section 9.7.    Effects of Termination.**  In the event that this Agreement is terminated pursuant to **Section 9.6**, written notice thereof shall forthwith be given to the other party or parties specifying the provision hereof pursuant to which such termination is made, there shall be no liability on the part of the Sellers or the Purchaser and, except as otherwise expressly provided in this Agreement, all further obligations of the parties hereunder (but not the obligations of the Purchaser under the Confidentiality Agreements) shall terminate.

## ARTICLE X.

## TAXES; INFORMATION

The parties hereto hereby covenant and agree as follows:

**Section 10.1.    Taxes Related to Purchase of Assets.**  Fifty percent, but in no event more than $25,000, of all state and local sales, use, purchase, transfer, transfer gains, franchise, deed, fixed asset, stamp, documentary stamp, excise, value-added, use or other similar taxes and recording charges, including all state and local taxes in connection with the transfer of the Purchased Assets (collectively, **"Transaction Taxes"**) that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets shall be paid by the Purchaser, and the balance of the Transaction Taxes shall be paid by the Purchaser on behalf of the Sellers pursuant to **Section 2.3**.  The Purchaser and the Sellers agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement.  The Purchaser and the Sellers agree to cooperate in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities and to take all reasonable steps necessary to establish any available exemptions from such Transaction Taxes.  Without limiting the foregoing, to the extent applicable, the Purchaser shall complete and execute a resale or other exemption certificate with respect to the inventory items sold hereunder, and shall provide the Sellers with an executed copy thereof.  Notwithstanding the foregoing, the Sellers shall not be responsible for payment of any mortgage recording tax or similar tax pursuant to any financing arrangement Purchaser may undertake in connection with its acquisition of the Purchased Assets.

**Section 10.2.    Real Estate Apportionments and Proration of Real and Personal Property Taxes.**  Real and personal property Taxes and assessments on the Purchased Assets for any taxable period commencing prior to the Closing Date and ending after the Closing Date and all expenses relating to the Owned Real Property and Leased Property of every type and nature as is customary with a closing of this type shall be prorated on a per diem basis between the Purchaser and the Sellers as of the Closing Date.  All such prorations shall be allocated so that items relating to time periods ending prior to the Closing Date shall be allocated to the Sellers and items relating to time periods beginning on and after the Closing Date shall be allocated to the Purchaser; provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code. The amount of all such prorations shall be settled and paid on the Closing Date pursuant to **Section 2.3**, provided that final payments with respect to prorations that are not able to be calculated as of the Closing Date shall be calculated

44

and paid as soon as practicable thereafter. If any of the real or personal property tax rates for the current taxable period are not established by the Closing Date, the prorations shall be made on the basis of the rate in effect for the preceding taxable period, and such proration shall be adjusted upon presentation of written evidence by the Purchaser that the actual Taxes paid differ from the amount assumed on the Closing Date.

**Section 10.3. Information and Cooperation.** The Purchaser and the Sellers agree to furnish or cause to be furnished to each other, as promptly as practicable, such information, access to information and assistance relating to the Business or the assets and liabilities of the Business as is reasonably necessary (i) for preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to tax matters, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer of any governmental or regulatory inquiry relating to tax matters or (ii) in the case of the Purchaser, in connection with the negotiation, settlement, payment or other disposition by or on behalf of the Sellers of any claim or proceeding in the Cases or any other matter relating to the administration or winding up of the Cases.

The Purchaser agrees to retain possession of all files and records related to Taxes delivered to the Purchaser by the Sellers for a period of at least six years from the Closing Date. In addition, from and after the Closing Date, the Purchaser agrees that it will provide reasonable access to the Sellers and their attorneys, accountants and other representatives (after reasonable notice and during normal business hours in a manner so as not to interfere with normal operations) to such files and records relating to Taxes as the Sellers may reasonably deem necessary in connection with any matter referred to in the preceding paragraph.

**Section 10.4. Payment of Taxes.** With respect to any Taxes that constitute Excluded Liabilities (**"Excluded Taxes"**) and which are not paid prior to the Closing Date, except the portion of the Transaction Taxes and property Taxes described in **Section 2.3**, the Sellers shall pay when due all Excluded Taxes the non-payment of which could result in a Lien other than a Permitted Lien on the Purchased Assets after Closing.

## ARTICLE XI.

## EMPLOYEES AND EMPLOYEE BENEFIT PLANS

**Section 11.1. Employment.** (a) **Offer to Hire.** Subject to each of that certain side letter from Purchaser to MMI of even date herewith and that certain side letter from Purchaser, Medline and Argon to MMI of even date herewith, in each case effective as of the Closing Date, the Purchaser shall (i) offer to hire, on comparable terms and conditions (including welfare benefit and retirement savings plans) substantially all of the active Business Employees who are primarily involved in the conduct of the Business on the day immediately prior to the Closing Date and all those inactive Business Employees who are on approved leave on the Closing Date because of jury duty, family or medical leave, sick leave, vacation or military duty or (ii) pay severance benefits to the Business Employees set forth in the preceding clause (i) to which the Purchaser does not offer employment in an amount equal to one week of "Base Salary" for each "Year of Service" (as such terms are defined in the Maxxim Medical, Inc.

45

Amended and Restated Severance Plan, effective February 10, 2003) with the Seller, with a minimum of one week of Base Salary and a maximum of eight weeks of Base Salary. The Purchaser shall be responsible for any obligations or Liabilities to the Business Employees, under the federal Worker Adjustment and Retraining Notification Act (Pub. L. 100-379) and any similar state or local "plant closing" law (**"WARN"**), to the extent that WARN thresholds are exceeded as a result of actions taken by the Purchaser after the Closing Date with respect to the Business Employees. The Sellers shall be responsible for any obligations or Liabilities to the Business Employees under WARN as a result of actions taken by the Sellers prior to the Closing Date.

(b) **Transferred Employees.** The Business Employees who accept and commence employment with Purchaser shall be referred to herein as **"Transferred Employees."** Purchaser's obligation with respect to Transferred Employees shall commence as of the Closing Date.

(c) **Terms of Employment**. For the period ending one year after the Closing Date, the Purchaser will provide Transferred Employees with benefits (other than benefits pursuant to an equity-based program or loan program) under the Purchaser's employee benefit plans which are substantially equivalent in the aggregate to those provided to such employees pursuant to the Plans specified on **Schedule 3.12**. Except as provided otherwise in this **Article XI**, the Transferred Employees' employment with the Purchaser shall be upon such terms and conditions as the Purchaser, in its sole discretion, shall determine, and nothing herein expressed or implied by this Agreement shall confer upon any Business Employee, or legal representative thereof, any rights or remedies, including any right to employment, or for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

**Section 11.2. Employee Welfare Benefit Plans**. The Sellers shall retain responsibility for all hospital, medical, life insurance, disability and other welfare plan expenses and benefits, and for all workers' compensation, unemployment compensation and other government mandated benefits (collectively referred to herein as **"Welfare Type Plans"**), in respect of claims covered by Plans and which are incurred by Business Employees and their dependents prior to the Closing Date. The Purchaser shall be responsible for all claims incurred after the Closing Date by Transferred Employees and their dependents under all Welfare Type Plans that are maintained by the Purchaser for the Transferred Employees and their dependents. For purposes of this **Section 11.2**, claims shall be deemed to have been incurred: with respect to all death or dismemberment claims, on the actual date of death or dismemberment; with respect to all disability claims, other than short-term disability or salary continuation benefits, on the date the claimant became unable to (a) perform his or her regular duties of employment, in the case of an employee claimant or (b) perform the normal day-to-day responsibilities that would reasonably be expected of someone of similar age and lifestyle, in the case of a dependent claimant; with respect to short-term disability or salary continuation claims, on each day for which income benefits are payable to the claimant; with respect to all medical, drug or dental claims, on the date the service was received or the supply was purchased by the claimant; provided, however, that a medical claim relating to a claimant's hospitalization shall be deemed to be incurred on the date the claimant was first hospitalized; and with respect to workers' compensation claims, on the date the incident occurred Transferred Employees shall participate as of the Closing Date under Welfare Type Plans established or provided by the Purchaser

without, to the extent practicable, any waiting periods, any evidence of insurability and any preexisting physical or mental condition restrictions (except to the extent applicable and unsatisfied under the Sellers' Welfare Type Plans).

**Section 11.3. COBRA.** Except as provided below, the Purchaser shall have sole responsibility for "continuation coverage" benefits provided after the Closing Date under the Purchaser's group health plans to all Transferred Employees, and "qualified beneficiaries" of Transferred Employees, for whom a "qualifying event" occurs after the Closing Date. The Sellers shall have sole responsibility for "continuation coverage" benefits provided under the Sellers' group health plans to all employees of the Sellers, and "qualified beneficiaries" of employees of the Sellers, for whom a "qualifying event" has occurred on or prior to the Closing Date; provided, however, that in the event Sellers, or any member of Sellers' controlled group, cease to maintain a group health plan following the Closing Date, the Purchaser shall have sole responsibility for "continuation coverage" benefits under the Purchaser's group health plans to all "M&A qualified beneficiaries". The terms "continuation coverage", "qualified beneficiaries" and "qualifying event" shall have the meanings ascribed to them under Section 4980B of the Code and Sections 601-608 of ERISA, and the term "M&A qualified beneficiaries" shall have the meaning ascribed to it under Treas. Reg. § 54.4980B-9.

**Section 11.4. 401(k) Plan.** MMI is currently a participating employer in a 401(k) plan known as the Maxxim Medical, Inc. 401(k) Plan (the **"Seller Savings Plan"**) which provides benefits for certain of the Transferred Employees. Effective as of the Closing Date, the Purchaser shall adopt or provide a savings plan or plans with a cash or deferred arrangement that is qualified under Section 401(a) of the Code on behalf of the Transferred Employees who participated in the Seller Savings Plan (the **"Purchaser Savings Plan"**) and that expressly provides that: (a) Transferred Employees who were participants in the Seller Savings Plans immediately prior to the Closing Date will continue their participation in the Purchaser Savings Plan as of the Closing Date without interruption and (b) all Transferred Employees will have their months and years of service with the Sellers and their Affiliates which is recognized under the Seller Savings Plans credited for eligibility, vesting and other purposes for which service is taken into account under the Seller Savings Plans. As soon as practicable after the Closing Date, the Sellers shall cause the assets of the trust under the Seller Savings Plan in respect of the aggregate benefits accrued (including unvested benefits) under the Seller Savings Plan by the Transferred Employees to be valued and transferred to the trust under the Purchaser Savings Plan; provided, however, that the Purchaser shall first have provided the Sellers with either a copy of a favorable determination letter from the IRS or an opinion of counsel reasonably satisfactory to the Sellers regarding the qualification, in form, of the Purchaser Savings Plan under Section 401(a) of the Code. The assets to be transferred from the trust under the Seller Savings Plan pursuant to this **Section 11.4** shall be in cash or, to the extent mutually agreed to by the Sellers and the Purchaser, a combination of cash, securities and other property; provided, however, that any outstanding loans attributable to the accounts of the Transferred Employees shall be transferred in kind. The actual amount transferred from the trust under the Seller Savings Plan shall be adjusted to reflect any normal and reasonable administrative expenses properly attributable to the accounts of the Transferred Employees during the period following the Closing Date. At the time the assets that are held in the trust with respect to the Transferred Employees under the Seller Savings Plan are paid to the trust under the Purchaser Savings Plan, the Purchaser Savings Plan shall assume all liabilities of the Seller Savings Plan for the

applicable benefits so transferred, and such transfer shall be in full discharge of all obligations of the Seller Savings Plan in respect thereof. During the period following the Closing Date and preceding the transfer of assets and liabilities pursuant to this **Section 11.4**, (i) the Sellers shall take such action as is necessary to prevent a default by any Transferred Employee with an outstanding loan from the Seller Savings Plan unless and until such Transferred Employee fails to make a timely payment on such loan and (ii) the Purchaser will cooperate with and assist the Sellers or their designee in the continued administration of the Seller Savings Plan, including, subject to the consent of the Transferred Employee, collecting and remitting to the trustee of the Seller Savings Plan payroll deductions relating to any outstanding loans. Notwithstanding the above, the amount transferred to the trust under the Purchaser Savings Plan shall in no event be less than the amount necessary to satisfy the requirements of Section 414(l) of the Code and the Sellers shall have first provided the Purchaser with an officer's certificate or an opinion of counsel to the effect that the Sellers either (A) have received a recent favorable determination letter as to the qualification of the Seller Savings Plan under the Code, and nothing has occurred since the date of such letter which would cause the loss of such qualification or (B) substantially complies by its terms with the relevant qualification provisions of the Code, and the plan sponsor has timely applied for a favorable determination letter with respect to Seller Savings Plan, and will make whatever changes to the plan as is requested by the IRS as a condition of qualification.

### Section 11.5. [Intentionally Omitted]

**Section 11.6. Severance Benefits following the Closing Date.** The Purchaser agrees that in the event any Transferred Employee is terminated by the Purchaser, other than for cause, during the one-year period immediately following the Closing Date, the Purchaser will provide such person with a severance benefit which is not less than one week's salary for each year of such person's service with the Sellers and the Purchaser, with a minimum severance benefit of one week's salary and a maximum severance benefit of eight weeks' salary.

**Section 11.7. No Third Party Beneficiaries.** The parties agree that nothing contained in this **Article XI** shall be deemed to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

### ARTICLE XII.

### MISCELLANEOUS PROVISIONS

**Section 12.1. Representations and Warranties.** The representations and warranties of the parties to this Agreement made in this Agreement, subject to the exceptions thereto, will not be affected by any information furnished to, or any investigation conducted by, any of them or their representatives in connection with the subject matter of this Agreement.

**Section 12.2. Expiration of Offer.** The Purchaser's commitment and offer hereunder and the agreements contained herein shall terminate on the earlier of (a) October 28, 2003 if the Purchaser has not been selected by the Sellers at the auction conducted by the Sellers as the successful bidder or the entity deemed to have the second highest or best bid and (b) November 12, 2003 if the Purchaser has been selected as the successful bidder or the entity

deemed to have the second highest or best bid and (i) this Agreement has not been accepted by the Sellers and executed and delivered to the Purchaser prior to or on such date or (ii) the Purchaser, in its discretion, has not agreed to extend the November 12, 2003 date of expiration.

**Section 12.3. Notices.** All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) when sent to the recipient by telecopy (receipt electronically confirmed by sender's telecopy machine) if during normal business hours of the recipient, otherwise on the next Business Day, (c) one (1) Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid) or (d) seven (7) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications will be sent to the Sellers and to the Purchaser at the addresses indicated below:

If to the Purchaser:

MaxMed Acquisition, LLC
One Medline Place
Mundelein, IL 60060
Facsimile No. (847) 949-2633
Attention: Alex Liberman

and

MaxMed Acquisition, LLC
272 East Deerpath Road, Suite 350
Lake Forest, IL 60045
Facsimile No. (847) 482-9215
Attention: David J. Koo

With copies(which shall not constitute notice) to:

Latham & Watkins LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004
Facsimile No. (212) 637-2201
Attention: Eric A. Stern, Esq.

and

Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, IL 60601
Facsimile No. (312) 660-0553
Attention: H. Kurt von Moltke, Esq.

49

| | |
|---|---|
| If to Medline: | MaxMed Acquisition, LLC<br>One Medline Place<br>Mundelein, IL 60060<br>Facsimile No. (847) 949-2633<br>Attention: Alex Liberman |
| With a copy (which shall not constitute notice) to: | Latham & Watkins LLP<br>555 Eleventh Street, N.W.<br>Suite 1000<br>Washington, D.C. 20004<br>Facsimile No. (212) 637-2201<br>Attention: Eric A. Stern, Esq. |
| If to Argon: | Argon Medical Devices, Inc.<br>272 East Deerpath Road, Suite 350<br>Lake Forest, IL 60045<br>Facsimile No. (847) 482-9215<br>Attention: David J. Koo |
| With a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601<br>Facsimile No. (312) 660-0553<br>Attention: H. Kurt von Moltke, Esq. |
| If to the Sellers: | Maxxim Medical, Inc.<br>477 Commerce Blvd.<br>Oldsmar, FL 34677<br>Attention: Chief Executive Officer<br>Facsimile No. (813) 855-2083 |
| With a copy (which shall not constitute notice) to: | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attention: Cornelius T. Finnegan, III<br>Facsimile No. (212) 728-8111 |

or to such other address as any party hereto may, from time to time, designate in writing delivered pursuant to the terms of this Section.

**Section 12.4. Amendments.** The terms, provisions and conditions of this Agreement may not be changed, modified or amended in any manner except by an instrument in writing duly executed by each of the parties hereto.

**Section 12.5. Assignment.** This Agreement is binding upon and inures to the benefit of the successors and assigns of each party to this Agreement (including any trustee appointed in respect of the Sellers under the Bankruptcy Code), but no rights, obligations or liabilities under this Agreement may be assigned by any party without the prior written consent of the other parties hereto, except as provided in **Section 2.11** and except that the Purchaser shall have the right, on or prior to the Closing Date, to assign all or any portion of its rights under this Agreement to one or more wholly owned subsidiaries of the Purchaser; provided that no such assignment shall relieve the Purchaser of its obligations hereunder.

**Section 12.6. Announcements.** All press releases, notices to customers and suppliers and other announcements prior to the Closing Date with respect to this Agreement and the transactions contemplated by this Agreement shall be approved by both the Purchaser and MMI prior to the issuance thereof; provided that any party may make any public disclosure it believes in good faith is required by law or regulation (in which case the disclosing party shall advise the other party (which shall be MMI in the case of disclosure proposed to be made by the Purchaser and the Purchaser in the case of disclosure proposed to be made by any of the Sellers) prior to making such disclosure and provide such other party an opportunity to review and comment on the proposed disclosure).

**Section 12.7. Expenses.** Except as otherwise set forth in this Agreement, each party to this Agreement shall bear all of its legal, accounting, investment banking and other expenses incurred by it or on its behalf in connection with the transactions contemplated by this Agreement, whether or not such transactions are consummated.

**Section 12.8. Entire Agreement.** This Agreement, the Ancillary Agreements, the Confidentiality Agreements and the Confidentiality Agreement dated August 1, 2002 between Medline and the Parent or any Affiliate thereof constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede and are in full substitution for any and all prior agreements and understandings between them relating to such subject matter. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 12.9. Descriptive Headings.** The descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

**Section 12.10. Counterparts.** For the convenience of the parties, any number of counterparts of this Agreement may be executed by any one or more parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original, but all of which shall constitute, and shall be deemed to constitute, in the aggregate but one and the same instrument.

**Section 12.11. Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of

New York, without giving effect to the principles of conflicts of laws thereof. For so long as the Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the Bankruptcy Court. After the Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the courts of the County of New York, State of New York or of the United States of America for the Southern District of New York.

**Section 12.12. Construction**. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any references to any federal, state, local or foreign statute or law will also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless the context otherwise requires: (a) a term has the meaning assigned to it by this Agreement; (b) an accounting term not otherwise defined has the meaning assigned to by GAAP; (c) the word "or" is not exclusive; (d) the words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation"; (e) words in the singular include the plural and in the plural include the singular; (f) provisions apply to successive events and transactions; and (g) "$" means the currency of the United States of America.

**Section 12.13. Substantive Consolidation**. The Purchaser hereby acknowledges that the Cases may be substantively consolidated and agrees that the Sellers shall not be deemed to have breached any representations, warranties or covenants hereunder solely as a result of such substantive consolidation.

**Section 12.14. Severability**. In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

IN WITNESS WHEREOF, the Sellers and the Purchaser have executed and delivered this Agreement as of the day and year first written above.

**MAXXIM MEDICAL, INC.,**
**a Delaware corporation**

By: _____
Name:
Title:


**FABRITEK LA ROMANA, INC.**
**MAXXIM INVESTMENT MANAGEMENT, INC.**
**MAXXIM OPERATIONS EAST, INC.**
**MAXXIM OPERATIONS WEST, INC.**


By: _____
Name:
Title:


**MAXXIM MEDICAL, LLC**


By: _____
Name:
Title:


**MAXMED ACQUISITION, LLC**


By: _____
Name:
Title:


**MEDLINE INDUSTRIES, INC.**
Solely with respect to Sections 5.9, 6.6, 6.7, 6.8,
6.9, 7.8, 11.1, 12.3 and 12.8 herein


By: _____
Name:
Title:

**ARGON MEDICAL DEVICES, INC.**
Solely with respect to Sections 5.9, 6.6, 6.7, 6.8,
6.9, 7.8, 11.1 and 12.3 herein


By: _____
Name:
Title: